UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 23 CR 54-3 |
| v. | |
| DAVID R. LIRA | Judge Mary M. Rowland |

**GOVERNMENT'S OBJECTIONS TO THE PRESENTENCE
INVESTIGATION REPORT AND SENTENCING MEMORANDUM**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... 3

OVERVIEW .................................................................................... 4

BACKGROUND ............................................................................... 5

*Defendant's Role at GK* ................................................................. 5

*GK's Financial Issues* .................................................................. 6

*Defendant's Clients Complaints About Not Being Paid* ........................... 7

*The Lion Air Lawsuits* .................................................................. 9

*Lies to the Victim Clients* ............................................................ 10

*Defendant's Resignation from GK* .................................................. 15

*Defendant's Lies to Judge Durkin* ................................................. 16

*The Advisory Guidelines Range* .................................................... 19

*The Government's Guidelines Calculation* ......................................... 24

*Base Offense Level* .................................................................... 24

*Increase Based On Loss* .............................................................. 30

*The Offense Involved More Than 10 Victims* ..................................... 30

*Defendant Knew Or Should Have Known That A Victim Of The Offense Was A Vulnerable Victim* ...................................................................... 30

*Abuse of Trust and Use of a Special Skill* ....................................... 32

*The Obstruction Guideline* .......................................................... 33

    The Nature and Circumstances of the Offense ................................. 35

    History and Characteristics of Defendant ...................................... 41

    The Need to Promote Respect for the Law, ................................... 42

    Provide Just Punishment, and Afford Adequate Deterrence ................. 42

    The Need to Avoid Unwarranted Sentencing Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct ................. 43

CONCLUSION ............................................................................... 45

# TABLE OF AUTHORITIES

**Cases**            **Page(s)**

*Gall v. United States*, 552 U.S. 38 (2007) ................................................ 35

*United Sates v. Polichemi*, 219 F.3d 698 (7th Cir. 2000) ......................... 33

*United States v. Arjoon*, 964 F.2d 167- (2d Cir. 1992) ............................. 26

*United States v. Arroyo*, 75 F. 4th 705 (7th Cir. 2023) ............................ 42

*United States v. Brennan*, 395 F.3d 59 (2d Cir. 2005) ........................ 26, 27

*United States v. Brown*, 880 F.3d 399 (7th Cir. 2018) ............................ 42

*United States v. Brownell*, 495 F.3d 459 (7th Cir. 2007) ......................... 30

*United States v. Cavera*, 550 F.3d 180 (2d Cir. 2008) ............................. 42

*United States v. Celafu*, 85 F.3d 964 (2d Cir. 1996) ................................ 27

*United States v. Ferrara*, 334 F.3d 774 (8th Cir. 2003) ........................... 26

*United States v. Heffernan*, 43 F.3d 1144 (7th Cir. 1994) ....................... 42

*United States v. Johns*, 686 F.3d 438 (7th Cir. 2012) .............................. 31

*United States v. Julian*, 427 F.3d 471 (7th Cir. 2005) ............................. 31

*United States v. Lohan*, 945 F.2d 1214 (2d Cir. 1991) ............................ 26

*United States v. Murtha*, 803 F. App'x 425 (2d Cir. 2020) ...................... 43

*United States v. Nolan*, 136 F.3d 265 (2d Cir. 1998) ............................... 26

*United States v. Parolin*, 239 F.3d 922 (7th Cir. 2001) ........................... 32

*United States v. Rumsavich*, 313 F.3d 407 (7th Cir. 2002) ...................... 31

*United States v. Sims*, 329 F.3d 937 (7th Cir. 2003) ............................... 31

*United States v. Tankersley*, 296 F.3d 620 (7th Cir. 2002) ................. 28, 34

*United States v. Trudeau*, 812 F.3d 578 (7th Cir. 2016) ......................... 28

*United States v. White*, 737 F.3d 1121 (7th Cir. 2013) ............................ 31

## Statutes

18 U.S.C. § 228 ....................................................................................... 25

18 U.S.C. § 3553 ..................................................................................... 25

18 U.S.C. § 3553(a) ........................................................................ 4, 34, 43

18 U.S.C. § 3553(a)(2) ............................................................................ 35

18 U.S.C. § 3553(a)(6) ............................................................................ 44

## Rules

U.S.S.G. §2J1.2 ...................................................................................... 34

U.S.S.G. §3B1.3 ................................................................................. 32, 33

U.S.S.G. §4C1.1(a)(9) ............................................................................ 32

U.S.S.G. § 2B1.1 ................................................................... 24, 28, 29, 30

U.S.S.G. § 2J1.2(a) ................................................................................. 34

U.S.S.G. § 3A1.1(b)(1) ........................................................................... 31

The UNITED STATES OF AMERICA, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, hereby submits its objections to the Presentence Investigation Report ("PSR") and Sentencing Memorandum. To account for the seriousness of David Lira's ("defendant") conduct and for the other reasons set forth below, the government recommends that the Court sentence defendant to a term of 36 months' imprisonment. This sentence is sufficient, but not greater than necessary, to satisfy the principles set forth in the Sentencing Guidelines and 18 U.S.C. § 3553(a).

## OVERVIEW

Defendant was a renowned plaintiff's lawyer who cared more about his own career than protecting the interests of his clients. Defendant lied to his clients all the while knowing that his father-in-law and law firm partner, Thomas Girardi, was stealing from them. Worse yet, defendant did nothing to stop the theft. He never notified Judge Durkin, his clients, his local counsel, or anyone else that Girardi was a thief. Instead, defendant fled the firm. In an effort to protect his own career, defendant then tried to distance himself from Girardi's theft—repeatedly lying to Judge Durkin. Defendant still fails to acknowledge the obvious: he knew Girardi was a thief. After holding an evidentiary hearing, Judge Durkin reached the same conclusion: "Griffin and Lira *knew from the start* that Girardi did not pay the clients when he was supposed to. And *they knew* at least as early as May 12, 2020 that Girardi was lying to the clients about the reasons for the failure to pay the full amounts." *See In Re Lion Air Flight JT 610*, No. 18 C 7686, Dkt. No. 1450, at 8-9 (emphasis added and attached hereto as Exhibit A).

## BACKGROUND

In 2020, by the time that the settlements at issue were funded, defendant knew that Girardi and the law firm of Girardi Keese ("GK") were in financial trouble and had not been paying clients. When the settlements at issue were funded, defendant knew that Girardi had been lying to other clients about settlement payments delays and similarly began lying to the Lion Air Victim Clients ("the Victim Clients"). Defendant then repeated those lies. Defendant had other settlements routed outside of GK shortly before he left the firm because he knew Girardi would steal that money too. Defendant left the firm calling Girardi a "thief" on the way out, but continued to monitor (via his GK email account which he still had access to) the fact that the Victim Clients had not been paid. Then when asked point blank about what defendant knew and when about Girardi, defendant lied. These facts all show that defendant knew what Girardi was doing, but did nothing to stop the theft.

