IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.

DAVID R. LIRA,

      Defendant.

23 CR 54-3

Judge Mary M. Rowland

**DEFENDANT'S CLARIFICATIONS AND OBJECTIONS TO THE
PRESENTENCE INVESTIGATION REPORT; AND POSITION PAPER AND
<u>COMMENTARY ON SENTENCING FACTORS</u>**

## TABLE OF CONTENTS

Page

I. Introduction ........................................................................................................ 1-3

II. Clarification and Objections to the Presentence Investigation Report ............................ 3-17

    A. Clarification Regarding the Base Offense Level, PSR, p. 14 ¶ 41-42:
       U.S.S.G. § 2J1.2 was Correctly Identified as the Most Analogous Guideline .................. 3-7

    B. Offense Level Computation, PSR, p. 14 ¶ 41-42: U.S.S.G. Objection to
       Application of U.S.S.G. § 2J1.2(b)(2) ................................................................. 7-10

    C. Offense Level Computation, Victim Related Adjustment, PSR p. 15 ¶ 46:
       Clarification Regarding U.S.S.G. § 3A1.1(b) .................................................... 10-13

    D. Offense Level Computation, Role in the Offense, PSR p. 15 ¶ 46:
       Objection to the non-Application of U.S.S.G. § 3B1.2(b) ................................... 13-15

    E. Offense Level Computation, Victim Related Adjustment, PSR p. 15 ¶ 46:
       Clarification Regarding U.S.S.G. § 3A1.3 ............................................................ 16

    F. Offense Level Computation, PSR, pp. 13-14 ¶ 40: Factual Clarification
       Regarding the "Lira" Clients. ...................................................................... 16-17

III. Revised Guidelines Calculation .......................................................................... 17-18

IV. Position Paper & Commentary on Sentencing Factors ............................................ 18-46

    A. Introduction ............................................................................................. 18-21

    B. The Nature and Circumstances of the Offense (§ 3553(a)(1)) ............................... 21-32

    C. The History and Characteristics of the Defendant (§ 3553(a)(1)) ......................... 33-37

    D. The Factors Set Forth in 18 U.S.C. § 3553(a)(2) ............................................. 37-41

       i. Promoting Respect for the Law and Deterrence ........................................ 37-39

       ii. Collateral Consequences .......................................................................... 39-41

    E. The Factors Set Forth in 18 U.S.C. § 3553(a)(3)-(4) .......................................... 41

    F. The Factors Set Forth in 18 U.S.C. § 3553(a)(6) ............................................. 42-45

V. Conclusion ........................................................................................................ 45

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*Gall v. United States,*
    552 U.S. 38 (2007) ......................................................................................1, 20, 37, 42

*Kimbrough v. United States,*
    552 U.S. 85 (2007) ...................................................................................................... 1

*Nelson v. United States,*
    555 U.S. 350 (2009) ............................................................................................... 1, 20

*Rita v. United States,*
    551 U.S. 338 (2007) .................................................................................................... 1

*United States v. Arjoon,*
    964 F.2d 167 (2d Cir. 1992) ....................................................................................... 6

*United States v. Booker,*
    543 U.S. 220 (2005) ........................................................................................1, 19, 42

*United States v. Brennan,*
    395 F.3d 59 (2d Cir. 2006) ......................................................................................... 6

*United States v. Guerrero-DeLeon,*
    2017 WL 5479 (4th Cir. 2017) .................................................................................. 13

*United States v. Jackson,*
    862 F.3d 365 (3d Cir. 2017) ....................................................................................... 3

*United States v. Johns,*
    686 F.3d 438 (7th Cir. 2012) .................................................................................... 11

*United States v. Lohan,*
    945 F.2d 1214 (2d Cir. 1991) ..................................................................................... 6

*United States v. Mallory,*
    525 F.Supp.2d 1316 (S.D. Fla. 2007) ........................................................................ 8

*United States v. McEnry,*
    659 F.3d 893 (9th Cir. 2011) ..................................................................................... 4

iii

*United States v. Nolan,*
    136 F.3d 265 (2d Cir. 1998) ........................................................................... 6

*United States v. Parolin,*
    239 F.3d 922 (7th Cir. 2001) ......................................................................... 11

*United States v. Rumsavich,*
    313 F.3d 407 (7th Cir. 2002) ......................................................................... 11

*United States v. Sorich,*
    523 F.3d 702 (7th Cir. 2008) ......................................................................... 13

*United States v. Tackett,*
    193 F.3d 880 (6th Cir. 1999) ........................................................................... 8

*United States v. Tankersley,*
    296 F.3d 620 (7th Cir. 2002) ........................................................................... 7

*United States v. Van Krieken,*
    39 F.3d 227 (9th Cir. 1994) ............................................................................ 3

*United States v. Weissman,*
    22 F. Supp. 2d 187 (S.D.N.Y. 1998) .............................................................. 8

**Statutes**

18 U.S.C. § 401 ................................................................................................. 4

18 U.S.C. § 3553(a) ................................................................................... passim

28 U.S.C. § 994(j) ........................................................................................... 42

**United States Sentencing Guidelines**

U.S.S.G. § 2B1.1 .............................................................................................. 3

U.S.S.G. § 2J1.1 .............................................................................................. 3

U.S.S.G. § 2J1.2 ...................................................................................... passim

U.S.S.G. § 2X5.1 .............................................................................................. 3

U.S.S.G. § 3A1.1 ....................................................................................... 10-11

U.S.S.G. § 3A1.3 ............................................................................................................... 16

U.S.S.G. § 3B1.2 .......................................................................................................... 13-15

### DEFENDANT'S CLARIFICATIONS AND OBJECTIONS TO THE PRESENTENCE INVESTIGATION REPORT; AND POSITION PAPER AND COMMENTARY ON SENTENCING FACTORS

Defendant, **David R. Lira**, by and through his attorneys, **Cheronis & Parente LLC,** and **Ryan J. Levitt**, pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, the opinions of the United States Supreme Court in *United States v. Booker*, 543 U.S. 220 (2005), *Rita v. United States*, 551 U.S. 338 (2007), *Gall v. United States*, 552 U.S. 38 (2007), *Kimbrough v. United States*, 552 U.S. 85 (2007), and *Nelson v. United States*, 555 U.S. 350 (2009), as well as 18 U.S.C. § 3553(a), respectfully submits his Clarifications and Objections to the Presentence Investigation Report ("PSR"); and Position Paper and Commentary on Sentencing Factors. For the reasons that follow, Mr. Lira, through counsel, respectfully requests that this Court impose a non-custodial sentence, which sentence would be sufficient yet not greater than necessary to effectuate the goals of 18 U.S.C. § 3553(a).

### I.      Introduction

David Lira helped injured people receive justice throughout his entire career. Whether he was representing victims of government abuse, sexual abuse, those who have had their civil rights violated, or families of victims whose lives had been taken through defective products or gross negligence, his goal was always to put the client first.[1] As can be seen see from the approximate two hundred letters written on his behalf, this is not a man who was "in it" solely for the money. He was

---

[1] A sampling of David Lira's cases include: representing minors abused while participating in a police sponsored program for disadvantaged youth, during which he obtained the largest settlement ever paid by the City of Santa Monica; representing the family of a homeless, mentally ill young man who was shot and killed by a security guard at Walgreens, during which he achieved a settlement that included Walgreens changing its security procedures nationally; and obtaining a unanimous United States Supreme Court decision allowing consumer cases against automobile manufacturers for defective seat belts (*Williamson v. Mazda Motor of America, Inv.*, 562 U.S. 323 (2011).

1

not a slave to ego or even the almighty dollar. Sure, he wanted to make a good living, but he was also an individual willing to "cut his fees" to ensure a better payout to his clients, and one who stayed at Girardi and Keese when he could have literally made millions more in a solo practice, and, at the end of the day, he was and is an individual more concerned about the work and the client. Insofar as this case pertains to David Lira, it is not at all about greed.

And that is one of the many reasons his sentencing will be a day filled with tragic irony. The lawyer that people looked up to and saw as a good friend, fair advocate, and, an all-around good person will appear before this Court not on behalf of a client in need, but as a man who faces the prospect of a prison sentence.

Through this filing, which will be supplemented orally and with additional letters, we are asking for this Court to impose a non-custodial sentence. The reasons supporting this request are manifold. First, David Lira is 65 years old, has no past criminal history, and has now pled guilty to a non-violent crime that has mitigation baked into the very facts of the case. Second, it would be hard to think of collateral consequences short of deportation more severe than the ones Mr. Lira has and continues to face. His life has been a raging sea for five years. David has been excoriated in the press, unfairly being treated as being one and the same with Tom Girardi. He has lost income, clients, prestige, and the respect of some (although far from all) of his peers. Third, his acceptance of responsibility for the fact that, despite all of the admirable things he has done for his clients throughout his career, in the Lion Air case, he could and should have done much more to ensure they received their settlement monies. Fourth, the battles he must fight are far from over, as he is facing additional collateral consequences, including a state bar inquiry, a lawsuit filed in the Central District of California by the Edelson firm for $50,000,000, and another Edelson lawsuit, this one

in the Northern District of Illinois, to collect their portion of the attorney's fees in the Lion Air Case. Fifth, the interplay of serving deterrence while also promoting respect for the law makes a prison sentence unnecessary in this instance. Sixth, and perhaps most importantly, his history and characteristics are that of a man who has lived a good life, treated others kindly, taken care of his family, and yes, spent decades working on behalf of his clients as a skilled and respected lawyer.

II.     **Clarifications and Objections to the Presentence Investigation Report**

A.  **Clarification Regarding the Base Offense Level, PSR, p. 14 ¶ 41-42: U.S.S.G. § 2J1.2 was Correctly Identified as the Most Analogous Guideline.**

As noted in the Plea Agreement, all parties acknowledge that there is no generally applicable base offense level for contempt of court (*see* § 2J1.1 and 2X5.1) and that the most analogous offense level is to apply. The government incorrectly submitted in its version of the offense that § 2B1.1 is the most analogous offense level. Instead, as the PSR found, § 2J1.2 should govern.

