

*Journal of Consumer Attorneys Associations for Southern California*

## Advocate

**June 2020**



**Christopher T. Aumais**
GIRARDI | KEESE



**David R. Lira**
GIRARDI | KEESE



# Problems in products liability likely to arise out of COVID-19

LITIGATION PROBLEMS STEMMING FROM COVID-19, AND COMMON ISSUES SURROUNDING *FORUM NON CONVENIENS* AND FAILURE-TO-WARN CASES

### The "Pandemic Pause"

As with the Spanish flu a century ago, 2020 has turned into a year that will go down as one of the most nefarious years in history due to the COVID-19 pandemic. When we first started work on this article, the world was a different place. We were planning on compiling a typical approach to products-liability cases. Then the world suddenly changed drastically.

So, we altered the focus slightly to address some recent developments. We decided to tackle some potential problems stemming from the COVID-19 and focus on two complex but common areas involving issues surrounding *forum non conveniens* and failure-to-warn cases.

### Early warning signs of the impact of the COVID-19 pandemic on products-liability cases

Aside from the numerous conspiracy theories about the origins of COVID-19, there have been some lawsuits that allege China failed to act quickly to contain the virus in the Wuhan region. One such complaint was filed by The Law Offices of Berman and Berman. Although it does not contain products-liability causes of action per se, it does contain a cause for strict liability for ultrahazardous activity:

"Upon information and belief, the only two registered bio-weapons laboratories in the [People's Republic of China] are located in the City of Wuhan, and one of them, the National Biosafety Laboratory at the Wuhan Institute of Virology, is the only declared site in China capable of working with deadly viruses, and handles, according to various press accounts, covert military applications of viruses."

The complaint goes on to allege that "some Chinese researchers are in the habit of selling their laboratory animals to street vendors after they have finished experimenting on them, instead of properly disposing of infected animals by cremation, as the law requires…" (https://images.law.com/contrib/content/uploads/documents/392/85094/Coronavirus-China-class-action.pdf.)

*See Aumais & Lira, Next Page*


The crux of this cause of action is that a bioweapon was the source or legal cause of the initial spread of COVID-19 because it was developed and/or "manufactured" in the Biosafety Lab, then dead lab animals were discarded or sold to the "wet market" for human consumption. Although this is not a technical "products" claim, it highlights certain reckless disregard for safety protocols. Perhaps not as extreme and far reaching, here we have many examples of development and ultimate dissemination to the consumer of various defective products such as pharmaceuticals, medication, or vaccines.

### Surprise, surprise

The plaintiff's bar has also seen many defendants use the outbreak for slowing negotiations and stalling the resolution of cases. For example, rumors abound that Bayer AG recently backed out of talks involving the Roundup weed killer. This product allegedly causes certain types of cancers, including but not limited to non-Hodgkin's lymphoma. Bayer/Monsanto of course denies that the key ingredient in Roundup, glyphosate, causes cancer.

After losing three trials in California that resulted in combined damages of $191 million, Bayer/Monsanto agreed to postpone upcoming trials to engage in further negotiations. Bayer/Monsanto is appealing the verdicts. Approximately six trials were set to commence at the beginning of 2020. Bayer was close to settling 45,000-75,000 claims related to its Roundup herbicide, manufactured by its subsidiary Monsanto Co., with mediator Ken Feinberg.

Then the pandemic hit.

This "pandemic pause" gives Bayer/Monsanto time to gauge the impact of the COVID-19 pandemic and ultimately help keep the global settlement under $10 billion. One Bayer spokesperson, Chris Loder, recently indicated that "COVID-19 dynamics, including restrictions imposed in recent weeks, have caused meeting cancellations and delayed this process … We cannot speculate about potential outcomes from the negotiations or timing, given the uncertainties surrounding the pandemic …" (www.claimsjournal.com/news/national/2020/04/06/296411.htm; https://www.bloomberg.com/news/articles/2020-04-04/bayer-effort-to-settle-roundup-cancer-cases-slowed-by-covid-19)

These developments should concern us all because this example may foreshadow the attitude of many manufacturer-defendants from the mass pharmaceutical case down to the defective-seat-belt products case.