### *Defendant's Role at GK*

By 2020, defendant had been a licensed lawyer for 32 years and had worked at GK for approximately 21 years. He was Girardi's son-in-law. Girardi also represented to lenders with defendant's knowledge and approval that defendant was Girardi's successor at the law firm, as reflected by the July 25, 2017 successor agreement below:



July 25, 2017

**SUCCESSOR AGREEMENT**

It is hereby agreed that if THOMAS V. GIRARDI is unable to continue as the

head of Girardi|Keese for any reason, DAVID R. LIRA assumes all the responsibilities

that Thomas has including responsibility for the repayment of loans or advances.

THOMAS V. GIRARDI    DAVID R. LIRA

Along with Girardi, defendant was also one of three lawyers at the law firm who were signatories on the client trust account. For his work, defendant was paid considerably: he made more than $4.3 million between 2015 and 2020 and was the highest paid employee at GK during that time period. Still, by early 2020, defendant was borrowing against his own retirement savings account.

### GK's Financial Issues

As defendant was well aware, GK faced its own financial struggles. In the fall of 2019, GK secured an $8 million line of credit with a litigation financing firm that previously provided financing to the firm. As part of that agreement, GK agreed to remit its attorney's fees on the Lion Air cases to the lender; in other words, GK was not entitled to any attorney's fees from its work on those cases. Defendant was aware

of this agreement. Defendant was also aware that another lender had sued GK in 2019 for failing to pay back a $5 million loan. *See Stillwell Madison LLC v. Girardi & Keese et al.*, No. 2:19 C 3563 (D. Ariz.). And, defendant was also aware that in the summer of 2019, a former GK client sued Girardi alleging theft.

In the fall of 2019, defendant communicated with Christopher Kamon (head of accounting at GK) and other GK lawyers about the firm's financial struggles. The firm's financial condition became so dire that in October 2019, defendant emailed Kamon, asking, "Will we make payroll?" That same month, defendant was on internal GK emails about GK's bank accounts being levied. In November 2019, defendant emailed Kamon stating that GK's "Amex is shut down." And, in December 2019, Kamon emailed defendant stating, "I don't even know if we can cover payroll today." Around the same time, defendant started looking for a new job.[1]

### Defendant's Clients Complaints About Not Being Paid

Contemporaneous with defendant's search for a new job and GK's financial troubles, defendant continued representing clients and settling cases on their behalf. Namely, by mid-2019, defendant settled three cases that were funded at the time of settlement. The clients in these matters, however, did not receive their settlement funds when they should have. Beginning in late November 2019, those clients and

---

[1] Attached as Exhibit B are examples of these communications between defendant and others at GK about the financial issues that GK experienced.

some family members began emailing and calling defendant directly demanding their settlement payments and asking questions about the delays[2]:



February 24, 2020

David R. Lira
Girardi & Keese
1126 Wilshire Blvd.
Los Angeles, CA 90017

Dear Mr. Lira,

In late November, you emailed my son, ▮▮▮ notifying him that the medical liens had been finalized and that a check in the amount of $104,000 would be sent to him. You then avoided and stalled by stating you were, "waiting for the check to be signed." It is now late February and ▮▮▮ has still not received his check.

We have contacted you and your firm numerous times about this matter both by phone and email. Our repeated attempts to secure this money have been met with nothing but delay and obfuscation from your office.

Your failure to pay to ▮▮▮ the full amount breaks both your fiduciary responsibilities and our attorney representation agreement.

If we do not receive payment of these monies owed within seven business days from receipt of this letter, we will contact The California Bar Association and file a formal complaint against you and your firm.

These clients also threatened to report Girardi and defendant to the California State Bar Association if they did not receive their settlement monies. Between November 2019 and March 2020, these clients repeatedly reached out to defendant and Girardi asking for their settlements, but were continuously put off by both defendant and Girardi. And, even worse, Girardi affirmatively lied to these clients. Defendant knew that as well and confirmed to Kamon on March 4, 2020 in an email that "Tom is lying to clients."

---

[2] Attached as Exhibit C are examples of these client complaints directed to Girardi and defendant.

```
From: David Lira
Sent: Wednesday, March 04, 2020 4:19 PM
To: Chris K. Kamon
Subject: Re: Lion air money should have been tired today.

Worse then bad. Tom is lying to clients. I am meeting with him as soon as I can.
```

### The Lion Air Lawsuits

In March 2020, the Lion Air settlements began funding. Boeing agreed to pay a combined total of approximately $11 million in settlement, and under the terms of agreements, the clients were entitled to approximately $7.5 million (with each plaintiff entitled to various amounts under each settlement agreement). Defendant's name was on the signature blocks when GK and their local counsel filed motions for court approval. According to the settlement terms that Judge Durkin approved in court orders, the settlement money was to be transferred from Boeing to GK, and then paid to the Victim Clients "as soon as practicable."

That did not happen, however. Instead of that money going to the Victim Clients, it went to pay the clients who had been complaining to defendant and Girardi for months, in addition to other GK clients. Defendant signed the checks for two of those clients on March 11, 2020—the day that the first of the Victim Clients' settlements came into GK's client trust account. Immediately thereafter, at Girardi's direction, Kamon transferred Boeing settlement money from GK's client trust account to its operating account. Ultimately, the Victim Clients' settlement money that was transferred to the firm's operating account was used to pay the firm's payroll, other clients who were due their own settlement payments from the firm, and

9

other expenses, including American Express credit card bills for lawyers at the firm. By the end of March 2020, defendant knew that the Victim Clients had not yet been paid. At the same time, in March 2020, defendant also signed a $500,000 check that moved money from the firm's client trust account (i.e., the account that received the Victim Clients' settlement funds) to the firm's operating account. Defendant was a co-signor on the trust account and could have requested records from the bank when he realized that the Victim Clients were not being paid. But he never did so.

GK's financial troubles also continued even after it received the Victim Clients' settlement funds. Most notably, in mid-April 2020, a former client obtained an $11 million judgment against GK related to a lawsuit filed in 2019 alleging that Girardi misappropriated the former client's settlement funds years earlier. When Kamon heard about the judgment secondhand, defendant confirmed to Kamon that it was true. Kamon then asked defendant, "Is BK [bankruptcy] even an option right now?" Defendant responded, "We are exploring all alternatives," revealing just how dire the financial condition of the firm was at that time.

### *Lies to the Victim Clients*

In April 2020, the Victim Clients began reaching out to defendant and other GK personnel about their settlements. In early April 2020, Victim B reached out asking for a $40,000 "loan." By this point in time, Victim B's settlement had funded and there no reason to provide her with a loan; rather, she was entitled to her settlement money. Victim B had no idea at this point in time that her settlement had

10

actually funded. Instead of telling Victim B that her settlement had funded, defendant did nothing as Girardi sent Victim B only $40,000, letting her believe that it was a loan. As the month progressed, defendant made affirmative misrepresentations to the Victim Clients. On April 17, 2020, defendant emailed the Victim Clients directly and attempted to shift the blame to the Covid pandemic:

| | |
|---|---|
| **From:** | David Lira <dlira@girardikeese.com> |
| **To:** | ███████████████████████ |
| **BCC:** | kgriffin@girardikeese.com |
| **Sent:** | 4/17/2020 1:36:00 PM |
| **Subject:** | Your cases |