U.S.S.G. § § 2J1.1 governs contempt of court convictions. That provision refers to § 2X5.1, which directs sentencing courts to apply the most analogous offense guideline. If one is not sufficiently analogous, the § 3553(a) factors control. The general rule is as follows:

> Because misconduct constituting contempt varies significantly and the nature of the contemptuous conduct, the circumstances under which the contempt was committed, the effect the misconduct had on the administration of justice, and the need to vindicate the authority of the court are highly context-dependent, the Commission has not provided a specific guideline for this offense. In certain cases, the offense conduct will be sufficiently analogous to §2J1.2 (Obstruction of Justice) for that guideline to apply. § 2J1.1 cmt. n. 1.

Caselaw has clarified that the determination whether an offense is sufficiently analogous should utilize an elements-based approach, comparing the various offense guideline and the elements of the offense of conviction. *United States v. Jackson*, 862 F.3d 365, 377 (3d Cir. 2017); *see also United States v. Van Krieken*, 39 F.3d 227 (9th Cir. 1994) (sentencing guideline for obstruction

of justice, rather than guideline for fraudulent returns, addressed conduct most analogous to that of defendant convicted of corrupt interference with administration of tax laws for filing false Forms 1099, filing false return, seeking tax levy on innocent taxpayers, filing groundless lawsuit, and filing groundless police theft report), *superseded by statute* as stated in *United States v. McEnry*, 659 F.3d 893 (9th Cir. 2011).

Contempt of Court as proscribed by 18 U.S.C. § 401(3) has three elements:

1. That the Court entered a reasonably specific order; and

2. That the defendant violated the order; and

3. The defendant's violation of the order was willful.

The superseding indictment itself alleged that defendants "did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order . . . issued by . . the District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute settlement funds to Victim A as required by that order."

U.S.S.G. § 2J1.2, which governs obstruction of justice, is the most analogous to the offense of conviction. David Lira did not steal money from his clients, nor did he profit from Tom Girardi and Chris Kamon's thefts. Rather, he pled guilty to contempt, because he was aware and subject to Judge Durkin's order requiring Girardi Keese to distribute those funds as soon as practicable while the remaining charges are being voluntarily dismissed by the government. When that did not happen and he became aware it had not happened, despite making efforts to convince Girardi to pay the clients, he did not alert the court, the bar, or otherwise engage in extensive enough efforts to ensure compliance.

4

Looking more closely at the elements, the offense conduct is at most willful, and lacks an intent to defraud entirely. There was no gain to Mr. Lira. As will be explained more fully below, he had his own set of Lion Air clients who received their settlement money in full. After three months of the settlement funds having been received but not distributed, David left Girardi Keese. He confronted Girardi, as he did on other occasions, and urged him to pay the clients. He also notified the Edelson firm that the money was wired to GK. In sum, contempt at its core involves interference or disruption with the authority and work of the court. Said conduct can vary widely, and in this instance, the subject of the at-issue order was the distribution of settlement proceeds. But David did not intend to steal or cheat anyone else out of money. Tellingly, four years later, the government did not charge Keith Griffin with fraud, rather, only contempt of court and misprision of a felony. In any event, while Girardi and Kamon were engaging in their outrageous conduct, David was aware of and subject to Judge Durkin's order, and he failed to comply with it. § 2J1.2 should thus apply.

The additional arguments put forth in the government's version of the offense do not alter this conclusion. First, as cited above, the application notes support application of § 2J1.2. There is a note setting forth the general rule, note 1, which starts "In General," and goes on to explain § 2J1.2 will generally be the most appropriate offense guidelines, as cited in full above. There are two illustrative exceptions: (1) for failure to pay court-ordered child support, and (2) for court orders enjoining fraudulent behavior. The government agreed Judge Durkin's order did not enjoin fraudulent behavior, but nonetheless posits the child-support exception directing sentencing courts to apply § 2B1.1 in lieu of the general rule requiring application of § 2J1.2. Suffice to say, this case is not at all analogous to a willful failure to pay child support. Child support cases never involve law firms, trust accounts, and limited authority of the party ordered to pay child support to in fact remit

the monies owed. David did not intend for Girardi to withhold disbursement, to the contrary, he pressed for it and greatly desired that Tom Girardi do so and put the matter to rest. The fault in his conduct was subject to a court order and not following that order, despite any desire or intent to violate it. Counsel is not downplaying the significance of this conduct; rather, explaining why objective review and application of the facts and information of this case make clear that the obstruction guidelines is the most analogous.

The out-of-circuit caselaw cited by the government does not alter this conclusion, and in any event is entirely inapposite. The government first cited *United States v. Brennan*, 395 F.3d 59, 73 (2d Cir. 2006), but that opinion found and relied upon the fact that defendant's "contumacious conduct amounted to stealing money from the Palm Beach Princess that should have gone to his victims or creditors" in order to apply § 2B1.1. It may be relevant to Tom Girardi, but not as to David Lira. *United States v. Nolan*, 136 F.3d 265, 267-68 (2d Cir. 1998) did not even involve contempt charges— the defendant was convicted of conspiring to embezzle the assets of a pension plan covered by the Employee Retirement Income Security Act of 1974 (ERISA), in violation of 18 U.S.C. § 371, and of embezzling such assets, in violation of 18 U.S.C. § 664. There was no argument regarding which provision sets the base offense level and it does not so much as reference § 2J1.2. It is not relevant to the facts of this case. Moreover, it applied § 2B1.1 to a defendant who embezzled monies. That may be analogous to Chris Kamon's independent criminal scheme, but not David Lira. Likewise, *United States v. Arjoon*, 964 F.2d 167 (2d Cir. 1992) suffers from identical limitations. It is not a contempt case but another embezzlement case that has nothing to do with the offense conduct for David Lira. And finally, *United States v. Lohan*, 945 F.2d 1214 (2d Cir. 1991) is another factually inapposite out-of-circuit opinion, this time involving a commodities trader who personally violated

a court order enjoining him from trading, and in the process, committed larceny and continued to defraud investors. While there was a contempt charge this time, there was no argument § 2J1.2 should apply; rather, the defendant argued there was no sufficiently analogous guidelines. In any event, because this defendant was in fact engaging in fraudulent conduct with the intent to cheat others out of money, it, too, is inapplicable.

The only controlling authority cited by the government was *United States v. Tankersley*, 296 F.3d 620, 621-22 (7th Cir. 2002). While *Tankersley* constitutes binding precedent the Court will not be free to disregard, the government nonetheless quarreled with the Seventh Circuit, arguing § 2J1.2 should not have applied to a defendant who violated a restraining order by selling a yacht. However, in that case itself, tellingly, the government *agreed* § 2J1.2 should apply. That is the only reason the Seventh Circuit did not address the issue. Thus, it is not "inapposite"— that the only factually-analogous Seventh Circuit case applied § 2J1.2 with the government's agreement supports application of § 2J1.2. Thus, pursuant to § 2J1.2(a), the base offense level is 14.

**B. Offense Level Computation, PSR, p. 14 ¶ 41-42: U.S.S.G. Objection to Application of U.S.S.G. § 2J1.2(b)(2).**

In calculating the base offense level, the PSR included a three-level adjustment pursuant to § 2J1.2(b)(2).[2] In doing so, it cited the fact that Tom Girardi and his firm failed to disburse the settlement proceeds as required by court order. PSR p. 14 ¶ 42. It noted that subsequently, in

---

[2] To clarify any semantical confusion, defense counsel and the probation officer agree that § 2J1.2 is the most analogous offense chapter and should govern the offense level calculation. The PSR described the base offense level as 17, and included the three-level adjustment contained in subsection (b)(2) to arrive at that figure (14 + 3 = 17). Defense counsel reads it as the same base offense level applies (14), but the specific offense characteristic enhancement set forth in subsection (b)(2) does not apply. The government meanwhile is conducting the analysis under § 2B1.1, which produces much more substantial guidelines ranges.

December 2020, GK's local counsel,[3] Edelson P.C., filed a motion for rule to show cause as to why GK should not be held in contempt of court for failing to obey lawful orders of the Court. It then states, "[o]ver the following year and several court appearances, the defendant had the ability to communicate to both Edelson and the Court that Girardi should have disbursed settlement proceeds to the Lion Air Victims; however, he did not." *Id.* It continued: "what was eventually required was a three-day-long hearing on the motion for the Court to determine that Thomas Girardi had defrauded his clients through a Ponzi-type scheme." *Id.*

U.S.S.G. § 2J1.2(b)(2) states that "[i]f the offense resulted in substantial interference with the administration of justice, increase by 3 levels." Application Note 1 defines *substantial interference with the administration of justice* to include "a premature termination of a felony investigation; an indictment, verdict, or any judicial determination based upon perjury, false testimony, or other false evidence; or the unnecessary expenditure of substantial governmental or court resources."

To sustain this enhancement, courts specifically require (1) identification of a particular expenditure of governmental resources (time or money), (2) which but for the defendant's conduct would not have been expended, and (3) was "substantial" in amount. *United States v. Tackett*, 193 F.3d 880, 887 (6th Cir. 1999); *United States v. Mallory*, 525 F.Supp.2d 1316, 1319 (S.D. Fla. 2007); *United States v. Weissman*, 22 F. Supp. 2d 187, 199 (S.D.N.Y. 1998).