The pandemic may also lead some manufacturers to the U.S. Bankruptcy Court steps. Indeed, some forecast that Chrysler (or other automobile manufacturers) may decide to go this route – mirroring a move by GM after the financial crisis. (https://www.cnn.com/2020/04/08/business/auto-industry-coronavirus-impact/index.html)

Many of us remember the slog through the GM bankruptcy and are not keen to return to that kind of quagmire.

### COVID-19 and the manufacturing of products; enter Trump

On April 28, 2020, President Trump said he would sign an executive order on food supply. This partially stemmed from recent outbreaks at certain meat-producing plants like Tyson Foods. The order, reports the Associated Press, is meant to deal with the shortage of chicken, pork and other meats in grocery stores. The order will use the Defense Production Act to classify meat processing as critical infrastructure to keep production plants open, the news organization reported.

At least 20 meatpacking plants have closed in recent weeks because of various outbreaks, according to an analysis by The Washington Post. The United Food and Commercial Workers, which represents thousands of workers at U.S. meat plants, indicated that at least 17 have died of COVID-19, and at least 5,000 have been directly affected by the virus.

In addition, the Washington Post reported, "legal experts say there are serious questions about whether legislation Trump cited authorizes the president to grant broad immunity to businesses from workplace, environmental and other safety protections, nor is it clear whether Trump can order a shuttered manufacturing plant to reopen." The immunity applies when manufacturers are sued for acts or omissions connected to their compliance with the Defense Production Act. However, it would not apply to choices they made in refusing to comply with other legal obligations." For example, prior Court rulings on the law indicate that plants would probably not be granted immunity if they refused to comply with local health officials' orders to provide protective gear or did not take steps to allow for social distancing. (https://www.washingtonpost.com/business/2020/04/28/trump-meat-plants-dpa/)

As of the date this article was written, the specific contents of the Order remain vague at best. Most legal experts believe that the main liability concern of the Order involves potential violations of various labor laws. Immunities extending to cover products-liability suits are anticipated either from the Defense Production Act or from other sources. We are seeing this play out in "real time." The FDA has continued to expand its Coronavirus-related Emergency Use Authorizations to cover additional products to respond to the COVID-19 pandemic, many of which may qualify for immunity under the Public Readiness and Emergency Preparedness Act (PREP Act), the FDA's Coronavirus Emergency Use Authorizations for Medical Devices. Indeed, such actions were contemplated by many in the years leading up to the current pandemic. (See James G. Hodge, Jr., JD, LLM et. al., *From (a)nthrax to (z)ika: Key Lessons in Public Health Legal Preparedness* (2018) 15 Ind. Health L. Rev. 23, 38.)

Many defense firms are concerned for their manufacturer-clients over potential liability in a products-liability

*See Aumais & Lira, Next Page*


lawsuit if they switch their manufacturing process to produce items that they do not normally produce. This includes the production of masks, ventilators and other medical equipment.

As opposed to federal protections, expect defense firms to argue that their manufacturer-clients also qualify for increased liability protection through individual state laws. Currently, there are state statutes that provide liability protection to parties acting pursuant to government or legal authority. California extends immunity for persons and private entities acting in response to public-health emergencies under the California Emergency Services Act. (Gov. Code, § 8657.5) Furthermore, to the extent companies are manufacturing products at the direction of the government, companies may be able to assert the "government contract defense" to receive liability protection in the event of a products-liability claim. The defense provides companies that contract with a public body for the performance of public work protection from liability for damages resulting incidentally or necessarily from performance of the contract. (Commander Charles W. Tucker, *The Government Contract Defense in Products Liability Cases* (1985) 34 Naval L. Rev. 157.) The justification of the government-contract defense rests on public policy grounds and is a complete bar to claims based on strict liability, breach of warranty, and negligence. (The Government Contactor Defense, C607 ALI-ABA 1321, 1329.)