Good morning ████████████

First, I want to thank you for your patience during this unfortunate pandemic. Our office has been closed since March 16th as a result of government mandates. It has been extremely difficult to run the day-to-day law office operations without employees present. Rest assured we are doing everything we can with limited staff. Tom Girardi has final say as to all wire transfers. It is "on his to do list." Our office is closed today due to a massive sanitation/disinfectant effort due to a COVID scare this week. I will keep you advised I hope you and your families are safe and sound. David

Less than a week later, defendant sent another email to the Victim Clients that again used the Covid pandemic as an excuse for GK's nonpayment of their settlement money:

**From:** David Lira
**Date:** Wednesday, April 22, 2020 at 1:24 PM
**To:** ████████
**Cc:** ██████████████████████ Private Mail
**Subject:** RE: Your cases

Dear ██████

We are still under the government mandate to stay at home. The Governor has hinted at re-opening the economy by May 15th. We will endeavor to wire funds by early May if not sooner. I hope you and your families are well. David

As defendant knew, the Covid pandemic was not the reason that the Victim Clients had not received their settlement payments. Defendant continued to go into

11

the office during this time period and GK (as reflected in the chart below) had the ability to make wire transfers and other financial transactions despite the pandemic:



The reason that the Victim Clients had not received their settlement money was because Girardi had stolen that money. By the time of these emails, defendant also knew that fact, yet said nothing to anyone outside GK. While defendant told Girardi to pay the Victim Clients, he did so to "cover my ass," as reflected in a text message that defendant sent to a GK consultant.

> So you know, I send every email from Lion air clients to Tom with a Request for payment. I have sent him memos to cover my ass. That is why we aren't talking at the moment.

12

By May 2020, the Victim Clients continued to make demands about their settlement funds. To stave off further questions, Girardi decided to pay them half of what they were owed. Defendant knew that Girardi was not sending the Victim Clients all of their money, but again did nothing. After receiving the partial payment, the Victim Clients started asking more questions of Girardi, defendant, and other GK personnel.

In response, Girardi wrote false letters—in one instance falsely claiming that there were tax issues—to stave off the Victim Clients' inquiries.[3] Girardi's legal assistant sent the false letters to defendant who responded "These are smart people. There are no tax issues." On May 14, 2020, defendant inquired of Girardi's legal assistant whether the false letters had been sent. Girardi's legal assistant sent defendant revised versions of the letters that took out the "tax issues" lie, but included other lies including the following separate letters to three of the Victim Clients:

> [To Victim B:] We made an agreement with Boeing that all of the cases would be resolved. They gave us special authorization to distribute 50%. I feel fairly confident the balance will be done within 30 days.

* * *

> [To Victim C:] I got enough of the problem taken care of so we were able to release 50% of the settlement. I feel pretty good about the next payment. I am working very hard.

* * *

---

[3] Attached as Exhibit D are these communications.

[To Victim D:] There are many confidential issues that I am solving. While I agree with two of the plaintiff's lawyers, we will not distribute until they settle because they knew our cases were settling higher than theirs. I need about 30 days. Believe me, I am working very hard.

Girardi's legal assistant sent each of those revised false letters to defendant as attachments to three separate emails. In each of those three emails, she asked defendant, "David: Is this ok?" Defendant responded within minutes to each of those three emails with the same one-word answer: "Ok." Understanding that defendant had approved those versions, Girardi's legal assistant began emailing them to the clients. But defendant then had second thoughts. He knew that the false explanations in even those toned-down versions were still too obvious. So, a few minutes later, he emailed Girardi's legal assistant, "I wouldn't send any of these letters. They are lies and can come back to haunt Tom." The legal assistant told defendant, "Oh no . . . I sent the first two already." Defendant responded, "Tom will have to be ready for an onslaught on [sic] inquiries. They all talk and all other [non-GK client] victims have received their compensation."

Aside from complaining to Girardi's legal assistant, defendant did nothing to correct the lies he helped Girardi and the firm spin. He did not tell his clients that the letters that they received, which he reviewed and initially approved, were false, even though defendant later admitted in his contempt hearing testimony that he *knew* the letters were false. Defendant also did not inform Judge Durkin or his local counsel on this matter that Girardi had stolen the settlement funds and was lying to the Victim Clients. Worse yet, the fifth settlement at issue funded in early June 2020

after defendant knew that Girardi had not paid the other four and had been lying to them. Defendant again did nothing and let the last settlement at issue fund. That settlement money was eventually stolen as well. At the same time, defendant represented other Lion Air victims; instead of having those clients' settlements sent to GK, defendant routed that settlement money to the referring attorney's client trust account. The reason was simple: defendant knew that if those funds went to GK, they would be stolen too, so defendant re-directed them.

### *Defendant's Resignation from GK*

By June 2020, defendant knew that Girardi was lying to the Victim Clients and had misappropriated their settlement money. On June 13, 2020, defendant met with Girardi in Girardi's office and told Girardi that he was leaving GK. According to defendant's testimony at the evidentiary hearing before Judge Durkin, defendant told Girardi that Girardi was a "thief," although defendant equivocated when pressed on whether he conclusively knew that Girardi had taken the money. Even crediting defendant's testimony that he was not in fact sure if Girardi stole the settlement money, at a minimum, he had suspicions and this explanation closes its eyes to the clear facts (i.e., the lies and non-payments to clients) showing that Girardi was in fact stealing from clients to address the financial fiscal woes that had befallen GK. The fact remains that defendant left the firm knowing that Girardi had not paid the Victim Clients fully and was lying to them about where the money was. Defendant also never told the Victim Clients that he was leaving the firm. Defendant made

15

approximately $275,000 for his work at GK in 2020 before he left and made another $100,000 as a signing bonus at his new firm.

### Defendant's Lies to Judge Durkin

After defendant left GK, he continued to have access to his GK email account and knew that the Victim Clients continued to complain about not having been paid. In the email below from October 30, 2020—almost five months after he left GK— defendant was still checking his GK email and forwarded a message about Girardi's non-payment to his new work email address:



Approximately six weeks later, on December 14, 2020, Judge Durkin held a telephonic status conference after learning that GK had not paid the Victim Clients, despite the court orders entered nine months beforehand. During that hearing,

16

defendant addressed Judge Durkin directly. First, defendant referenced his own Lion Air clients (i.e., the ones whose settlement payments defendant routed to the referring lawyer to keep them from going to GK): "So the four I was directly involved with in terms of the communications, all four have been funded, releases signed, and the clients paid. And I have wire confirmation from Wells Fargo on those four." Defendant next addressed the Victim Clients (who were the subject of that status hearing): "I cannot speak to the other four that are at issue today, as I did not have the day-to-day involvement. And, quite frankly, I didn't know when the funding came in on those - - those four." Defendant's statement about not knowing when the first four of the Victim Clients' settlements funded was false. Defendant had lied to the Victim Clients and knew that Girardi had not paid them their full settlements.