The PSR, respectfully, did not tether its analysis to the application note's guidance, nor that provided by caselaw interpreting this enhancement. Mr. Lira's conduct did not cause a premature

---

[3] As will be discussed later, Edelson P.C. was not merely local counsel—they were co-counsel. They were not merely advising GK on local practices and customs, taking care of filings, and handling basic status hearing appearances. No. They shared equally in the primary litigation responsibilities, boasted about the amount of work they did on the case, and in fact continue to demand an equal share of the attorney's fees generated from the firm clients' cases. Describing them merely as local counsel tends to minimize their involvement.

termination of a felony investigation, indictment, verdict, etc., and nor does it rise to the other circumstances discussed in the application note. The fact that a three-day evidentiary hearing to discover the scope of Tom Girardi's broader crimes was necessary does not at all justify imposition of this enhancement—federal prosecutions nearly always take far more resource expenditures to come to light, contempt allegations nearly always include additional hearings, and nothing about Mr. Lira's actions constitute *substantial interference* so as to justify imposition of an *aggravating* enhancement above and beyond the base offense level.

Moreover, and perhaps most importantly, whether the Court is inclined to adopt the test utilized by multiple other federal courts or not, it still follows from the fact that Mr. Lira's conduct did not constitute substantial interference with the administration of justice because it was not the "but for" cause of the expenditure of governmental resources. On this point, undersigned counsel offers no rebuttal to what the government itself has already persuasively argued:

- "[Girardi] owned and controlled his law firm, including payments out of the firms bank accounts to victims."

- Tom Girardi "was the only person who decided when and how much to pay clients."

- "[N]o one else could authorize payments to those clients out of that client trust account. Only [Girardi]."

- It's not [Girardi's] money when he owes these clients money. When he's stolen their money and they're demanding payment, it's not his money to spend how he wants. It didn't just come from the operating account. Sometimes it came directly from the trust account. That is how [Girardi] ran his firm. He didn't care. These corporate formalities didn't matter to him. He's Tom Girardi. He is the guy on the cover of these magazines. No one is going to tell him what to do. No one is going to tell him how to run his law firm.

Finally, at risk of belaboring the point, counsel directs the Court to the December 8, 2023 declaration of Norina Rouillard, attached as an exhibit hereto. In that sworn declaration, Ms.

Rouillard averred that she was an employee in GK's accounting department from 2003 through 2020. Kamon was in charge of accounting, she and Ariel Monasterio worked full-time in the accounting department, and an individual named Kathy Marlatt was responsible for trust account reconciliation. As Ms. Rouillard stated, "[a]s to the business account, Tom Girardi and Chris Kamon were the only signatories. Any check drawn from the business account greater than $5,000 required Mr. Girardi's approval." With respect to the Torrey Pines trust account, senior GK attorney James Callahan was the secondary signatory up until his sudden passing in 2019. It was only afterwards that Mr. Lira became the sole second signatory.

Ms. Rouillard continued, noting that, to her knowledge, "Mr. Lira never had access to the overall balance [of] that account or any other firm account. He also did not have access to bank statements for any Girardi Keese accounts." She specifically noted in a section entitled "**ONLY MR. GIRARDI COULD APPROVE WIRE TRANSFERS**" that only Mr. Girardi could approve wire transfers, including Lion Air, which "Mr. Lira did not initiate or caused to be initiated any wire transfers to the Lion Air clients as he did not have authority to do so."

For all of these reasons, counsel respectfully objects to the imposition of the three-level enhancement set forth in ¶ 2J1.2(b)(2).

### C. Offense Level Computation, Victim Related Adjustment, PSR p. 15 ¶ 46: Clarification Regarding U.S.S.G. § 3A1.1(b)

In calculating the total offense level, the Probation Office correctly rejected the government's argument that U.S.S.G. § 3A1.1(b) applies because "the defendant knew or should have known that a victim of the offense." Application Note 2 defines "vulnerable victim" as:

> a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct. Subsection (b) applies to offenses

involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery in which the defendant selected a handicapped victim. But it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. Similarly, for example, a bank teller is not an unusually vulnerable victim solely by virtue of the teller's position in a bank offense was a vulnerable victim.

The PSR reasoned that "the victim of a contemptuous act or obstruction of justice is a societal interest and not a person." PSR p. 15 ¶ 45. This is the correct analysis because, as explained in the Application Note, the term "victim" is limited to the "offense of conviction." Here, that is contempt of court, and to the government's detriment, it relied exclusively on cases involving mail and wire fraud convictions. *See* GVO pp. 41-42[4] (citing *United States v. Rumsavich*, 313 F.3d 407, 413 (7th Cir. 2002) (investment fraud scheme targeting elderly investors who "had a lower than average ability to protect themselves" warranted enhancement); *United States v. Johns*, 686 F.3d 438, 460 (7th Cir. 2012) (financial desperation can make a victim vulnerable for purposes of this enhancement); *United States v. Parolin*, 239 F.3d 922, 926-27 (7th Cir. 2001).

The government's arguments are convincing as applied to Tom Girardi. But David Lira did not steal a single dollar from his clients. He did not cheat them out of money. Rather, he was aware and subject to Judge Durkin's order requiring Girardi Keese to distribute those funds as soon as practicable. When that did not happen and he became aware it had not happened, despite making

---

[4] The Government's Version of the Offense does not include page numbers.

efforts to convince Girardi to pay the clients, he did not alert the court, the bar, or otherwise engage in extensive enough efforts to ensure compliance.

It is just as relevant to note again that there was no gain to Mr. Lira.[5] He had his own set of clients who got paid properly. Mr. Lira certainly did not devise or participate in any scheme. On the contrary, after three months of the settlement funds having been received but not distributed, David left Girardi Keese. He confronted Girardi, as he did on other occasions, and urged him to pay the clients. In sum, and to reiterate, contempt at its core involves interference or disruption with the authority and work of the court. Said conduct can vary widely, and in this instance, the subject of the at-issue order was the distribution of settlement proceeds. But David did not intend to steal or cheat anyone else out of money. There is no "victim" to his offense of conviction *within the meaning of this guideline* and thus no basis to apply § 3B1.1(a).

Having said all of that, Mr. Lira in no way seeks to deprecate the Lion Air clients and what they went through in this ordeal. The clients in this case were from another country, they spoke a different language, and they depended on American lawyers to deliver them whatever justice they could after the loss of their loved ones in what can aptly be described as one of the worst ways possible. Under no circumstances should any client whether foreign or native born have been subjected to any of this. This argument is not to suggest that the Lion Air clients were not victimized;

---

[5] In arguing over guidelines enhancements at Kamon's sentencing, the government made the point that Kamon was helping Girardi commit his fraud because he was skimming millions of those proceeds out of the firm coffers. It argued that Kamon was not simply continuing to work at a business engaging in wrongful conduct to keep his job, for example, such as an administrative employee at a healthcare facility: "[a]nd all this person gets is their salary. They're just doing it because they want to keep their job. It's wrong. They know that what they're doing is wrong, and they're helping the doctor necessarily commit a fraud to keep their job." 23 CR 54 Dkt. # 168. While David was not simply a front desk employee at GK, he never stood to receive anything other than his salary.

they were, and if Mr. Lira were convicted of fraud, unlike Mr. Kamon, he would not object to this enhancement. But the government proposed a plea agreement to the charge of criminal contempt and now, having made that bargain, is attempting to stretch it into something else. For all of these reasons, this enhancement does not apply.

### D. Offense Level Computation, Role in the Offense, PSR p. 15 ¶ 46: Objection to the non-Application of U.S.S.G. § 3B1.2(b).

U.S.S.G. § 3B1.2(b) allows for a two-level reduction in the offense level if the defendant was a "minor participant" in any criminal activity. "Minor participants" deserving a two-level reduction are those who are "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal." *See* § 3B1.2 cmt. n. 3(C); *United States v. Guerrero-DeLeon*, 2017 WL 5479, *2 (4th Cir. 2017). Whether this reduction is applicable requires sentencing courts to consider the totality of circumstances, and "is heavily dependent upon the facts of the particular case." *Id.* The Seventh Circuit is highly deferential to a district court's determination as to the applicability of this adjustment given that "[it] is in the best position to evaluate a particular defendant's role in a criminal scheme." *United States v. Sorich*, 523 F.3d 702, 717 (7th Cir. 2008).

The PSR declined to apply this enhancement, and reasoned as follows:

> The defendant had the ability to comply with the Court's orders, at the very least insofar as he could have communicated to Edelson and the Judge Durkin about the circumstances which led to Lion Air Victims not being properly paid moneys owed to them. This officer respectfully opines that the defendant had an understanding of the scope of his own behavior which detracts from any assertion that he was a minor participant in the instant offense. PSR p. 15 ¶ 46.

Counsel respectfully disagrees. First, as the PSR detailed, there was initially a dispute regarding whether David specifically knew that Girardi had stolen the funds, as opposed to general concerns over nonfeasance. In the limited couple of months between receipt of funds in the GK trust account, whenever "as soon as practicable" passed, and David's resignation from GK, the

concern slowly grew more and more serious. The government has conceded and the PSR accepted that, although it initially pressed the claim, David did not admit in the plea agreement to specifically knowing that Girardi was *stealing* from the firm's clients. And nor did he prior to his resignation.

This is difficult to reconcile with the PSR's reliance upon David's ostensible knowledge of the full scope of Girardi's misconduct. And in any event, the relevant point of analysis, again, is the contempt charge. Counsel reincorporates the government's own arguments and statements as to the relevant factual considerations impacting this analysis:

"[Girardi] owned and controlled his law firm, including payments out of the firms bank accounts to victims." Tr. 176.[6]

***

"[Girardi] founded Girardi Keese decades ago, and from its inception until the firm closed, he was the 100 percent owner of it. He controlled it. He managed it. And [Girardi] hired other attorneys to work on cases, but he made all of the important decisions." Tr. 176.

***

"[Girardi] was the only person who decided when and how much to pay clients." Tr. 178.

***

"[N]o one else could authorize payments to those clients out of that client trust account. Only [Girardi]." Tr. 179.

***

You heard from witness after witness, [Girardi is] the one who determines whether or not a client gets paid. Shirleen Fujimoto, his secretary of 20-plus years testified: Was it Mr. Girardi and nobody else who decided whether to sign that check and pay client? Yes. And if he chose not to sign off – if he chose not to sign that check for a client, then that client wouldn't get paid? Correct. Was there anybody who could

---

[6] Citations to the transcript from Girardi's California Trial are denoted as "Tr." followed by the referenced page numbers. Counsel is willing to make any relevant portion of those transcripts available to the Court if requested.