Defense firms are already recommending that manufacturer-clients look to state and local laws to determine whether the government contract defense applies to specific claims. Although the Supreme Court applied the government contract defense to design defect claims, jurisdictions have differing opinions regarding whether to apply the defense to failure-to-warn and manufacturing-defect claims. (*In re "Agent Orange" Prod. Liab. Litig.*, 304 F. Supp. 2d 404, 437 (E.D.N.Y. 2004), aff'd sub nom. *In re Agent Orange Prod. Liab. Litig.* (2d Cir. 2008) 517 F.3d 76.) (https://www.bclplaw.com/en-US/insights/us-liability-considerations-for-product-manufacturers-shifting-production-to-new-products-to-assist-in-pandemic-response.html)

### Practical analysis: *Forum non conveniens* and failure-to-warn cases

Plaintiffs' lawyers in Los Angeles encounter various types of products cases and do a terrific job with them. However, we have recently seen that there are a few areas under the products umbrella that can be quite challenging. Although there are numerous "problem" areas, we chose to focus on forum non conveniens and failure-to-warn cases.

**Forum non conveniens** *doctrine – "An inconvenient truth" – David Lira*

The global market place and the proliferation of products by foreign manufacturers pose complicated jurisdictional and procedural obstacles for lawyers filing products-liability lawsuits. Service of the summons and complaint, discovery and preservation of evidence issues are commonplace with foreign manufacturers. This section will address the doctrine of *forum non conveniens* ("FNC") in both state (California) and federal court. The litigation pertaining to the Boeing 737-8 MAX will be discussed in this context.

**The FNC doctrine**

*Forum non conveniens* is Latin for "an inconvenient forum." The doctrine applies between courts in different states and countries. In its simplest terms, the doctrine bestows discretionary power to courts to dismiss a case where there is a more "appropriate" forum to hear the dispute. (*Stangvik vs. Shirley, Inc.* (1991) 54 Cal.3d 744, 751.) However, a court should not grant an FNC dismissal where alternative forum is unavailable or inadequate. (*Stroitelstvo Bulgaria Ltd. v. Bulgarian-American Enterprise Fund* (7th Cir. 2009) 589 F. 3d 417, 421.) An alternative forum is "available" if all of the parties are amenable to process and are within the forum's jurisdiction. (*Ibid*.) An alternative forum is "adequate" if it provides the plaintiff with a fair hearing and remedy. (*Ibid*.) While FNC motions are common in both state and federal courts, the statutory schemes and case law are similar in many regards.

The procedure in bringing an FNC motion in California state courts is governed by Code of Civil Procedure sections 410.30 and 418.10. The California Legislature codified the doctrine of FNC in 1969 by enacting Code of Civil Procedure section 410.30 (*Hahn v. Diaz-Barba* (2011) 194 Cal.App.4th 1177.)

The court is not required to make findings of fact in ruling on the motion. (*Cal-State Business Products and Service, Inc. v. Ricoh* (1993) 12 Cal.App.4th 666.)

Both state and federal courts employ a balancing test in FNC motions. If there is an "alternative" forum that is both "available" and "adequate," the court will balance the private interests of the parties and the public interests of the alternative forums. (*Stangvik v. Shirley, Inc.*, 54 Cal.3d at p. 751.) Relevant private interest factors include access to evidence, process and costs for attendance of witnesses, to name a few. A predominant public interest includes the avoidance of conflicts of laws or in the application of foreign law. The local interest is having localized disputes decided at home and the unfairness of burdening citizens in an unrelated forum with jury duty. (*Campbell v. Parker Hanifin Corp*. (1999) 69 Cal.App.4th 1534.)

A plaintiff's choice of forum should be disturbed only if the balance of public and private interest factors strongly favors the defendant. Where the plaintiff is a foreign citizen, his choice of the United States as a forum should be accorded less deference than if a choice is made by a United States citizen. (*Sinochem Int'l Co. v. Malaysia Int'l Shipping Co.* (2007) 127 S.Ct. 1191.) Furthermore, in determining whether an alternative forum is adequate, the test is whether the forum provides some potential avenue for redress for the subject matter of the dispute." (*Stroitelstvo Bulgaria*, 589 F.3d at 421.)

*See Aumais & Lira, Next Page*

CHRISTOPHER T. AUMAIS AND DAVID R. LIRA, continued



June 2020

Questions as to the "suitability" may be avoided by defendants' agreement to submit to foreign jurisdiction, tolling of any statute of limitations, agreeing to discovery orders of the foreign court and agreeing to make witnesses available to testify in the foreign court. (Weil & Brown, California Practice Guide, Civil Procedure before Trial, ¶ 3.423.5.)