Knowing that there was an email showing that defendant received notice when the Victim Clients' settlements funded, defendant admitted to knowing when the Victim Clients' settlements funded during the evidentiary hearing before Judge Durkin one year later. However, defendant continued to lie in an attempt to distance himself from Girardi. During the evidentiary hearing, defendant denied knowing about other GK clients—aside from the Victim Clients—whose settlement payments had been delayed more than a month and a half:

| THE COURT: | Had this occurred in the past in your experience at Girardi Keese where there had been delays between the funding of a settlement or verdict and the payout to the clients? |
| --- | --- |
| LIRA: | The only -- the only case I remember where there was a delay, it was because there was an MSA issue, a Medicare set-aside issue, and multiple Medi-Cal, and the client wasn't happy enough with the speed of the delivery of the settlement. That's the one case I remember out of thousands. |
| THE COURT: | So out of thousands, this is the only one as far as you know where you had a delay of -- at this stage of a month and a half? |
| LIRA: | As far as I'm aware, that's correct. |

Defendant further lied when he denied that Girardi had lied to GK clients, aside from the false letters Girardi sent to the Victim Clients:

| QUESTION: | Are you aware of any other occasion besides the letters we've seen [from GIRARDI to certain of the Client Victims] where Mr. Girardi lied to a client? |
| --- | --- |
| | [Objection made and overruled] |
| LIRA: | No. |

These statements were clearly false, and defendant knew it when he testified. Defendant received numerous emails indicating that his clients had been complaining for months that their settlement payments were delayed, but to no avail. Defendant acknowledged that Girardi had not paid these clients and had lied to them. Defendant tried to distance himself from Girardi in an attempt to save face. Judge Durkin found defendant's testimony incredible on this point, and the evidence detailed above corroborates Judge Durkin's finding.

### *The Advisory Guidelines Range*

The government objects to the Presentence Investigation Report's ("PSR") calculation of the advisory guidelines range. The PSR calculated defendant's guidelines range to be 10 to 16 months' imprisonment based on an adjusted offense level of 12 combined with criminal history category I, as detailed below:

| | |
|---|---|
| Base Offense Level (§§ 2J1.1(a)(1), 2X5.1, 2J1.2(a)) | 14 |
| Substantial Interference with Justice (§ 2J1.2(b)(2)) | 3 |
| Acceptance of Responsibility (§ 3E1.1) | -3 |
| Zero-Point Offender (§ 4C1.1) | <u>-2</u> |
| Total | 12 |

The government objects to the PSR's use of the obstruction guideline in § 2J1.2(a) to determine the base offense level. The basis for the contumacious conduct is Girardi's theft from the Victim Clients. The contempt conviction is intertwined with the fact that the Victim Clients did not receive their full settlement. Girardi embezzled that money. But Girardi could not do it on his own. Defendant helped perpetuate this fraud by lying to the Victim Clients and covering for Girardi. Defendant knew that Girardi was not paying clients and lying to them even before the Boeing settlements funded. Defendant also knew that the firm was having trouble paying bills and making payroll.

Then, after the Boeing money funded, the firm was able to pay two of defendant's other clients immediately who had been complaining for months about

19

not receiving their settlement funds, and had threatened to report defendant to the California bar. While defendant's other clients were being paid, the Victim Clients started complaining that they were not being paid. Girardi then lied to those clients, and defendant repeated those lies to them. Defendant also knew that Girardi kept lying to the Victim Clients and did nothing. When defendant left GK, he called Girardi a thief. And when Girardi was exposed as a thief, defendant repeatedly lied to Judge Durkin to distance himself from Girardi. Defendant cannot credibly claim that he did not know what was going on at GK: Girardi was taking money that rightfully belonged to the Victim Clients and using it for other purposes. In doing so, both Girardi and defendant violated Judge Durkin's court orders requiring prompt payment to the Victim Clients.

The PSR concluded that "defendant indeed obstructed justice" but "was not involved in the intentional defrauding of Lion Air Victim settlement funds." ¶ 40. In arriving at this conclusion, the PSR relied on the following: (1) Judge Durkin found that "defendant did not repeat the lies Thomas Girardi told the victim clients about the availability of their settlement proceeds"; (2) GK had the money available to pay the Victim Clients and defendant's own issuance "of certain checks does not establish that the defendant intended to misappropriate monies owed to said victims"; (3) defendant "confronted Thomas Girardi about the need to disburse settlement proceeds to the Lion Air Victims and eventually resigned from Girardi & Keese, calling Girardi a 'thief'"; and (4) defendant "expressed concern about Girardi's false

20

statements to clients about tax issues delaying settlement fund disbursements." PSR ¶ 40. The government respectfully disagrees.

*First*, Judge Durkin found that defendant's testimony was incredible: "It is not credible that Griffin and Lira were so completely unaware of the prior disputes over client payments that they had no suspicions of Girardi's conduct and motives." In other words, Judge Durkin found that defendant provided misleading testimony at the evidentiary hearing. Rather than crediting defendant's testimony, Judge Durkin specifically concluded that defendant "knew from the start that Girardi did not pay the clients when he was supposed to," and that defendant "knew at least as early as May 12, 2020 that Girardi was lying to clients about the reasons for the failure to pay the full amounts." Further, defendant also lied to the Victim Clients when telling them in April 2020 that the pandemic was the cause for the delay in GK sending the settlement payments. Importantly, defendant also did nothing to correct these lies.

*Second*, the notion that Girardi or GK could have ultimately paid the Victim Clients is incorrect. The firm did not have the financial ability to pay the Victim Clients because Girardi embezzled the money. Defendant also knew at that time that the firm had trouble paying bills and other clients, and was not collecting fees on the Lion Air cases because those funds went to pay a lender. Further, defendant signed checks from the GK client trust account during this time period that went to pay other clients who were complaining and also signed a check transferring $500,000 from the client trust account to GK's operating account right after the Boeing

21

settlements funded. The fact that defendant was signing checks and moving money is illustrative of defendant's ability to access the firm's financial accounts. Once defendant knew that the Victim Clients were not being paid, he could have checked the bank accounts to see why the Victim Clients were not receiving their money. As a signatory on the client trust account, defendant could have gone to the bank and taken action. Again he did nothing.

*Third*, defendant had been looking for a new job for close to a year before June 2020 when he confronted Girardi. He did not leave GK because Girardi was not paying the Victim Clients. He left because the firm was a sinking ship. Defendant saw the writing on the wall well before then and knew that the firm was in trouble. Defendant's calling Girardi a "thief" also establishes that defendant knew when he left the firm in June 2020 that Girardi was actually stealing money from clients. But, defendant will not go that far because defendant knows that his own knowledge of Girardi's theft precludes the distance that he has been trying to keep from Girardi after Girardi was exposed as a fraud. Defendant also knows that admitting to knowing about Girardi's thefts in June 2020 makes him complicit in the fraud because defendant too lied to cover it up. Even assuming *arguendo* that defendant did not definitively know that Girardi was stealing money by June 2020 when he resigned (which the government disputes), defendant did nothing even though he harbored that suspicion. Defendant never informed Judge Durkin or the Victim Clients. Defendant just left the firm. That fact is not mitigating.

22

*Fourth*, defendant was the reason that the false letters that Girardi wrote to the Victim Clients in May 2020 were sent. Girardi's legal assistant checked with defendant before the letters were sent, and defendant initially authorized them— even though defendant knew that they were full of lies. When defendant tried to walk back his approval, Girardi's legal assistant told him two of the letters had already been sent. All that defendant did at that point was tell Girardi's legal assistant that Girardi would have to answer to the Victim Clients. But, they were defendant's clients too. Defendant knew that they had received false letters, but defendant never told the Victim Clients anything. Defendant also never told Judge Durkin that Girardi had sent these false letters. Instead, defendant resigned a month later—and again did nothing to alert anyone as to what was taking place.