14

stop him from paying clients? No. No. No. You heard from Kim Cory. Same thing. Tr. 2634.

\*\*\*

And other attorneys said as much too. You saw this message from Chris Aumais. As you know, I don't deal with the money or payment aspect of the firm. Mr. Girardi, as the head of the firm, does. Not Chris Kamon. Not other attorneys. Mr. Girardi. It's his name on the door. He's the one you need to talk to. Tr. 2639.

\*\*\*

Here's Chris Aumais again. I spoke with Mr. Girardi. He said he's going to call you. As mentioned, as the head of the firm, Tom has sole control of the settlement funds. Tom has sole control of the settlement funds. He's the one who distributes and signs off on the checks. Tr. 2640.

\*\*\*

I asked Ms. Fujimoto, was there anybody who had the power to tell Tom Girardi what to do? Anybody above Tom? No. His name on the door. Tr. 2646.

\*\*\*

It's not [Girardi's] money when he owes these clients money. When he's stolen their money and they're demanding payment, it's not his money to spend how he wants. It didn't just come from the operating account. Sometimes it came directly from the trust account. That is how [Girardi] ran his firm. He didn't care. These corporate formalities didn't matter to him. He's Tom Girardi. He is the guy on the cover of these magazines. No one is going to tell him what to do. No one is going to tell him how to run his law firm. Tr. 2652.

Suffice to say, an individual with no actual ability or decision-making authority over the funds at issue—funds that David desperately wanted Tom to pay to the clients and actively pressured him to do so (albeit not significantly enough), especially in comparison to the roles played by Tom Girardi and Chris Kamon, comfortably qualifies at least as a minor participant within the meaning of § 3B1.2. Counsel therefore requests the Court apply this two-level reduction when calculating Mr. Lira's total offense level.

### E. Offense Level Computation, Victim Related Adjustment, PSR p. 15 ¶ 46: Clarification Regarding U.S.S.G. § 3A1.3

In calculating the total offense level, the Probation Office correctly rejected the government's argument that § 3B1.3 applies. This enhancement states, "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." The language of the enhancement further provides that the enhancement may not be employed if the abuse of trust or special skill is included in the base offense level or specific offense characteristic, and further, when based upon use of a special skill, it cannot be employed in tandem with § 3B1.1.

Lawyers do in fact constitute strong examples of individuals requiring a "special skill," but finding as much is not all application of this enhancement requires. U.S.S.G. § 3B1.3 cmt. n. 4. The plain language of the enhancement additionally requires that the defendant *used* the special skill to significantly facilitate the commission and concealment of the offense. The background commentary further clarifies "[t]his adjustment applies to persons who abuse their positions of trust or their special skills to facilitate significantly the commission or concealment of a crime."

Mr. Lira did not do this. Again, his crime is one of nonfeasance—not that he affirmatively participated in Girardi's fraud scheme, but that he failed to do enough to sufficiently discharge his obligations in conformity with the settlement order. The PSR correctly declined to apply this enhancement, and the Court should as well.

### F. Offense Level Computation, PSR, pp. 13-14 ¶ 40: Factual Clarification Regarding the "Lira" Clients.

In discussing its rationale for finding § 2J1.2 the most analogous offense guideline, relying in part on the Defendant's Version, the PSR stated that Mr. Lira "took the unusual step of having another client's settlement funds sent to a referring attorney's client account to prevent Girardi from

16

stealing those funds." This is a fair statement that does not require any correction. There is important nuance to this point, and for purposes of clarification, counsel notes that the clients referenced here were the "Lira Clients," the separate Lion Air Plaintiffs that David obtained as *his* clients separate and apart from the firm clients whose settlement proceeds Girardi stole. David directed the wires to run through his referring attorney's trust account *not* because he was concerned Girardi would attempt to steal the client funds; rather, he had a concern Girardi would attempt to cheat the referral source out of the referral fee. That is unscrupulous behavior, but regrettably, it happens with some regularity within the legal profession. It is not on the same magnitude as stealing from clients. Moreover, Lira set this up with Mr. Koushan prior to the Lion Air case even reaching the stage of settlement discussions.

## III.   Revised Guidelines Calculation

The guidelines presented in the PSR and Mr. Lira's position are summarized as follows:

| | PSR | David Lira |
|---|---|---|
| **Sentencing Factor** | | |
| | | |
| Base Offense Level | 14 | 14 |
| | | |
| § 2J1.2(b)(2) | +3 | |
| | | |
| § 3B1.2 | | -2 |
| | | |
| § 3E1.1 | -3 | -2 |
| | | |

17

| § 4C1.1 | -2 | -2 |
| --- | --- | --- |
| | | |
| **Total Offense Level** | 12 | 8 |

Mr. Lira submits that, after adjusting for acceptance of responsibility, his total offense level is 8. The probation office submits that the total offense level is properly calculated as 15. The parties are in agreement that Mr. Lira has zero criminal history points resulting in placement in criminal history category I. Mr. Lira's calculation results in an advisory guidelines range of 0-6 months' incarceration, and placement in Zone A of the sentencing matrix. The PSR's calculation results in an advisory guidelines range of 10-16 months' incarceration, and placement in Zone C of the sentencing matrix.

**IV.    Position Paper & Commentary on Sentencing Factors**

   **A.  Introduction**

There is not a simple narrative counsel can provide the Court to describe David Lira. Having represented him for years, undersigned counsel has seen first-hand the type of man he is and the extent of the pain, stress, and damage this indictment has brought upon him and his family. The descriptors in the letters as devoted father, loving husband, son, and brother, accomplished lawyer, and kind, caring, and valued member of his community are all apropos.[7] He is simply a good person

---

[7] Regarding the voluminous nature of the letters the following may be said. On an important level, despite the words used to describe Mr. Lira, this case relates to a lawyer and his clients, and the failure to protect them when they needed it most. Not by theft, not by raiding their trust accounts, or anything of the sort; but rather, by not putting them first in every matter and in every instance, even if it requires making a torturous decision. The letters the Court has received and read, many of which are from judges and members of both the plaintiff's and defense bar, demonstrate that David is a good person and lawyer whose humanity is on full display in this case, its facts, and the mitigation submitted. Yet, most importantly, they demonstrate that his conduct in this case was aberrant.

in every sense of the word, with a remarkable ability to share his best qualities with his family, friends, clients, and community. The letters describe him accurately as being kind, respectful, generous, helpful, sincere, honest, personable, mild-mannered, selfless, loving, family-oriented, hard-working, giving, and loyal. But as this case and so many others prove, even good people find themselves in complicated and difficult circumstances, and even outright terrible ones at times- even good people stumble.

Nevertheless, the number of lives that David has touched as will be discussed more fully herein, is plainly at odds with the fraudster the government has portrayed. David has unquestionably made a positive impact on those that know him and his wider community. And, more importantly, if this Court shows David leniency, he will have a chance to make a continued positive impact on his community. While undersigned counsel has had the absolute privilege to represent David throughout the course of these proceedings, the countless letters submitted by friends, family members, professional acquaintances, and others attest to these qualities better than counsel could ever hope to. In short, David's family structure, greater community ties, and demonstrable inner strength and kindness weigh in favor of allowing him to put what has been undeniably one of the most sad, difficult, embarrassing, and trying chapters of his life behind him as soon as possible. Thus, counsel strongly suggests that a non-custodial sentence is reasonable and appropriate under the circumstances.

Mr. Lira now finds himself before a court that has the authority to fashion a just and appropriate sentence. Indeed, as this Court is no doubt well aware, since *United States v. Booker*, 543 U.S. 220, 264 (2005), the applicable guidelines range has been advice this Court should consider but is not required to follow. But even as advice, the guidelines may be flawed and are not to be

presumed reasonable. *Nelson v. United States*, 555 U.S. 350, 351 (2009) ("[t]he Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable").

The guidelines in any event remain a "starting point" and "initial benchmark" for this Court to consider in the determination of a just and appropriate sentence. *See Gall v. United States*, 552 U.S. 38, 49-51 (2007). As this Court is also well aware, per *Gall*, before determining which sentence is just and ultimately "sufficient but not greater than necessary to achieve the purposes of sentencing," it must consider all of the § 3553(a) factors. The parties agree that David Lira's criminal history score is zero establishing a criminal history category of I. The parties differ, however, in calculating the total offense level.

As indicated in the Plea Agreement (Dkt. # 145) and its Version of the Offense, the government argued for an offense level of 28, which when combined with the anticipated criminal history category of I, results in an advisory guidelines range of 78 to 97 months' imprisonment. After agreeing with defense counsel and rejecting the prosecutors' argument that § 2B1.1 sets the base offense level, the vulnerable victim enhancement (§3A1.1(b)) applies, and the abuse of trust enhancement (§ 3B1.3) applies, it found a total offense level of 12, which when combined with a criminal history category of I, results in an advisory guidelines range of 10-16 months' imprisonment. Mr. Lira and counsel agree with the Probation Office that the most sufficiently analogous guideline is § 2J1.2, and thus the base offense level should be 14. The PSR, however, should not have added three offense levels pursuant to § 2J1.2(b)(2), and as a minor participant in the offense, the offense level should have been reduced by an additional two levels pursuant to § 3B1.2. Thus, a total offense level of 8, combined with a criminal history category of I, results in an advisory guidelines range of 0-6 months' imprisonment.

Regardless of which party is correct on the Guidelines issues, counsel respectfully submits that, for the totality of the reasons advanced herein, the just and appropriate sentence in this case is a non-custodial sentence.