### Case Study: Boeing 737 Max 8 Litigation (Handling plaintiffs' attorney, David Lira)

On October 29, 2018, Lion Air Flight JT610 departed Soekarmo-Hatta International Airport in Jakarta. The designation was Depati Amir Airport (aka Pangkal Pinang Airport) in Pangkal Pinang City, Bangka Belitung Islands Province, Indonesia. The Boeing 737 Max 8 aircraft with tail number "PK-LQD" operating the route crashed into the Java Sea twelve minutes after take-off, killing all passengers and crew (178 adults, one child and two infants) (the "Incident").

*Product defect allegations*

Plaintiffs alleged that the subject aircraft's maneuvering characteristic augmentation system ("MCAS") was defectively designed. More particularly, the defective MCAS caused the aircraft's nose to suddenly drop and dive steeply as a result of the aircraft receiving erroneous input from the MCAS's angle of attack ("AOA") sensors. The AOA sensor measures how high or low the aircraft's nose is positioned relative to oncoming air. It was further alleged that the 737 MAX 8 flight operations manual ("FOM") lacked proper and adequate instructions on how to correct the MCAS during flight.

The MCAS malfunctioned on a previous Lion Air flight a week prior to the incident. In that flight, the AOA sensor erroneously concluded the nose was too high and the aircraft was losing lift, causing a stall warning. This triggered safety software to put the aircraft into a dive.

Because Boeing has its corporate headquarters in Chicago, Illinois, Plaintiffs filed their lawsuits in the United States District Court in Chicago, Illinois.

### The *FNC* doctrine rears its ugly head

During the pendency of the cases, Boeing's lawyers advised the court of its intent to file a Motion to Transfer the case to a more suitable forum, i.e., Indonesia. Judge Thomas M. Durkin discussed Boeing's imminent FNC Motion in open court. The hearing disclosed factors which were weighing heavily and included the following:
- The airline disaster occurred in the Java Sea;
- All passengers and crew were non-U.S. citizens;
- The Indonesian equivalent of the NTSB had the lead on the investigation;
- The pilots were Indonesian (Boeing asserted pilot error); and
- The Indonesian authorities cited several causes of the incident, including pilot error, Lion Air's failure to address a prior control incident, improper maintenance of a sensor, to name a few.

During one hearing, Judge Durkin stated in reference to case law in the 7th Circuit the following:

> "You can't read these cases without coming away from it with the impression is the law is pretty – pretty favorable to moving this case out and back to Indonesia."

Judge Durkin was abundantly clear that he had not made up his mind but was signaling the obstacles the plaintiffs might encounter with the facts known at the time and the existing caselaw. Litigation involving the crash of Air Asia Flight 8501 in 2014 was originally filed in the U.S. District Court in Chicago. In that case, the Court found Indonesia both "available" and "adequate." The Court noted that under Indonesian law a products-liability claim could be submitted and maintained, thus providing an "adequate" forum.

Another example of the Court's weighing both private and public interests is *Clerides v. Boeing Co.* (7th Cir. 2008) 534 F. 3d 623. In *Clerides*, the crash occurred during a flight from Cyprus to Greece. The plane was designed and built by Boeing in the State of Washington. One hundred eleven of the 115 decedents were nationals of Greece or Cyprus, and none was a United States citizen. The official accident investigation was conducted by the Greek Accident Safety Board, with representatives of the NTSB participating. Boeing acted as a technical advisor to the NTSB, providing assistance as requested. The accident report attributed the direct causes of the accident to flight crew errors, but also criticized Boeing's checklists, cabin altitude warning horn, and inadequate remedial response. (*Id*. at 626-27, 630.) On these facts, the Seventh Circuit affirmed the District Court's forum non conveniens dismissal of the action.

FNC motions are also prevalent in mass torts involving pharmaceuticals such as the Accutane drug cases in Los Angeles County. (Judicial Council Coordination Proceeding No. 4740). Defendants' motion based on the FNC doctrine was granted resulting in many Plaintiffs' cases being transferred to other state courts. In weighing public interest factors, the Court concluded:

> "California's interest in the case is minimal. The two major Defendants, Hoffman-LaRoche, Inc. and Roche Laboratories – are located outside of California, and manufactured Accutane outside of California. It was distributed in California by the one California party to the case, McKesson Corporation. However, all of the listed Plaintiffs are out-of-state residents, and were prescribed Accutane outside of California by non-California physicians. Thus, notwithstanding the listed Plaintiffs' choice of California as a forum, these competing facts (demonstrating California's miniscule interest in these particular claims) demonstrate that granting the motion is appropriate – notwithstanding California's general jurisdiction over the parties in the case."