A common theme runs through the PSR and the defense submissions: Girardi was to blame for this entire mess and defendant did what he could do to have Girardi pay the Victim Clients. This is a cop out for defendant. True, Girardi orchestrated this fraud scheme, but he needed help. And defendant was there to do so. Although defendant may have wanted the Victim Clients to be paid, he took no action outside the walls of GK to make sure that happened. Instead, defendant covered up for Girardi, repeatedly lied to the Victim Clients, and ultimately lied to Judge Durkin. The reason was that defendant's own professional reputation was so intertwined with Girardi's that defendant could not afford to expose Girardi as a thief to the outside world. Defendant could have made a different choice, but by protecting Girardi's

thefts, defendant is complicit in the thefts. That is why the base offense level should be governed by U.S.S.G. § 2B1.1.

### *The Government's Guidelines Calculation*

The government's calculation of the adjusted offense level is as follows:

| | |
|---|---|
| Base Offense Level (§§ 2J1.1, 2X5.1, and 2B1.1(a)(1)) | 7 |
| Increase Based on Loss (§ 2B1.1(b)(1)(I)) | 16 |
| Offense Involved More than 10 Victims (§ 2B1.1(b)(2)(A)(i)) | 2 |
| Defendant Knew or Should Have Known that a Victim of the Offense Was a Vulnerable Victim (§ 3A1.1(b)(1)) | 2 |
| Abuse of Trust (§ 3B1.3) | 2 |
| Acceptance of Responsibility (§ 3E1.1) | -3 |
| Total | 26 |

Defendant is in criminal history category I, which when combined with adjusted offense level 26, yields an advisory guidelines range of 63 to 78 months' imprisonment.

### *Base Offense Level*

There is no set base offense level for criminal contempt. The offense of conviction is criminal contempt and the applicable guideline for that crime is § 2J1.1, which does not include a base offense level, and states that § 2X5.1 (Other Offenses) should be applied. The Application Notes to § 2J1.1 provide further guidance:

> 1.  <u>In General</u>.—Because misconduct constituting contempt varies significantly and the nature of the contemptuous conduct, the circumstances under which the contempt was committed, the effect the

misconduct had on the administration of justice, and the need to vindicate the authority of the court are highly context-dependent, the Commission has not provided a specific guideline for this offense. In certain cases, the offense conduct will be sufficiently analogous to §2J1.2 (Obstruction of Justice) for that guideline to apply.

2. <u>Willful Failure to Pay Court-Ordered Child Support</u>.—For offenses involving the willful failure to pay court-ordered child support (violations of 18 U.S.C. § 228), the most analogous guideline is §2B1.1 (Theft, Property Destruction, and Fraud). The amount of the loss is the amount of child support that the defendant willfully failed to pay. In such a case, do not apply §2B1.1(b)(9)(C) (pertaining to a violation of a prior, specific judicial order) . . ."

3. <u>Violation of Judicial Order Enjoining Fraudulent Behavior</u>.—In a case involving the violation of a judicial order enjoining fraudulent behavior, the most analogous guideline §2B1.1. In such a case, §2B1.1(b)(9)(C) (pertaining to a violation of a prior, specific judicial order) ordinarily would apply.

Section 2X5.1 provides that "[i]f the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline. If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control, except that any guidelines and policy statement that can be applied meaningfully in the absence of a Chapter Two offense guidelines shall remain applicable." U.S.S.G. § 2X5.1.

In a criminal contempt conviction, the inquiry over the appropriate guideline for the base offense level purposes usually involves "comparing the elements of a federal offense to the crime of conviction," but the "elements of contempt of court are of little help in determining the most analogous guideline" because "misconduct constituting contempt of court varies significantly" and is "highly context dependent."

25

*United States v. Ferrara*, 334 F.3d 774, 777 (8th Cir. 2003) (internal quotation marks and citations omitted). Additional cases have held that § 2B1.1 is the most analogous guideline provision when the underlying offense is criminal contempt, and the contemptuous conduct relates to theft—similar to what happened in this case. *See United States v. Brennan*, 395 F.3d 59, 73 (2d Cir. 2005) (transferring of assets in violation of a judicial freeze order); *United States v. Nolan*, 136 F.3d 265, 267-68, 273 (2d Cir. 1998) (embezzlement of pension funds by pension fund manager); *United States v. Arjoon*, 964 F.2d 167-69 (2d Cir. 1992) (embezzlement by bank employee of stock held by bank as collateral for loan); *United States v. Lohan*, 945 F.2d 1214, 1215-17 (2d Cir. 1991) (violation of a court order prohibiting a defendant from operating as a commodities broker; defendant was also defrauding clients).

In *Brennan*, the defendant violated a judicial freeze order prohibiting the transfer of assets in connection with related to civil regulatory litigation where he was a defendant. *Brennan*, 395 F.3d at 63-64. The defendant pled guilty to criminal contempt based on his having transferred approximately $500,000 from his holding in a luxury yacht in violation of a court order. *Id*. The parties agreed that § 2J1.2 (the obstruction guideline) was the most analogous provision, but the district court found instead that §2B1.1 applied and the court of appeals affirmed. *See id*. at 72-74. On appeal, the court likened contempt premised on theft to the hypothetical concerning the failure to pay child support in violation of a court order, even if the funds in those cases actually belong to the defendant. *Id*.

The court rejected the notion that the obstruction guideline should apply in cases where theft underlies the contempt conviction: "the obstruction Guideline is insufficiently flexible to deal with a contempt offense such as appellant's, which may be of widely varying degrees of seriousness depending on the amount of money transferred. If the obstruction Guideline were applied to his contempt offense, appellant's offense would be the same whether he removed $12 or $12 million from the [luxury yacht]." *Brennan*, 395 F.3d at 74. The court also stated that "[c]ourts cannot be bound to sentence under the Obstruction of Justice Guideline any time they find an intent to obstruct justice.'" *Id.* (quoting *United States v. Celafu*, 85 F.3d 964, 968 (2d Cir. 1996). The court held that "[a]ppellant's conduct—transferring money frozen by a court order for the benefit of a party to litigation—closely resembles none of these examples [in § 2J1.2's Background section], all of which describe conduct that actually and directly seeks to hinder or corrupt a judicial proceeding. Appellant's conduct sought to deprive a party of the benefit of such a proceeding and, as the district court pointed out, was more akin to stealing from creditors than hindering or corrupting the proceeding." *Id.*

The court in *Brennan* cited a Seventh Circuit case that applied the obstruction guideline in a case where the underlying contempt violation was the unlawful movement of client funds: *United States v. Tankersley*. But, the Seventh Circuit in that case never addressed the applicability of § 2B1.1 and is thus inapposite, and in any event, it is also factually distinguishable. In *Tankersley*, the defendant pled guilty

27

without a plea agreement to criminal contempt of court after selling a yacht that was subject to a restraining order in connection with a consumer fraud suit brought by the Federal Trade Commission against the defendant. *Tankersley*, 296 F.3d 620, 621-22 (7th Cir. 2002). The defendant was sentenced to 27 months' imprisonment and appealed his sentence. *Id*. On appeal, the Seventh Circuit stated that the district court found that the applicable guideline was the obstruction guideline—§ 2J1.2. *Id*. at 622.