### B.  The Nature and Circumstances of the Offense (§ 3553(a)(1))

Lion Air Flight 610 crashed into the Java Sea shortly after takeoff from Jakarta, Indonesia on October 29, 2018, killing all on board. It was an unmitigated tragedy. Worse, the family and loved ones of the decedents were robbed of the peace, security, and closure the eventual lawsuit should have swiftly provided. First it was by Lion Air—immediately after the crash, as local Indonesians rushed to the airport for news of their loved ones, upon confirmation of their worst fears, airline representatives forcefully ushered as many of these individuals into private rooms or areas at the airport gate as possible and unduly pressured them to sign legal releases in exchange for a pittance. Some of these individuals did not get to court at all as a result, and even for some of those that did, Boeing argued the validity of the releases to lessen the eventual recovery.

Several plaintiffs came to GK to file wrongful death suits. Not all of them retained the firm at the same time and it is worth noting how David became involved in the case. The victims whose money was eventually misappropriated came to the firm through a man named George Hatcher. Hatcher was a liaison of sorts for Tom Girardi and would send him business in return for money. This first tranche of cases came to the firm and were handled by senior lawyer Keith Griffin. David Lira had nothing to do with these cases and the victims in this case were not initially his clients.

Months later, after the firm had already hired the Edelson firm as local and co-counsel and filed suit for the original clients, David was referred a second batch of clients by a California attorney

named Anthony Koushan.[8] It was only then that David became involved in the cases. He too joined with the Edelson firm (mainly because they had already started work with GK through Keith Griffin) and started prosecuting the cases against Boeing. This was not an easy task. The clients were half a world away, some had signed liability releases immediately after the crash, and there were looming legal challenges, including on the issues of *forum non conveniens* and "death on the high seas."

Once David obtained these new cases, he and Keith then began to work together to bring them to a successful conclusion. They attended mediations, obtained "damages" packages from the victims, and otherwise did the legal work associated with the case. It was by no means a quick and easy ordeal as Boeing was initially playing hardball regarding the Lion Air releases, and there was a fear the case could get transferred to Indonesia where the laws were not as favorable to victims.

Mr. Lira got to work on the Lion Air cases and helped the plaintiffs achieve a notable settlement. The Lira Clients (referred by Koushan) received their entire settlement amounts, and Mr. Lira ensured that Mr. Koushan, his referral source, was paid as well.[9]

David did not formally file an appearance on the Lion Air matters. Judge Durkin's court orders requiring the settlement proceeds be distributed "as soon as practicable" did not require any specific individual to take any specific action. Rather, "[t]he settlement funds shall be distributed to Plaintiff […], individually and as legal guardian of the minor plaintiffs, in accordance with the process

---

[8] Had David never received the referral from Koushan, which were all funded and paid properly, he would have had no involvement with the Lion Air case.

[9] Importantly, David was in line to make absolutely no money personally on these cases aside from his salary. The "Keith" clients were firm clients and the money was set to pay the firms loans. The Koushan cases, even though originated through David's referral source, was money that also went to the firm. GK, unlike almost every other personal injury firm in the country, did not have a set percentage or bonus structure from attorneys who brought in business. Any extra money was at the discretion of Tom, who often promised and rarely delivered.

identified in Plaintiff's counsel's sealed affidavit." The disbursement process provided in that affidavit was as follows:

> The settlement funds for the minor plaintiff in this case shall be initially paid to a trust account established by Girardi Keese for the benefit of the Plaintiffs, including the minor. Pursuant to the instructions provided to counsel by Plaintiff [...] in [his/her] role as legal guardian for the minor plaintiff, the Plaintiffs' net proceeds (identified above) shall be sent as soon as practicable via wire transfer to PT Bank Madiri, Indonesia's largest bank and leading Islamic banking institution.

Nonetheless, Mr. Lira was subject to this order given that he was in fact a part of the team of attorneys representing the Lion Air plaintiffs, and he was a senior attorney at the Girardi Keese firm. After these orders were signed, the firm clients had their settlements funded by Boeing in Spring 2020. Keith Griffin handled the logistics because he was the senior attorney primarily responsible for these clients. To that end, he immediately sent to the firm's accounting department a settlement allocation and request for payment:



This was done in a timely fashion and was supposed to set into motion the immediate payment of the clients.  There is little doubt that Keith Griffin also desperately wanted these clients paid.[10]

Once the settlements were funded and the checks were deposited into the IOLTA account, the money should have gone immediately to the clients. Instead, Tom Girardi refused to issue the wires and began to use the money for other purposes. As the government had conceded, Tom Girardi fully ran the firms' finances, he decided who would be paid and when and the buck stopped with him. For the government to take a different position here or attempt to minimize its prior arguments would be, at a minimum, disingenuous. *See* Dkt. # 111 pp. 6-8.

How this happened when Tom Girardi made millions of dollars hand over fist during his career is simply infuriating. First, Girardi intentionally kept others in the dark regarding his finances.[11] Chris Kamon knew the ugly truth and was all-the-while pilfering the firm through his own side hustle. It was only after Rome had burned that the full scope of the carnage became clear. Tom was pumping millions into his wife's "entertainment" career. He was spending more and more and more, always assuming the next check would come in to settle the accounts. In the end, Tom Girardi was controlling, manipulative, and obsessed with increasing his own power and influence.

Raiding the firm's client trust account in this manner was, however, unimaginable, not because of Girardi's high moral character, but because doing so is an instant ticket to disbarment and imprisonment with scant hopes of "getting away with it." Girardi was in his 80s at the time of

---

[10] There was also a provision regarding the settlement payments that GK's portion were to be paid directly to California Lending for repayment of a litigation loan. The rest of the funds were to be used for the purpose of paying the clients and the Edelson firm.

[11] While the government relies heavily on the fact that David had the ability to sign trust checks, it was not until late 2019 when he really started understanding the scope of the financial issues. David's information about the firm's financial situation came from Kamon, who did not disclose his own thefts. David did not get updates regarding the trust account balances or have electronic access to the accounts.

his offense conduct. He was in the twilight of his career, and for many years had been effectively "playing out the string." In addition to disbarment and imprisonment, his legacy, and everything he spent decades building, would be destroyed entirely.

Of the monies that were received by GK, Mr. Lira signed two checks totaling $550,000.00 from the IOLTA account to the operating account. To be clear, this was in no way intended to deprive the Lion Air clients of their money, and the remaining funds that were in the account, (save the $550,000.00) was more than enough to fully pay the settlement funds to Lion Air clients. As to the rest of the checks purportedly signed by David Lira, they were forged. And while the government contends that Lira "allowed" others to sign his name to checks at times, they have no evidence he did so as it related to Lion Air and he had no visibility into the fact that his name was being signed to these other checks. Indeed, his signature continued to be forged after his resignation and departure from GK, a fact Judge Durkin noted as well.

In April 2020, Mr. Lira started receiving emails from the clients Keith had been the point man for and, with minor exception, David had almost no direct contact with. When they began asking him about the money, he made inquiries within the firm as to when the clients would be paid. His responses were not intentional lies. The first response indicated that the money was in the firm's possession and it was on Tom's "to do" list. This is true as he had been told this by Chris Kamon.

Claiming that Mr. Lira used the pandemic to intentionally lie is inaccurate. In the spring of 2020, virtually everyone mentioned Covid for myriad reasons, including as an excuse. One needs to look no further than this case, when the lawyer for Perkins Coie, when giving an excuse as to why

25

the Boeing wires had not funded yet, blamed Covid. To the extent Covid was brought up it was not to cheat the clients out of money. David was always actively trying to get them paid.

In any event, these clients were much more Keith's than David's. Keith "ran point," Keith represented them from the beginning, and Keith put together their settlement paperwork. This is not to say David had no responsibility towards them—he certainly did—but he did not have any regular contact with them until they started asking about their money.

As the weeks rolled on and Tom Girardi did not send the wires, David continued to make inquiries and complaints. On May 4, 2020, for example, David emailed one of the victims, "Hi Septi, I have forwarded your email to Tom Girardi. Only he can authorize the wires." On May 8, 2020, he forwarded another email from a victim demanding payment to Shirleen Fujimoto and Kim Cory, stating "Please make sure Tom sees this. Thanks." The more Girardi stalled, the worse position Lira found himself in. As is clear from text messages he sent with George Hatcher, he did not want to lie to the clients, he wanted them paid.[12]

In one exchange he explains to Hatcher, "I talk to Tom all the time about these issues. Last time he told me to fuck off. You don't know the half of it." (4/15/20 Hacther Text). He also explained, "Each day of delay is not good. I don't want to lie to the clients. Tom created this problem and he is the only one who can resolve it." (4/16/20).  On April 16, 2020, he wrote to Hatcher, who wanted Lira to reach out to the Lion Air client's about payment, "If I make a promise of when

---

[12] This is worth dwelling on. The government claims in its version that David's "wrongful conduct expanded far beyond the contours of what defendant admitted in his factual basis," and places great weight on his text message to George Hatcher, in which Lira expresses his knowledge that Girardi is "lying to clients." What David is doing in that message is expressing his shock and dismay at the situation. He is horrified by it and describes it to George Hatcher as "worse than bad." These are not the words of a co-schemer, a fraudster, or someone whose "wrongful conduct expanded far beyond the contours of what defendant admitted in his factual basis."

the money will be coming; it would be a lie" and "I like aviation – they are easy cases compared to my auto defect cases. I can write something but I am not going to lie."[13]

These texts show Mr Lira's state of mind. He wanted the clients paid, he hounded Tom to do it, and he did not want to lie to them. He pled guilty because he should have done more.

To be fair, he also did not want to blow up the law firm he worked at for over 20 years and risk the jobs of the employees he cared about. So, he took another path. As David testified before Judge Durkin, he pressed Tom for payment, he confronted Tom, he complained, and eventually, he called him a thief and told him he must pay the clients. Numerous GK employees corroborated these facts in interviews with the FBI.