The granting of an FNC motion to dismiss will promptly get the United States lawyers removed in cases where the alternative forum is a foreign country.

*See Aumais & Lira, Next Page*


Therefore, it is incumbent that lawyers analyze the factors that courts consider in such motions before filing.

## How to approach a failure-to-warn case

### Warning/instruction defects

To make a prima facie case, plaintiff has the initial burden of producing evidence that he or she was injured while the product was being used in an intended or reasonably foreseeable manner. If this prima facie burden is met, the burden of proof shifts to the defendant to prove that the plaintiff's injury resulted from a misuse of the product. (*Perez v. VAS S.p.A.* (2010) 188 Cal.App.4th 658, 678.)

"The actual knowledge of the individual manufacturer, even if reasonably prudent, is not the issue. We view the standard to require that the manufacturer is held to the knowledge and skill of an expert in the field; it is obliged to keep abreast of any scientific discoveries and is presumed to know the results of all such advances." (*Carlin*, supra, 13 Cal.4th at p. 1113, fn. 3.)

"'A manufacturer's duty to warn is a continuous duty which lasts as long as the product is in use.' [¶]... [T]he manufacturer must continue to provide physicians with warnings, at least so long as it is manufacturing and distributing the product." (*Valentine v. Baxter Healthcare Corp.* (1999) 68 Cal.App.4th 1467, 1482.) "In most cases, … the adequacy of a warning is a question of fact for the jury." (*Jackson v. Deft, Inc.* (1990) 223 Cal.App.3d 1305, 1320.)

A product not otherwise defective in manufacture or design may nonetheless be deemed legally "defective" if a suitable warning about its dangerous propensities is not given (e.g., warning of potential risks from use of certain machinery, etc.). Similarly, a legal "defect" may be rooted in the failure to *provide appropriate safe use instructions.* (*Webb v. Special Elec. Co., Inc.* (2016) 63 C4th 167, 180-181; *Barker v. Lull Engineering Co., Inc.* (1978) 20 Cal.3d 413, 429; *Johnson v. American Standard, Inc.* (2008) 43 Cal.4th 56, 64-65; see CACI 1205; BAJI 9.00.7.)

In almost every products case, defendants inevitably look to the Affirmative Defense of Product Misuse or Modification. (CACI No. 1245.) Product misuse is a complete defense to strict products liability *only* if the defendant proves that an unforeseeable abuse or alteration of the product after it left the manufacturer's hands was the sole cause of the plaintiff's injury. (*Campbell v. Southern Pacific Co.* (1978) 22 Cal.3d 51, 56; see CACI No. 1245.)

Evidence that some users heeded the warning does not establish the warning was adequate. "A manufacturer does not satisfy its duty to warn by supplying a warning so vague and ambiguous *only some* users are likely to read and comprehend the danger." (*Huynh v. Ingersoll-Rand* (1993) 16 Cal.App.4th 825, 834.)

## Case study: Child seat failure to warn – *Martin v. ABC Seat manufacturer* (Handling plaintiff's attorney, Christopher T. Aumais)

In *Martin*, an almost 2-year-old boy was catastrophically injured when a drunk uninsured truck-driver hit his parents' vehicle head on. The poor child was rendered a quadriplegic with a TBI. He spent over six months in the hospital, endured over a dozen life-threatening surgeries, and was not expected to survive.

### Product defect allegations

Plaintiffs sued the manufacturer of the baby seat for failure to properly warn the parents that it is significantly more dangerous to have a baby seat forward-facing as opposed to rear-facing.

During the crash, the minor plaintiff sustained an atlanto-occipital separation of his cervical spine. This type of injury is very infrequent during frontal crashes involving children. However, when it does occur during a frontal crash, typically the child is forward-facing and the inertial loading of the head applied to the neck places the neck in flexion and distraction. Most often, some head impact is also involved. Younger children are at greater risk of cervical injury from inertial loading of the head due to their under-developed ligaments and musculature in the cervical spine combined with their relatively large head.