The Seventh Circuit in *Tankersley*, however, never addressed whether that was the correct guideline. Instead, it ultimately reversed holding that the obstruction enhancement in § 3C1.1 should not have been imposed, while affirming other parts of the sentence (i.e., the defendant was not entitled to acceptance of responsibility credit and the enhancement for substantial interference with the administration of justice was warranted). Given that this case did not include any discussion on whether § 2B1.1 applied, it did not decide the issue here. Additionally, in a more recent case, *United States v. Trudeau*, 812 F.3d 578 (7th Cir. 2016), the Seventh Circuit upheld using § 2B1.1 in connection with the violation of a court order and the resulting $37.6 million lost by consumers who purchased a book published in violation of that order. *See Trudeau,* 812 F.3d at 578 n.6 (7th Cir. 2016) ("The Sentencing Commission instructs courts to use § 2B1.1, the guideline for Basic Economic Offenses, to calculate a sentencing range for contempt arising out of a violation of a court order enjoining fraudulent conduct."). Put simply, the Seventh Circuit has not

28

in detail addressed the use of § 2B1.1 in a criminal contempt case based on the circumstances here—where the contemptuous conduct is premised on failure to follow court orders as the result of theft.

This case falls squarely within § 2B1.1's parameters and it is the most closely analogous guidelines provision. Application Notes 2 and 3 to § 2J1.1 support using § 2B1.1 given the interrelatedness between Girardi's theft, defendant's knowledge thereof, and his subsequent failure to follow court orders. Girardi was stealing from the Victim Clients and defendant knew it and did nothing to stop it—even though he was bound by Judge Durkin's orders mandating that the Victim Clients be paid. Defendant's willful violation of those orders allowed Girardi's theft to continue. In other words, defendant's contumacious conduct exacerbated Girardi's fraud. The Second Circuit's discussion in *Brennan* is also apt to the facts here: the amount of the theft has to mean something. Applying the obstruction base offense level renders it meaningless. In other words, it would not matter whether Girardi stole $3,000 or $3 million. That cannot be the case, and is further support for why § 2B1.1 should apply.

In sum, where the criminal contempt is intertwined with theft of client funds, the most analogous guideline provision is § 2B1.1 and it should be applied here. The base offense level should be 7 pursuant to §§ 2J1.1, 2X5.1, and 2B1.1(a)(1) because the underlying fraud is wire fraud, which carries a statutory maximum of 20 years' imprisonment.

29

### *Increase Based On Loss*

The base offense level should be increased by 16 levels because the amount of Girardi's theft was approximately $3,069,500, which includes all five Victim Clients. That GK's local counsel repaid the $3,069,500 after the fraud was detected does not offset this actual loss figure. *See* U.S.S.G. § 2B1.1, App. n. 3(E)(i) (credit against loss is available only for funds returned "before the offense was detected"); *United States v. Brownell*, 495 F.3d 459, 463 (7th Cir. 2007) (holding that in order for there to be a credit "when a loss is partially repaid . . . [t]he defendant must make her repayment before the crime is uncovered.").

### *The Offense Involved More Than 10 Victims*

Section 2B1.1(b)(2)(A)(i) provides for a two-level increase to the adjusted offense level if "the offense involved 10 or more victims." This enhancement applies here too. Although there are only five named victims, their family members were also named as recipients for the settlement amounts. In fact, the reason that Judge Durkin needed to enter court orders for four of the Victim Clients was because the settlement was for the benefit of minors. All of these victims lost loved ones in the Lion Air crash and all were represented by defendant.

### *Defendant Knew Or Should Have Known That A Victim Of The Offense Was A Vulnerable Victim*

Section 3A1.1(b)(1) provides for a two-level increase to adjusted offense level if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." U.S.S.G. § 3A1.1(b)(1). Application Note 2 to § 3A1.1 further

provides that a vulnerable victim includes those who are unusually vulnerable "due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1(b)(1), App. N. 2. The government need only establish by a preponderance of the evidence that a single victim was vulnerable, and no other factor "need accompany age so long as the victim's vulnerability is related to the victim's age." *United States v. Sims*, 329 F.3d 937, 944 (7th Cir. 2003); *United States v. White*, 737 F.3d 1121, 1142 (7th Cir. 2013); *see also United States v. Julian*, 427 F.3d 471, 489 (7th Cir. 2005) (enhancement warranted based on children's economic vulnerability).

The Victim Clients were vulnerable victims due to their age and given that they were particularly susceptible to the criminal conduct here. *United States v. Parolin*, 239 F.3d 922, 926-27 (7th Cir. 2001) (enhancement warranted where victim was financially unsophisticated, spoke and wrote limited English, and had just lost her husband). Certain of the victims were minors. All of the victims were also non-English speakers. They lived thousands of miles away in Indonesia. They had no experience with the American justice system. They relied on defendant to represent them. *Cf. United States v. Rumsavich*, 313 F.3d 407, 413 (7th Cir. 2002) (investment fraud scheme targeting elderly investors who "had a lower than average ability to protect themselves" warranted enhancement); *United States v. Johns*, 686 F.3d 438, 460 (7th Cir. 2012) (financial desperation can make a victim vulnerable for purposes

of this enhancement). This enhancement also negates a two-level reduction for zero-point offender relief in §4C1.1. *See* U.S.S.G. § 4C1.1(a)(9).

The PSR concluded that this enhancement did not apply because "the victim of a contemptuous act or obstruction of justice is a societal interest and not a person." PSR ¶ 45. The government respectfully disagrees. The contempt conviction cannot be divorced from the fact that real victims were impacted by it. Defendant's crime here prevented the Victim Clients from being paid and allowed Girardi to steal their money. The count of conviction led to their harm. There is also nothing about a contempt conviction that precludes a victim enhancement, especially in a case like this where the contemptuous conduct impacted actual victims and exacerbated their harm. This enhancement applies, and should apply even if the Court applies the obstruction guideline to determine the base offense level.

### *Abuse of Trust and Use of a Special Skill*

Section 3B1.3 provides for a two-level enhancement to the adjusted offense level if "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission of the offense." U.S.S.G. §3B1.3. Application Note 4 provides that a special skill "refers to a skill not possessed by members of the general public and usually requiring substantial education, training, or licensing" and includes "lawyers." U.S.S.G. §3B1.3, App. N. 4. As an attorney, defendant was a licensed member of the California State Bar who represented the Victim Clients in civil litigation. Defendant used his knowledge of

the legal system to falsely assure the Victim Clients that their settlements were on the way, when in fact, defendant knew that Girardi had stolen the settlements. Defendant's role as an attorney here warrants this two-level enhancement. *See United Sates v. Polichemi*, 219 F.3d 698, 713 (7th Cir. 2000).