As Christopher Aumais, a senior GK attorney stated on August 4, 2022:

```
    LIRA left GIRARDI KEESE before AUMAIS did.  LIRA left GIRARDI KEESE in
approximately July 2020.  LIRA did not tell AUMAIS too much when he left the
firm - just that he was leaving to work with JOHNSON.  AUMAIS could not
recall what exactly LIRA told AUMAIS when he told him he was leaving, and
AUMAIS could not recall if LIRA told him the exact circumstances that caused
him to leave.  LIRA may have told AUMAIS he was leaving GIRARDI KEESE for a
different firm a few days before he left.  AUMAIS knew that LIRA and GIRARDI
had been getting into heated discussions before LIRA left.  LIRA and GIRARDI
had a heated discussion the day LIRA left the firm.  That day, AUMAIS was
working upstairs in the same building GIRARDI worked in.  AUMAIS walked down
the stairs and heard LIRA and GIRARDI arguing.  AUMAIS could not recall
exactly what they were arguing about.  When AUMAIS heard them arguing,
AUMAIS went back upstairs. Later, after LIRA left the firm, AUMAIS learned
that the day of the argument was LIRA's last day.  LIRA told AUMAIS about
```

Tom Girardi's secretary, Shirleen Fujimoto, stated the following:

---

[13] Additionally, David Lira had already secured a position at another firm at this point. In maybe the most ironic part of this entire ordeal, he was supposed to join another firm in January of 2020. He did not because he was working on a case that was set for trial in New Mexico in the Spring of 2020, he was the only lawyer at the firm who was capable of trying it, and he did not want to abandon his clients.

> FUJIMOTO never heard KAMON talk about why the clients were not being
> paid.  Regarding if she ever heard GRIFFIN or LIRA talk about clients not
> getting paid, towards the latter part of 2020, FUJIMOTO heard both GRIFFIN
> and LIRA in GIRARDI's office telling GIRARDI they needed to get clients
> paid.  The gist of what FUJIMOTO overheard was that clients were calling and
> GIRARDI KEESE needed to get them paid. FUJIMOTO also heard those kinds of
> conversations even prior to the second half of 2020.  LIRA was pretty loud.

Moreover, and conspicuously missing from the Government's version (or otherwise generally unacknowledged to date), after Mr. Lira resigned from the firm, he notified the Edelson firm that the settlements had been funded. First, on June 16, 2020, near contemporaneous with his resignation, David informed the Edelson Firm of his departure and let them know that the settlement proceeds had been received by GK. Here is an example of Edelson Attorney Ari Scharg confirming this fact for the government:

Lira then again formally notified Edelson for a second time—and this time in writing—of the same via letter on July 6, 2020:



28

Edelson claimed to have not known this fact. Nonetheless, armed with this information (and awareness of the already existing delay), the Edelson Firm employed the same strategy as Lira (with the exception that they did not intentionally remove themselves from the situation and despite not being his "son-in-law") over the next five months—they pressed Girardi to pay the clients. It was not until December of 2020 after an additional five months passed before they finally notified Judge Durkin of the situation by filing a Motion for a Rule to show Cause as to why Girardi and Keese should not be held in contempt.

A year passed before the eventual hearing and at no time did the Edelson firm offer up its malpractice insurance money. During the hearing, Judge Durkin scolded the Edelson firm for not doing anything sooner. It was only at this point, a year later, and after they were told that they too were "in the soup," that they worked out an agreement with their insurer to pay the Lion Air Victims. Following the government's theory of prosecution, the Edelson's firm conduct was contemptuous and akin to David Lira's. David removed himself from the situation by formally ending his relationship with Girardi Keese, which was one and the same as ending his professional relationship with his mythical father-in-law[14], notified Edelson, who continued on as co-counsel for another five months all while still awaiting payment of their co-counsel fees. They knew the money had not been distributed in line with the order and did nothing for months other than hound Tom Girardi. This is not to say the Edelson firm was aiding and abetting Tom; they were most likely in shock and disbelief that this situation was occurring and wanted to give Tom the benefit of the doubt,

---

[14] This was anticipated to and in fact resulted in an incredibly vitriolic and personal response from Tom Girardi, including Tom subsequently writing to other attorneys in their professional network to disparage David, and serious personal and family consequences. David and Tom were estranged well before David's resignation from GK and have not spoken since that day.

notwithstanding the fact that none of them were married to his daughter. But it does demonstrate that the situation was bizarre and not easy to deal with, and that every lawyer involved pushed Tom to pay but took too long to notify the court of the situation.

***

<strong>Lie Letters</strong>

There has at times been a claim that David Lira also lied to other, unrelated clients and approved the sending of false letters. Any such claim is demonstrably false.

First, is the claim that David Lira sent a "lie" letter to Cesar Castillo. GVO p. 30. The letter itself was authored by Tom Girardi, not David Lira, and Lira was not copied on the letter. Next, the government relies on a response Lira gave to George Hatcher in an email. In that email, Hatcher remarked that a false Girardi letter to one of the Lion Air plaintiffs reminded him of a letter Girardi wrote to Castillo, and Lira remarked, "indeed." As David explained at the order to show cause hearing, he was referring to the other portion of that letter where Hatcher claimed that Tom Girardi would not know how to "put the fire out" once the clients received it, not the Castillo letter portion.

The next claim, that he had anything to do with the "lie letters" to the Lion Air clients is also not true. Again, Tom drafted those letters and it was Kim Corey who sent the letters to Keith Griffin, because Keith was the lawyer of these Lion Air Victims. Keith then forwarded the letter to Lira who disavowed the letters. The government claims that Mr. Lira "ok'd" the letters and then seconds later had reservations about sending them. The emails were sent in a flurry. Lira never "ok'd" sending them and then specifically told Kim not to send them. The government is reaching and the only clear message is when David says, "I wouldn't send these." Now, at this point, Mr. Lira absolutely should have notified his clients-as Judge Durkin aptly referred to it as a Rubicon moment-

of what had happened. Albeit constituting poor judgment, it does not support the negative conclusions and inferences the government posits.

This is supported by Kim Cory, one of Tom Girardi's secretaries, who regularly dictated his correspondences. She was interviewed regarding these letters and said the following:

- Cory did not remember drafting a series of letters and then sending them to Griffin and Lira and then revisions being made on the letters. (FD-302, 318E-CG-3354816_0000060.pdf, 2/10/22)
- Regarding Tom's May 13, 2020 letter to Dian Daniaty, "The letter attached to this email was a dictation Cory took from Girardi and typed." *Id.*
- Regarding the May 14, 2020 revised letter to Daniaty, "The letter attached to this email would have been dictated by Girardi and typed by Cory. Cory did not think whatever revisions were made were from Griffin or Lira – Cory thought the revisions would have been given by Girardi." *Id.*

***

## Perjury

The government has also alleged David Lira perjured himself. First, the government is not seeking an obstruction enhancement, nor should they be. They have voluntarily decided to dismiss these charges and counsel submits, at a minimum, no affirmative finding should be made on this point. That said, there is much to say about these allegations. As will be clear from the letters submitted from judges, lawyers, co-counsel, friends, family, and past clients, Mr. Lira's character is such that he would not willfully lie under oath.

When David testified at the Order to show Cause hearing, he had been gone from GK for 18 months. He voluntarily testified when he did not have to, unlike Tom Girardi and Christopher Kamon, who both asserted their Fifth Amendment privilege against self-incrimination. Moreover, at the time of his testimony Mr. Lira was fully aware that Judge Durkin had already referred the matter to the United States Attorney's office and that his comments would be scrutinized by federal

31

prosecutors. Mr. Lira did not expect the questioning to veer from the Lion Air matter and delve into the history of GK. Mr. Lira had no access to his text messages, emails, or case documents from GK.

The government's charges of perjury pertained to two related issues. The first had to do with Mr. Lira's knowledge of whether past clients had been paid late. Mr. Lira responded that he remembered at least one occasion where this was so, Cesar Castillo. After combing through GK files with an army of agents, the government was able to identify a handful of clients over the 30-year period that Mr. Lira worked at GK. While the government choses to look at this case with the benefit of extensive hindsight that David could not, through "dirty windows"—and asks probation and eventually the court, likewise, to draw every possible negative inference that they can against David Lira, the truth is that he testified to the best of his recollection at the time. The fact that there were other instances where clients were paid late, and Mr. Lira did not recall them, is not dispositive of the question. Moreover, knowing that the federal government was involved in this case, he would have to be insane to lie in this situation. He is not insane. He made a mistake.

Additionally, when he answered "no" as to whether Tom had lied to clients in the past, was similarly not a false answer. He testified to the best of his recollection at the time.

***

Regarding the nature and circumstances of the offense more generally, the victims have been made entirely whole. Girardi himself provided approximately half of the funds to them in the form of what the government calls "lulling payments," and Edelson reached an agreement with the victims whereby they would assign the right to Edelson to collect the judgment, and Edelson's malpractice insurance carrier would cover the outstanding balance. Finally, this was of course a non-violent offense, and there is no allegation of physical harm, threats, or violence.

**C.  The History and Characteristics of the Defendant (§ 3553(a)(1))**

In determining the sentence to be imposed, the Court must also consider the "history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1).

David Lira was born on May 26, 1960 in Blytheville, Arkansas. He has two siblings, Lorraine and Patricia. David's father, Carlos, worked as a mechanic for the United States Postal Service, and his mother worked as a homemaker. Both of his parents are now deceased.

David has resided in Los Angeles, California since he was three years old. David was the first member of his family to attend college. He became interested in attending law school after an 8th grade presentation about the work of lawyers called "Roll of lawyer." David attended undergrad at UCLA and graduated in 1983. He continued his education at Boston College, where he graduated with his juris doctor degree in 1986. He initially pursued corporate, transactional work, but eventually transitioned to plaintiff's work because of the engaging nature of the work and impact it can have on individuals.

Upon graduating law school, David worked at a civil litigation firm, practicing insurance defense. It was in 1994 or 1995 that he transitioned to plaintiff's side work. David was living in Northern California, and it was around the same time he met his wife, Jacqueline Lira.  The two met on a blind date and have been by each other's side ever since, through thick and thin, and most recently through the tempest that has become their lives.