While young children are more vulnerable to cervical injury, our review of real-world crashes from NHTSA's NASS CDS database indicates that many children between one and five years old, restrained in forward-facing car seats in very high delta-V crashes (30-50 mph) have survived without serious cervical injuries and often sustained only recoverable or minor injuries, even when the car seat is not tethered. In all cases, where a serious cervical injury occurred, there was also head impact.

Research has found, and it has been widely recognized for decades, that infants and children are afforded significantly superior crash protection when restrained in a rear-facing car seat compared to a forward-facing car seat or any other type of restraint system.

As a result, all organizations dedicated to the crash protection of children have stated for decades that children should remain in rear-facing car seats for as long as possible. In 2009, the American Academy of Pediatrics recommended that children remain rear-facing until at least two years of age. In 2014, the NHTSA Passenger Safety Guide recommended that children remain rear-facing until they are three years old.

The standards and research upon which this change was based have been available and widely recognized since at least 2007. Finally, in 2015, assembly member Cristina Garcia introduced Assembly Bill 53, which would require children up to two years old to sit in a rear-facing car seat. The bill was eventually signed by Governor Brown.

In this case study, the warnings and instructions for the subject seat were defective and unreasonably dangerous because they were inconsistent with how a child under two years old should be restrained. The warning on the

*See Aumais & Lira, Next Page*



car seat itself, on the box and in the instructions, all contradicted each other. For example, the case study subject seat stated that children must remain rear-facing until they are 20 pounds and one year old. This is incorrect as children should remain rear-facing until at least two years of age. Additionally, another warning stated that an infant should ride rear-facing as long as possible – again contradicting other warnings. The minimum weight for forward-facing was listed as 20 pounds. Essentially, all children exceed 20 pounds before their second birthday; therefore, this minimum-weight threshold encourages children under two years old to be positioned forward-facing.

The parents testified that the child's legs were becoming bunched and wanted to check to see if it was safe to change the seat to forward-facing. After reading all instructions and warnings, they found the instruction that said it was safe for a child who weighed 20 pounds and was a year old to be seated in the forward position. The parents complied with the instruction only two days before the crash.

Interestingly, our research uncovered that the manufacturer contributed to several articles contradicting their own improper warnings. This highlights the absolute importance to look under every proverbial rock. For example, disgruntled former employees and the use of various plaintiff listservs were extremely helpful in this case.

Although this case was especially challenging and complex, it came to a successful resolution.

One of the keys to any type of warning case like this one is to adequately prepare your client for deposition on the issue of familiarity of the warning. Specifically, that the plaintiff was aware of the defective warning, read the warning, and most importantly, *followed* the defective instruction. This seems like a "no-brainer," but clients who have suffered so much pain need to be reminded to be clear in their account of this crucial component in any failure-to-warn/labeling case.

### And when it's your own child…

One last takeaway. As a father of an almost three-year-old daughter, I have struggled with child-seat instructions and installation. In fact, I consulted our expert on this case numerous times – the first time when I was purchasing and installing a car seat. He recommended the Britax Boulevard. He also recommended that we take advantage of the LAFD's car seat installation program (most Fire Departments have such a program).

The second time was just after my daughter turned two years old because she looked uncomfortable and her legs were bunched. He informed me to keep her rearward facing for *"as long as possible"* – until she turns four or five, if we could! He continued by saying *"She may need to fold her legs, but as long as she meets the height and weight requirements and she tolerates the leg room issue – keep her rear-facing. If her head gets near the top of the child seat's back, that's also an indication that it's time to go forward facing. When you do put her forward facing, make sure you use the child seat's tether."*

Feeling a little dumb, I had to immediately consult the instructions to figure out where the heck the tether was on a car seat! Hopefully, this last bit of information is especially helpful to many of you who have young children and are trying to navigate through various child seat warnings and instructions.

### Conclusion

We covered a lot of ground, and we hope that it will help guide you through some pitfalls in the months, if not years, ahead.

*David R. Lira is a senior trial attorney at* Girardi | Keese. *He is President-Elect of the Los Angeles Chapter of ABOTA.*

*Christopher T. Aumais is currently on the CAALA Board of Governors and trial attorney at* Girardi | Keese. *He also serves on the Boards for CAOC, AAJ and LA ABOTA.*