The PSR concluded that this enhancement did not apply, reasoning that "the position of trust is viewed from the perspective of the victim, and that the Lion Air Victims are not the victims of the contempt of court alleged in this case." PSR ¶ 47. Not so. The contemptuous conduct directly harmed the Victim Clients. The PSR further stated that "while being a lawyer in a civil proceeding does carry an expectation of professionalism, it is not clear that the defendant had managerial discretion as to the matter of complying with Judge Durkin's order." *Id*. Again, the government respectfully disagrees. As a lawyer, defendant had a duty to tell Judge Durkin that Girardi was lying to the Victim Clients and withholding their settlement funds. As an officer of the Court, defendant could have and should have done more to stop the fraud here and to protect the Victim Clients. Defendant abdicated that role when he lied to his clients and Judge Durkin. This enhancement applies, and should apply even if the Court uses the obstruction guideline to establish the base offense level.

### The Obstruction Guideline

If § 2J1.2 were the operative guideline provision here (and the government disagrees that it is), the three-level enhancement for substantial interference with

33

justice in § 2J1.2(b)(2) should apply. *See* U.S.S.G. § 2J1.2(a), (b)(2); *Tankersley*, 296 F.3d at 623 ("The Sentencing Guidelines further explain that substantial interference includes 'the unnecessary expenditure of substantial governmental resources or court resources.' U.S.S.G. § 2J1.2, cmt. n.1. In the present case, [the defendant] failed to comply with the district court's preliminary injunction, and as a result of that failure, the government and the receiver expended substantial resources investigating [the defendant] and securing his assets."). Here, Judge Durkin had to hold an evidentiary hearing—during which defendant lied—to unearth Girardi's fraud. Under this scenario, defendant's adjusted offense level would be 18 yielding an advisory guidelines range 27 to 33 months' imprisonment.

### The Factors Set Forth in 18 U.S.C. § 3553(a)

Section 3553(a) requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[4]  In order to determine the sentence to impose, the Court must consider the statutory factors listed in § 3553(a)(1)-(7). One of those factors is the advisory range set by the Sentencing Guidelines, and another is the Sentencing Commission's policy statements.  Although the Sentencing Guidelines are advisory only, "[a]s a matter of administration and to

---

[4]  Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2).

secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007). For the reasons set forth below, consideration of the § 3553(a) factors reflects that a sentence of 36 months' imprisonment is warranted and necessary.

<u>The Nature and Circumstances of the Offense</u>

Defendant failed to uphold his oath as a lawyer. Defendant held himself out as a David-like figure representing the little guy against Goliaths—but in the end, defendant was more concerned with his own professional reputation than the clients he claimed to serve. Defendant knew better. He had been a practicing lawyer for over 30 years, garnering numerous accolades for his work. There were also real victims here: Victims A, B, C, D, E, and their families lost millions of dollars that rightfully belonged to them. Those victims were also in a terrible point in their lives when they sought representation from GK, having suddenly lost their loved ones in an airplane crash. GK exploited their vulnerability, and defendant was their lawyer too and he let GK exploit them. Defendant's actions over 2020 and 2021—when he testified before Judge Durkin—showed a troubling pattern of minimizing his own conduct.

By March 2020, defendant knew that GK was in financial trouble. Defendant knew that GK had trouble paying its bills and making payroll. Defendant also knew that GK had taken out an $8 million loan that required the firm to pay the entirety of its fees on the Lion Air cases to the lender in return for a cash infusion at the end of 2019. Put simply, the firm was not on strong financial footing at that time and was

35

strapped for liquidity. Defendant knew by this time that Girardi had not been paying the firm's clients their settlement monies. Defendant also knew that Girardi had been lying to those clients and falsely making up excuses for delays in settlement payments.

In March 2020, when Boeing started funding settlements for the Victim Clients, what was past at GK was prologue: Girardi did not pay the Victim Clients their settlements and lied to them. The Victim Clients lived thousands of miles away and relied on GK to represent them. Instead, Girardi lied to the Victim Clients about why they had not received their settlement money to conceal the fact that Girardi had stolen it. Defendant too lied to the Victim Clients to cover for Girardi. Below are illustrative emails of the Victim Clients politely reaching out to defendant asking about their settlements:

```
From: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Sent: Monday, April 20, 2020 1:09 AM
To: David Lira
Cc: ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Subject: Re: Your cases

Dear david,

We are sure you have tried your best to resolve this case. One last thing is that we need
from you is our fund transfer. We want certainty, just like what other clients from their
lawyers. They get certainty about the transfer from their lawyer no later than the end of
this April. We want a promise of similar certainty. Please tell us when the wire will be
done. Will it be at the end of this month? Or will it be early May? Having certainty will
make us calmer.
Again, we thank you for your work. We look forward to hearing from you.be<http://you.be/>
safe and healthy for all of us.

Regards,
All GK clients
```

***

| From: | ████████████████ |
|---|---|
| To: | David Lira <dlira@girardikeese.com>;Keith Griffin <kgriffin@girardikeese.com>; ████████ |
| | ████████████████████████████████████████ |
| Sent: | 5/2/2020 9:25:03 AM |
| Subject: | Updhate on May |

Dear david,

Hope you be fine and safe.btw, we want asking about what you said in your last e-mail that the funds will be transferred early May or no later than May 15. We want to know the developments regarding this matter. We hope nothing will change because most of us here need these funds to survive this pandemic.

Regards,
GK clients

Defendant did notify Girardi that the Victim Clients were asking questions about the status of their settlement funds, but not for the right reason. As defendant acknowledged in a text message, he did so "to cover my ass." The emails from the Victim Clients continued—again with the Victim Clients politely pleading for an update on why they had not received their settlement funds. The email below is in response to the Victim Client's learning that they only received half of their settlement money. Victim A astutely noted that "I don't think this is in accordance with the results of the court's order" in response to defendant's email stating that "money was wired to your account today."



| From: | |
|---|---|
| Sent: | Tue 5/12/2020 4:44:47 AM (UTC) |
| To: | David Lira[dlira@girardikeese.com] |
| Cc: | |
| | Keith Griffin[kgriffin@girardikeese.com]; |
| | Thomas Girardi[tgirardi@girardikeese.com]; |
| | |
| Subject: | Re: Lion air - |

Dear David

Thank you for your email. It made me more relieved.
However, after I checked it, it turned out that only a portion of the specified amount is there. I don't think that this is in accordance with the results of the court's order. If I may know, how are the calculations and when will the rest be sent?

Thank you very much for making a portion of the payment (disbursement), I am looking forward for the rest to be sent.

May God bless you all.

On Tue, 12 May 2020 at 11.26 David Lira <dlira@girardikeese.com> wrote:

Mama: money was wired to your account today. David

Defendant left GK the following month, calling Girardi a "thief" on the way out, but doing nothing else—except running to another firm where he could make a fresh start. Up until that point, defendant had collected approximately $275,000 in salary from GK knowing that the firm had not paid his other clients. At no point did defendant tell anyone at the firm to stop his own salary and pay his clients first. Nor did defendant tell anyone outside the firm what was happening.

In late 2020, Judge Durkin provided defendant that chance when Girardi was finally unearthed as a fraud. But, defendant instead tried to distance himself from Girardi to protect his own professional reputation. During the initial status hearing on December 14, 2020, defendant denied knowing whether the funding for the Victim

Clients came through, which was absolutely false. Defendant knew that those settlements had funded, that GK had not paid them out, that Girardi was lying to the Victim Clients, and that defendant too had lied to the Victim Clients to cover for Girardi.