After their marriage in 1996, sometime around 1998, David was considering changing firms and moving over to do plaintiff's work. His new father-in-law caught wind of this fact and was offended and embarrassed that David did not go to him for advice, much less a job. Tom eventually offered David a job at GK. Wanting to make his own name and way in the world, David was reticent

33

at first. But after talking it over with trusted confidants—all of whom unanimously advised he would be a fool not to take a job with the "King of Torts"—David accepted and began working at Girardi Keese in 1998.

To understand this case, it is important to know more about Tom Girardi and his firm. Tom was one of the most prestigious lawyers of his time. He built and exclusively owned a top tier law firm. He brought in billions of dollars in settlement proceeds over the years. And although his career and reputation ended in ruins, his firm helped countless plaintiffs who fought unimaginable odds to secure significant verdicts against insurance companies, corporations, and municipal entities.

This is a significant point because in the aftermath of this scandal it would be easy to forget that most clients who came to GK received top notch representation and were paid in full, including David Lira's clients. This was not some fly by night firm whose goal was the plunder trust accounts, maintaining only a thin veneer of legitimacy. Not at all. It was one of the most prestigious firms to work at in all of California. Numerous GK lawyers went on to become judges and valued members of the bar.

But Tom's ego was always front and center. He was larger than life and enjoyed the favor and loyalty of countless other powerful and wealthy individuals, politicians and judges included. He owned multiple private jets, stakes in casinos, and mansions. He married a Real Housewife of Beverly Hills approximately 30 years his younger and bankrolled her entertainment career. How much was enough for Tom Girardi? Just a little but more, as the saying goes. And as time wore on, and he lost his way, we can harken back to the words of Sir Thomas Moore in the Robert Bolt play *a Man for All Seasons*: "what good would it do a man to gain the whole world and lose his soul in the process?" As much as Tom is a villain in this story, his life is also a tragic reminder of the consequences of

greed and hubris. And so, somewhere along the line, Tom began to use his clients IOLTA account inappropriately—paying clients with whatever money was available—be it his own money, other client's money, or money he borrowed. Tom lost his way and the carnage he caused to his firm and the lawyers who worked there—mostly good and hardworking people—cannot be understated.

But in all things, David Lira was not Tom Girardi. As echoed in letters from lawyers, judges, and even Tom Girardi's own children, David was the antithesis of Tom Girardi. He did not have fancy lunches at Morton's with the glad handers; he did not buy 100 copies of every magazine with his face in it; he came to work, grinded in his office, took depositions, tried cases, and he went home to his family. Moreover, his relationship with Tom was completely estranged by the time this happened. Tom saw his grandchildren once a year. Tom did not come to the Lira house for holidays. The two men did not socialize. When David took depositions at the GK firm, he would position himself so that he would not have to look at the large and obnoxious oil painting of Tom that hung in the conference room. David made a good living, but not outlandish by any means and certainly not even close to the money he could have made elsewhere.

As for his work at the firm it was often exciting and rewarding. Every day was different and included working on incredibly engaging, high-profile cases, as well as mundane ones. Over the years, David came to represent plaintiffs from all walks of life—from factory workers to judges. Today, David has obtained over $500,000,000.00 for his clients through settlements and verdicts. He has successfully argued before the Supreme Court. He is a member of International Academy of Trial Lawyers, holds the rank of Advocate in the American Board of Trial Advocates, and he was named "Consumer Trial Attorney of the Year" by the Consumer Attorneys of California, among countless other awards. David is especially proud of his role at the Public Counsel Law Center, a nonprofit

public interest law firm dedicated to advancing civil rights and racial and economic justice, where he was a board member from 2010-2018.

Since the start of this case, David's life has been upended in every way imaginable. But true to his character, he did not run and hide under a rock or hold his head in shame. Certainly the sleepless nights have been too many to count and the physical, mental, financial and professional toll cannot be understated. But David has continued to practice law admirably. He has been employed at the California law firm of Engstrom, Lipscomb & Lack, where he does what he does best—he represents clients who are facing catastrophic injuries.[15] David Lira been a trial attorney for thirty-seven years without being sanctioned by a court or disciplined in any non-Lion Air related matters. Further, significant time has elapsed since his wrongful conduct without incident. Indeed, at his current firm he has been involved in approximately 70 cases that have settled during that same time and all clients were paid promptly and fully. As his sentencing date approaches, he has several cases set for trial. Mr. Lira's clients were all aware of his situation, and he has kept them abreast of his plea of guilty. In what may speak more to David's character and skill than anything, several of these clients have submitted affidavits that they still want Mr. Lira to represent them. He has no had issues of alleged misconduct in the last five years and as you can see from the letters of his co-workers, he is a valued member of the firm who shares his wit and wisdom with young lawyers at the firm.

---

[15] As part of his state bar proceedings, Judge Wang imposed a comprehensive set of conditions limiting Mr. Lira's practice in several ways. These restrictions included, prohibiting his control over client trust accounts and requiring co-counsel supervision over all client communications. Judge Wang also ordered Mr. Lira to submit quarterly certifications, under penalty of perjury, of continued compliance of the interim orders to the Office of Probation. Finally Judge Wang retained jurisdiction to revoke the interim remedies if there were any substantive violation by Lira or his firm. To date Mr. Lira has been in full compliance and is vigorously representing his clients.

Today, he has a wife of 28 years, Jacqueline Lira, and the two have four children: Michael (27), Catherine (24), and twins Elizabeth and Carolyn (21).

### D. The Factors Set Forth in 18 U.S.C. § 3553(a)(2)

18 U.S.C. § 3553(a)(2) requires sentencing courts to consider the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; [and] to protect the public from further crimes of the defendant."

### i. Promoting Respect for the Law and Deterrence

As the Supreme Court famously stated in *Gall*, "a sentence of imprisonment may work to promote not respect but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54.

It appears to be the case that Girardi was able to get away with his conduct for as long as he did because he was so powerful and influential. There is no shortage of blame to go around in that regard. First, solely Girardi himself, others at the firm, yes, but also, law enforcement and other investigators bare some level of blame as well. As the American Bar Association reported on March 13, 2023, a post-mortem investigation revealed that "Tom Girardi's efforts to buy relationships and exercise influence at the State Bar of California likely caused some ethics complaints against him to be improperly closed."[16] That report indicated that one witness reported, "it's almost like Girardi

---

[16] American Bar Association, State bar finds 'shocking past culture of unethical and unacceptable behavior' in its handling of Girardi complaints, *available at* https://www.abajournal.com/web/article/state-bar-finds-shocking-past-culture-of-unethical-and-unacceptable-behavior-in-handling-of-girardi-complaints#google_vignette (last accessed September 21, 2025).

became part of the fabric at the state bar." As a result, "State bar employees accused of unethical behavior in their dealings with Girardi are no longer affiliated with or employed by the state bar, according to the press release and a statement by Ruben Duran, chair of the state bar's board of trustees."

Meanwhile, the United States Attorneys' Office did not bring charges against any individuals until February 1, 2023. David has *not* been accused of participating in the full scope of Girardi and/or Kamon's frauds. Notwithstanding the fact that he was initially charged with participating in defrauding the Lion Air client victims—which the government not only agreed to dismiss, but has made binding admissions that David fought against Tom on this—David was *never* charged or accused of participating in the full scope of Girardi's criminal conduct. Each and every disparate, unconnected victim of Girardi's "Ponzi Scheme" were charged in the California Indictment, save those from the Lion Air matter.

Also relevant on this point is the government's treatment of GK Lawyer A. His name is Keith Griffin, and he was a senior lawyer at Girardi Keese. As noted, Mr. Griffin was the "lead" or attorney primarily responsible for handling the Girardi Keese firm's Lion Air clients. Mr. Griffin is the individual who calculated the settlement distributions, and prepared a case closing memorandum for Tom Girardi so that he would know where to wire the respective funds. Unlike David, who resigned from the firm as the improprieties continued and grew out of hand, Griffin remained at Girardi Keese to the bitter end. He remained for another six months, knowing equally as well as David that the settlement monies were due and owing each and every day he remained at the firm, and as attorney of record for plaintiffs. He continued to interact with the clients and the Edelson firm. He would show up to the office every day with Girardi and the rest of the firm. Emails that

Griffin sent constitute the executions of the alleged fraud scheme. He was not charged in the initial indictment but appears as "GK Lawyer A."[17] It was not until August 7, 2025, that the government elected to charge him with contempt of court and misprision of a felony, not long after reaching a plea agreement with Mr. Lira to the contempt charges, and to dismiss the others. While he may face those lesser charges now, he was treated differently than David, and the government persists in arguing David's personal culpability in the fraud scheme in certain respects.

The foregoing discussion of the state bar investigation failures, the delays in prosecution, and the government's questionable and uneven charging decisions is not to shift the focus off of David. Rather, when such substantial questions exist, it is *all the more important* to avoid an unnecessarily punitive sentence to avoid promoting derision of the law, rather than respect for it. Suffice to say, the fact that Girardi got away with his crimes until an age where he will not pay nearly the same price he would have had he been caught sooner does not justify making an example out of David Lira in the slightest.

Finally, there is absolutely no concern with specific deterrence. David Lira is no threat or harm to anyone in the future. This case was a perfect storm that began due to someone else's devices. Had David Lira not accepted that position in 1998, he is at home in Pasadena right now worrying about his caseload and how many games the Dodgers can last against the Cubs in October.

### ii. Collateral Consequences

David's heart was in the right place by trying to ensure the clients were paid. That cannot be overlooked and the government cannot deny that. Girardi and Kamon are thieves. David is not.

---

[17] For the record, there is ample evidence that Keith Griffin too was thrown into a situation he absolutely had nothing to do with creating and also pressured Tom to pay the Lion Air clients.