One year later when Judge Durkin held an evidentiary hearing to determine why the Victim Clients were not paid, defendant again lied in an effort to distance himself from Girardi. Judge Durkin asked defendant whether defendant knew of other instances where GK clients had not been paid on time. Defendant knew that at least three clients (his own clients) had not been paid and threatened to report defendant and Girardi to the California bar. Defendant was also asked whether he knew of other instances of Girardi lying to clients, and defendant stated that he did not, when in fact defendant absolutely knew that Girardi had been lying to clients, as evidenced by defendant's own email to Kamon in March 2020 when defendant wrote "Tom is lying to clients."

```
From:           Chris K. Kamon <ckamon@girardikeese.com>
To:             David Lira <dlira@girardikeese.com>
Sent:           3/4/2020 6:22:09 PM
Subject:        RE: Lion air money should have been tired today.


I told him I need money for payroll and just went to lunch and didn't say anything to me.

From: David Lira
Sent: Wednesday, March 04, 2020 4:19 PM
To: Chris K. Kamon
Subject: Re: Lion air money should have been tired today.

Worse then bad. Tom is lying to clients. I am meeting with him as soon as I can.

Sent from my BlackBerry - the most secure mobile device
From: ckamon@girardikeese.com<mailto:ckamon@girardikeese.com>
Sent: March 4, 2020 4:16 PM
To: dlira@girardikeese.com<mailto:dlira@girardikeese.com>
Subject: RE: Lion air money should have been tired today.


Its really bad.

From: David Lira
Sent: Wednesday, March 04, 2020 4:16 PM
To: Chris K. Kamon
Subject: Re: Lion air money should have been tired today.

Yes. A lot of emails from folks and irate calls from clients the whole time.

Sent from my BlackBerry - the most secure mobile device
From: ckamon@girardikeese.com<mailto:ckamon@girardikeese.com>
Sent: March 4, 2020 4:15 PM
To: dlira@girardikeese.com<mailto:dlira@girardikeese.com>
Subject: Re: Lion air money should have been tired today.


Really need to chat when you're ready.
```

Defendant undoubtedly knew Girardi was lying to clients. But, admitting those obvious facts implicated defendant more with Girardi's fraud scheme. So, despite documentary proof showing that defendant knew about Girardi's lies and delays in client payments, defendant claimed not to know about either. If defendant claimed not to know about these facts, it is a fair inference to draw that defendant knew more about what was happening at GK than he has admitted to. Defendant continues to try to protect his professional reputation when the evidence shows that he knew that Girardi was looting the client trust account in 2020 to keep the firm afloat.

All that defendant, Girardi, and other lawyers at GK cared about was keeping up the charade that GK was a legitimate law firm. It was not, and defendant knew that fact and perpetuated the lie by covering for Girardi. The nature and circumstances of this offense are egregious and warrant a meaningful custodial term of imprisonment.

<u>History and Characteristics of Defendant</u>

This § 3553 factor is both mitigating and aggravating. Defendant is not Girardi. He is also a loving spouse and father. And, as the numerous letters submitted on his behalf reveal, defendant spent his career working as a plaintiff's lawyer protecting those who were victims of traumatic injuries. Defendant's stature in the California bar is evident in these letters: he was a hardworking lawyer who made meaningful relationships with lawyers and judges across the board. This is all mitigating, but at the same, it is aggravating.

Society looks to people like defendant to uphold the rule of law. When someone with defendant's stature fails to do that, the fallout is even worse. When someone like defendant commits a crime this like one, it breeds cynicism of the legal profession. Defendant also had chances and a network of friends that most criminal defendants do not. To whom much is given, much is expected. Defendant did not live up to that standard. Defendant's background and support network makes this crime all the more troubling. He had a network of friends and colleagues from whom he could have

sought advice or to whom he could have blown the whistle on Girardi. But, he never did so.

In sum, defendant's history and characteristics do not outweigh the need for a meaningful sentence here.

<u>The Need to Promote Respect for the Law,</u>
<u>Provide Just Punishment, and Afford Adequate Deterrence</u>

The government's recommended sentence would promote respect for the law, provide just punishment, and afford adequate deterrence. A meaningful custodial sentence here would promote respect for the law by showing that lawyers who hide fraud and lie to the Court are not above the law.

Moreover, client embezzlement cases like these where lawyers at a law firm knowingly lie and steal from clients are serious. By covering for Girardi, and keeping silent, defendant helped this fraud succeed. The public needs to know that there will be serious consequences when lawyers commit crimes like this one. In addition, intertwined with promoting respect for the rule of law—and equally important—is the concept of general deterrence. *See United States v. Arroyo*, 75 F. 4th 705, 709 (7th Cir. 2023) ("General deterrence is, after all, an economic theory of punishment: 'Where the profits to be made from violating the law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence.'" (quoting *United States v. Cavera*, 550 F.3d 180, 196 (2d Cir. 2008) (en banc)); *United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) (stating that "white-collar criminals . . . are . . . prime candidates for general deterrence"); *United States v. Heffernan*, 43 F.3d

1144, 1149 (7th Cir. 1994) ("[C]onsiderations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); *United States v. Murtha*, 803 F. App'x 425, 428 (2d Cir. 2020) (affirming top of the guidelines sentence in a case where a lawyer stole from clients noting that the district court "explained the particular need for deterrence in this case in order to send the 'right message to lawyers . . . that lawyers [do not] get special deals.'"). General deterrence in a case like this is important and warrants a sentence of 36 months' imprisonment.

Finally, specific deterrence also weighs in favor of a meaningful custodial sentence. It is unlikely that defendant will commit this crime again in the future. Still, specific deterrence is important. Defendant is still a practicing lawyer in California. A significant custodial sentence can serve an important message to defendant, especially given his intent to keep practicing law.

<u>The Need to Avoid Unwarranted Sentencing Disparities among Defendants with Similar Records Who Have Been Found Guilty of Similar Conduct</u>

Defendant is the third person to be sentenced in connection with Girardi's fraud scheme. Girardi was sentenced to 87 months' imprisonment in the Central District of California in connection with an unrelated fraud scheme involving client theft. The Victim Clients here were included as aggravation under 18 U.S.C. § 3553(a) during Girardi's sentencing. This Court sentenced Kamon to 65 months' imprisonment in connection with his wire fraud guilty plea in the present case. The

43

government has taken these sentences into consideration, and juxtaposed with defendant's conduct here, believes that a meaningful custodial term is warranted, and that the length of that prison term should be 36 months. This sentence comports with 18 U.S.C. § 3553(a)(6)'s directives to avoid sentencing disparities among similarly situated defendants.

## CONCLUSION

For the reasons set forth above, the government respectfully requests that the Court impose a sentence of 36 months' imprisonment. Such a sentence is well supported under Section 3553(a), as it will reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, properly account for defendant's history and characteristics, and provide a fair and uniform sentence.

Dated: September 17, 2025

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By:     */s/ Jared Hasten*
JARED HASTEN
EMILY C.R. VERMYLEN
Assistant United States Attorneys
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300
jared.hasten2@usdoj.gov

45