Moreover, the seriousness of the offense is reflected in collateral consequences that the guidelines do not account for. As a licensed attorney, a felony conviction for Mr. Lira may prove to be absolutely devastating. First, after the Court enters judgment, Mr. Lira will have to face the California State Bar. That case has been stayed during the pendency of the criminal case; however, he has recently been put on suspension due to his plea of guilty. Following sentencing the stay will be lifted and the case will resume. The contempt charge is not a crime of moral turpitude, and while Mr. Lira intends on practicing law, he fully expects to be disciplined from this matter.[18]

Disbarment is a possible, forthcoming consequence. As an individual who has made his living as a lawyer since 1986, this consequence, again, is potentially devastating. To be clear, however, disbarment is not a foregone conclusion and Mr. Lira hopes mightily that he will be allowed to continue to practice law. On this point, it deserves further note that David has been cooperative with the state bar, while others have invoked the Fifth Amendment privilege against self-incrimination.

It is not only the financial consequences that Mr. Lira faces with respect to his ability to practice law, but the reputational damage is equally disastrous. Since this case was first charged, anyone conducting an internet search on David Lira would instantly be flooded with news articles, the United States' Attorney's Office press release, and the like describing the allegations. The harm that both he personally and his businesses suffered, almost unquantifiable. And it will only be worse going forward. David Lira is now a 65-year-old man with an otherwise unassailable reputation. The point is certainly underscored by the countless letters from industry and professional acquaintances that have been submitted on his behalf. To now have his livelihood potentially taken from him even

---

[18] Keith Griffin had a similar case brought by the California State Bar and following a trial, where Lion Air clients testified, Mr. Griffin was suspended for a period of 18 months.

if by suspension, a craft he has spent his entire adult life honing, and to be branded a convicted felon, for contempt of court no less, is simply tragic. And most importantly, for our purposes, those consequences are not contemplated by the advisory guidelines.

Aside from the state bar case, Jay Edelson has sued Mr. Lira in Federal Court in California alleging he was part of a civil RICO case and has sought not only the money paid to Lion air, but $50,000,000.00 in punitive damages. Edelson, while often stating that he was not interested in the legal fees on Lion air, has taken extensive action to recoup those fees and more. He has sued Mr. Lira to get those same fees in a case pending in the Northern District of Illinois. There are other lawsuits too as Mr. Lira has miles to go before he rests.

### E. The Factors Set Forth in 18 U.S.C. § 3553(a)(3)-(4)

18 U.S.C. § 3553(a) further requires sentencing courts to consider "the kinds of sentences available" and applicable policy statements as provided in subsections (3) and (4). The guidelines range should be calculated here to counsel a sentence of 0-6 months' imprisonment. In other words, a non-custodial sentence is a guidelines sentence, and further, Mr. Lira should fall into Zone A of the Sentencing Table, which further counsels in favor of non-custodial alternatives.

Furthermore, it is important to recall that Congress intended probation to be the presumptive sentence for first-time offenders not convicted of a crime of violence or otherwise serious offense. *See, e.g.*, 28 U.S.C. § 994(j); *see also Gall v. United States*, 552 U.S. 38, 54 (2007) ("a sentence of imprisonment may work to promote not respect but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing."

### F. The Factors Set Forth in 18 U.S.C. § 3553(a)(6)

18 U.S.C. § 3553(a)(6) mandates that "[t]he court, in determining the particular sentence to be imposed, shall consider . . . the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." In fact, as the Supreme Court noted in Booker, Congress' "basic statutory goal" in enacting the guidelines was to implement "a system that diminishes sentencing disparity." *Booker*, 543 U.S. at 250.

There are a number of other involved individuals relevant to this factor. Tom Girardi received a sentence of seven years' imprisonment in the California matter, and Christopher Kamon received a 121-month sentence. But they were convicted of wire fraud and of intentionally stealing money from the Lion Air clients. David was not. They also have other convictions in California for the same conduct. David does not. Girardi was of course the principal bad actor here. The California matter did not pertain to fraud allegations relating to the four Lion Air plaintiffs; rather, it included fraud allegations stretching back for over a decade, with charged conduct pertaining to at least five additional, unrelated client victims.

Mr. Lira was not alleged to have been involved. Tom Girardi is also far more culpable than anybody else with respect to the conduct at issue here. Girardi is the one who exclusively decided to withhold payment from the clients. He is the one who profited from the criminal conduct, directly lied to clients and others, and he himself elected to proceed to trial rather than accept responsibility.

As for the Lion Air case, the charges against Tom Girardi were dismissed due to his age and his cognitive decline.

As the head of accounting and CFO of Girardi Keese, Christopher Kamon was just as knowingly involved as Girardi. And making matters worse, starting in at least 2013, Kamon utilized

his position to intentionally embezzle and misappropriate the said same funds. He utilized other co-schemers to pose as "vendors." They would create phony invoices for fabricated goods and services, which Kamon would then use for his own personal benefit, such as financing construction projects at his personal home. Altogether, Kamon embezzled and misappropriated over $10 million in funds from Girardi Keese between 2013 and 2020 with no one, not even Tom Girardi, knowing what was happening. Mr. Kamon was sentenced to 10 years imprisonment for his unrelated crimes against the GK law firm. In the instant case, he received a sentence of 68 months, which, based on the concurrent nature of the sentenced with the California case, adds no additional prison time. This is despite the government arguing firmly that his conduct here was wholly apart and separate from the conduct at issue in the California Case, and thus the practical effect of his concurrent sentence was no additional time in custody for this specific "separate" conduct. Any day in custody David received would thus be a day more than Christopher Kamon.

As it stands at present, then, Girardi has been dismissed and Kamon, due to his other criminality, did not receive any additional time for his crimes related to the Lion Air victims.

There is also G.K. Lawyer A in this indictment, Keith Griffin. As previously discussed, he was the "lead" or attorney primarily responsible for handling the Girardi Keese firm's Lion Air clients. Mr. Griffin is the individual who calculated the settlement distributions, and prepared a case closing memorandum for Tom Girardi so that he would know where to wire the respective funds. It was not until August 7, 2025, that the government elected to charge him with contempt of court and misprision of a felony, not long after reaching a plea agreement with Mr. Lira to the contempt charges, and to dismiss the others. The practical result of its charging decisions is uneven, non-

neutral treatment between similarly situated individuals and the creation of an unwarranted disparity.

Finally, the same could be said for Edelson P.C. And while their malpractice insurance ended up making the Lion Air clients whole in this case, there is more to the story. This firm acted as co-counsel with Girardi Keese, and for the firm clients, was set to receive attorneys' fees in a 50/50 split.[19] Edelson P.C. then, attorneys of record for these clients, tried to quickly distance themselves from David based upon the fact that they were not internal GK employees and were unaware of what was occurring in the early stages of the settlements being funded. True, from March of 2020 through early June of 2020 they were somewhat in the dark.

The fact is, however, that even lacking insight into the backend of the financial wires, after the case settled, even if they did not know exactly when the wires would have come in from Boeing, there was no basis for multiple months' worth of delay. They continued to remain co-counsel on these cases—for six whole months after David resigned and notified them the money sent from Boeing—and it was not until December 2020 that they finally alerted the Court as to the situation. This again shows the difficult and bizarre nature of the situation. As cited herein, David informed Edelson at least as of June 16, 2020, that the wires had been received. In those interim five months in which they remain attorneys of record after David's intentional departure, they did their best to press Girardi to make payment, the same as David.

As Judge Durkin remarked during the show cause proceedings:

You may be in the soup, too, over that. Not quite as early but at some point, definitely. Because this motion didn't come to me in September which - - or in August. It came December 2nd. And maybe it was a deference to Tom Girardi, this

---

[19] There seemed to be a misstatement during Chris Kamon's sentencing hearing that the Edelson firm reached out to GK to work on this case when in fact it was GK who sought the Edleson firm as co-counsel.

so-called titan of the plaintiff's bar that how could he ever lie, how could he ever do anything like this. That's really my call. Tr. 545.

After this, the Edelson attorneys quickly pivoted, cut a deal with their insurance company and positioned themselves as reformers and victim advocates, as opposed to being "in the soup." True enough, the fact that the Lion Air clients received their money was absolutely the most important result, regardless of the motives, but what all these people have in common is that they were left to deal with the mess Tom Girardi created.

## V.    Conclusion

David Lira is a reputable lawyer, father, husband, and human being generally. He has handled thousands of cases over the years. In one of those cases, he helped perform work on behalf of the firm's clients, and skillfully negotiated a hard-earned settlement alongside a team of other lawyers, both internal and external to Girardi Keese. Tom Girardi, the exclusive proprietor of Girardi Keese, decided not to pay them. David made efforts to convince Girardi to disburse the funds, but he did not do enough. He could and should have done more. He was overly trusting, sloppy, and not as meticulous as he could have been. And for that he has already paid a tremendous price.  Whatever the case may be, he is a good man who made a serious mistake. Those mistakes do not define him and should be weighed against what has been a remarkable life and career to date. The just and appropriate sentence in this matter is therefore a non-custodial sentence.

Respectfully submitted,

/s/ Damon M. Cheronis
**Damon M. Cheronis**

/s/Ryan J. Levitt
**Ryan J. Levitt,**
Attorneys for Defendant.

Damon M. Cheronis
**Cheronis & Parente LLC**
140 S. Dearborn St. Ste. 404
Chicago, IL 60606
312.663.4644
damon@cheronislaw.com

Ryan J. Levitt
**Benesch, Friedlander, Coplan, & Aronoff LLP**
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
312.212.4943
rlevitt@beneschlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I, Damon M. Cheronis, hereby certify that on September 24, 2025, I electronically filed the foregoing **Defendant's Clarifications and Objections to the Presentence Investigation Report; And Position Paper and Commentary on Sentencing Factors** with the Clerk of the U.S. District Court for the Northern District of Illinois, Eastern Division, by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the CM/ECF system.

s/ Damon M. Cheronis
Damon M. Cheronis
Cheronis & Parente LLC
140 S. Dearborn Street, Suite 404
Chicago, Illinois 60603
(312) 663-4644
damon@cheronislaw.com