## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA,

     Plaintiff,

v.

DAVID R. LIRA,

     Defendant.

23 CR 54-3

Judge Mary M. Rowland

## DAVID LIRA'S RESPONSE TO THE
## GOVERNMENT'S SENTENCING MEMORANDUM

## TABLE OF CONTENTS

Page

I. Introduction .................................................................................................. 1-5

II. Factual Disputes and Clarifications ........................................................... 6-23

    A. David "Fled the Firm" ........................................................................ 6-9

    B. Koushan Wires .................................................................................. 10-12

    C. Notification to "Local Counsel" ....................................................... 12-13

    D. The Successor Agreement & the "Son-in-Law" ............................... 13-14

    E. David's Personal Finances Circa 2020 .............................................. 15-16

    F. Lira Signing Trust Checks ................................................................. 16-17

    G. "Lies" to Victim Clients .................................................................... 17-19

    H. Dismissed Perjury Allegations .......................................................... 19-23

III. Guidelines Calculations ............................................................................ 24-31

    A. Clarification Regarding the Base Offense Level, PSR, p. 14 ¶ 41-42:
    U.S.S.G. § 2J1.2 was Correctly Identified as the Most Analogous
    Guideline. ............................................................................................ 24–28

    B. Offense Level Computation, Victim Related Adjustment, PSR p. 15 ¶
    46: Clarification Regarding U.S.S.G. § 3A1.1(b) ............................... 28-30

    C. Offense Level Computation, Victim Related Adjustment, PSR p. 15 ¶
    47: Clarification Regarding U.S.S.G. § 3B1.3 .................................... 30-31

IV. 18 U.S.C. § 3553(a)(6) .............................................................................. 31-32

V. Conclusion ................................................................................................... 33

## TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*United States v. Alvear,*
   2024 WL 940414 ................................................................................ 19

*United States v. Betts,*
   99 F.4th 1048 (7th Cir. 2024) ........................................................23, 28

*United States v. Cotton,*
   823 F.3d 430, 439 (8th Cir. 2016) ...................................................... 19

*United States v. Johns,*
   686 F.3d 438 (7th Cir. 2012) ............................................................. 24

*United States v. Parolin,*
   239 F.3d 922 (7th Cir. 2001) ............................................................. 24

*United States v. Rumsavich,*
   313 F.3d 407 (7th Cir. 2002) ............................................................. 24

*United States v. Tankersley,*
   296 F.3d 620 (7th Cir. 2002) ............................................................. 27

*United States v. Trudeau,*
   812 F.3d 578 (7th Cir. 2016) ........................................................27, 28

**Statutes**

18 U.S.C. § 401 ...................................................................................25-26

18 U.S.C. § 3553 ............................................................................... passim

18 U.S.C. § 3584(a) .............................................................................. 32

**United States Sentencing Guidelines**

U.S.S.G. § 1B1.3 ..................................................................................... 3

U.S.S.G. § 3A1.1 ................................................................................28-29

### DEFENDANT'S RESPONSE TO THE
### GOVERNMENT'S SENTENCING MEMORANDUM

Defendant, **David R. Lira**, by and through his attorneys, **Cheronis & Parente LLC,** and **Ryan J. Levitt**, pursuant to Rule 32(c) of the Federal Rules of Criminal Procedure, and the Due Process and Effective Assistance of Counsel provisions of the Fifth and Sixth Amendments, hereby submits his response to the government's sentencing memorandum.

## I.     Introduction

As lawyers, our task is to assemble evidence, invite the factfinder to draw reasonable inferences, and argue vigorously for our side. In some cases, the issues are relatively straightforward, such as whether Jim shot Bill or whether the car ran the red light. Even despite nuances, the core issues can and do often remain clear. Advocates naturally rely on inference, because that is logical and what we are trained to do. The government's memorandum largely does the same. In many instances, however, the government disregards contrary, objective evidence, oversimplifies complicated questions, and stacks multiple, tenuous inferences upon each other in order to press an interpretation of the facts that, to be diplomatic, is subject to vigorous debate. At several points, and as a result, it encourages the Court to view this case and Mr. Lira through a lens that distorts the broader context and reality of this sentencing.

To be clear: David Lira failed his clients in the Lion Air matter. Nothing in our briefing minimizes that fact. Nor does Mr. Lira claim this was a "technical" violation of the law. He understands its weight and gravity. Equally important, however, is that the Court's view of Mr. Lira be balanced, contextual, and reflective not only of his final months at Girardi & Keese, but of his entire career as a lawyer and as a person.

In its opening line, the government asserts that Mr. Lira "cared more about his own career than protecting his clients' interests." That is a sweeping statement—and one refuted by more than 200 letters from judges, lawyers, and clients alike. The government further claims that Mr. Lira knowingly remained silent while Girardi stole from clients and repeatedly lied to Judge Durkin. The government's assertions, however often repeated, do not transform into established facts. The reality is that the government itself chose to dismiss these charges, despite having every opportunity to present them to a jury if it believed they should be tried.

As this Court is aware, this matter was set for trial and was resolved only weeks before jury selection was set to begin. Mr. Lira did not initially seek a deal; he was prepared, as was his right, to have twelve jurors decide his fate. At trial, evidence would have been presented, witnesses examined, arguments made, and the adversarial process honored. Instead, the matter was fairly resolved and Mr. Lira stands by his guilty plea where he admitted that he violated Judge Durkin's order and recognizes the harm that caused his clients. Ultimately, the government agreed to dismiss all fraud and perjury counts and agreed to a factual narrative that acknowledged Mr. Lira's efforts to secure payment for the Lion Air clients. Yet now, despite that resolution, the government presses forward with arguments related to fraud and perjury.

To be clear, this is not a case about relying on acquitted conduct. Rather, it involves conduct the government itself chose not to pursue at trial. It made that decision notwithstanding the Department of Justice guidelines stating:

> Plea agreements should reflect the totality of a defendant's conduct. These agreements are governed by the same fundamental principles as are charging decisions: prosecutors will generally seek a plea to the most serious offense that is consistent with the nature and full extent of the defendant's conduct and likely to result in a sustainable conviction and proportional sentence, informed by an

2

individualized assessment of all of the facts and circumstances of each particular case. See DOJ Manual: 9-27.400 - Plea Agreements Generally.

This is worth discussion because the government entered into a much more limited plea agreement yet it has expressly argued that the "full extent" of Mr. Lira's conduct is much broader. While it is not legally estopped from doing so, it begs the question as to why it did so on the lesser charge only. To put a finer point on it, if the government offered a plea agreement that in its opinion did not reflect the totality of the defendant's conduct but a limited portion of it—contrary to their own office's directives—only to go right back to arguing the full extent of its broader version post-plea, then that strategic approach deserves no small measure of scrutiny.

Mr. Lira was offered a plea agreement that he accepted on its face, that was negotiated in good faith, and that he believed fairly recognized his conduct. Now that he is making arguments consistent with that plea agreement, there are suggestions he is not accepting the full weight of his actions.

The guidelines themselves place a firm, relevant limit on the use of relevant conduct in cases of jointly undertaken criminal activity: "Acts of others that were not within the scope of the defendant's agreement, even if those acts were known or reasonably foreseeable to the defendant, are not relevant conduct under subsection (a)(1)(B)." U.S.S.G. § 1B1.3 cmt. n. 3(B).

Regardless, this Court should focus on the plea agreement and the offense of conviction. While there is no doubt that the contempt charge had connections to the Lion Air clients, and that we are not asking this Court to look at Mr. Lira's conduct in a vacuum, these disputes about the "broader conduct" could have been settled at trial. But those charges are being dismissed and this will be a sentencing hearing for Mr. Lira's contempt conviction.

3

Finally, one other line stood out from the government's brief as requiring immediate comment—that Mr. Lira's prior submissions amount to a "cop out" and that he is shifting the entirety of the blame on Tom Girardi. To the extent the Court has any such concerns, the following may be said. David Lira understands what he did and what he failed to do. Not a day has gone by where he does not replay these events in his mind's eye, in particular, how he handled the situation and the ways in which he failed to act. It haunts him. And because of that, he pled guilty to a federal felony, which, while seemingly not enough for the government, is a significant acceptance responsibility and a dire penalty for an attorney.

The undeniable truth, however, and one the government would have a difficult time arguing against, is that David Lira was not the "but-for" cause of any of this. David Lira did not start this mess. He did not want this, he did not approve of it, and he was not comfortable with it. It is also true that he should have done more to stop it. And while the government portrays this as a shirking of responsibility, that is not the case. What more would they ask of him? How many more stones need to be placed on his chest? In this case there are three defendants. Two of them were thieves who did not care a lick for anyone but themselves, who lined their pockets on the literal suffering of clients. The third one did not. If there is a question as to why Mr. Lira lays fault on Tom Girardi and Chris Kamon, it is because the fault does not lay in the stars. That is not tantamount to denying Mr. Lira's own culpability, and to the extent the government believes that—having never spoken to the man or seen the impact of these self-inflicted wounds—it is mistaken.

The sampling that follows is from the letters submitted by those who do know Mr. Lira, and how he views his relationship with his clients:

**From a Former Paralegal:**

He often represented clients who wouldn't have had any help if he hadn't stepped in... David was always so gentle with them, helped them understand what was going on and always took their calls. David made sure they were looked after and taken care of. The girls always told us how much they appreciated Mr. Lira and what he was doing for their family.

Never once did David ask for settlement funds to be held on to or delayed for any reason. He knew more than anyone that his clients needed that money because he'd built relationships with them and truly knew their stories.

**From a Colleague Attorney:**

David approaches this profession with sincerity, compassion, and relentless dedication. He is the kind of lawyer who sees his clients as people first—and whose guiding principle is that justice must be pursued with integrity.

His commitment to justice in that matter went beyond any courtroom victory—it was about holding institutions accountable and doing right by the client and the broader community.

Among the positive characteristics I see in David is his honesty and integrity – in all matters... He was always honest with clients and made it clear he expected the same in return. He was patient explaining the legalities and intricacies of a case, helping his clients manage expectations and understand the process. If it made sense to reduce the legal fees so the client received more, he did.

**From a Former AUSA and Colleague:**

David is gutted by the fact that he didn't do enough to help his clients by following through with the Court's order... He has worked his entire professional life on behalf of clients, and he knows he let them down here. Regardless of his relationship with the firm's owner, his clients should have come first, as they did throughout his career. His choices haunt him... because he harmed his clients.

David Lira would never go out of his way to cheat a client, just the opposite. Hundreds of such letters have been submitted by people who know David Lira, and despite also understanding and appreciating the severity of the conduct, they all still stand in his corner.

## II.     Factual Disputes and Clarifications

 In its sentencing memorandum, the government advanced factual claims cast in the harshest possible light, which require further comment. These include the following:

### A.  David "Fled the Firm"

The government contends that Mr. Lira's resignation from Girardi Keese amounted to "fleeing the firm . . . in an effort to protect his own career." That is a mischaracterization and oversimplification of what happened. Well before the Lion Air settlements were funded, Mr. Lira had made arrangements to depart and had accepted a position with another firm. He nonetheless stayed on to try a complex toxic tort case that had been pending for decades, knowing there was little personal benefit to him but that the clients deserved continuity of counsel. His departure in June 2020 was the culmination of those plans, coupled with frustration with Tom, not a panicked effort to avoid responsibility. To recast his resignation as "fleeing" ignores both the documented timeline and the professional obligations that guided his decision. While Lion Air certainly played a role in his departure, his plans to leave were already well in motion prior thereto.

Specifically, his plans to leave were well in the works prior to the Lion Air cases even reaching a settlement, let alone GK receiving those funds, let alone Tom failing to pay the clients and eventually misappropriating them. David already had plans to join Johnston Hutchinson as of December 2019. As the government also knows full well, David had a trial in New Mexico in the Spring of 2020, *Concepcion v. Shell Western*, and he stayed through to see it to fruition. This was an extremely complicated toxic tort matter that had been pending since 1999. The case was initially lost at trial and lingered in the appellate court on key evidentiary issues culminating in a New Mexico Supreme Court decision rejecting the application of *Daubert* and its progeny to New Mexico state

6

court action. This was a major victory for the plaintiffs' bar in New Mexico. David was the main trial lawyer and knew the case better than anyone. He was not going to leave the clients in the lurch, even though the odds of winning were stacked against him and even if he did win, he sought to gain not one penny as it was a GK firm case. David nonetheless tried the case over four weeks in February 2020 (when much of the Lion Air events unfolded). Had he wished to "flee" in his own self-interest, he would have high-tailed it out of Girardi Keese at the turn of the calendar year and left the other decent attorneys who still remained scrambling to try the case. If he had indeed fled, he never would have met the undersigned, Mr. Hasten, or your honor.

And, no, David did not quietly slip into the night when things became rocky. Instead, compare the government's claim that Lira "fled the firm" to the binding admission it made in the plea agreement[1]:

> settlement funds in contravention of Judge Durkin's orders. During the period when GIRARDI failed to distribute the funds, defendant told GIRARDI that GIRARDI needed to pay the Lion Air Victims their full settlements, and also forwarded numerous emails to GIRARDI and the GK accounting department asking that the clients be paid, however, defendant knew that GIRARDI was not doing so. Defendant resigned from GK on or around June 13, 2020, after confronting Girardi at the GK office and demanding that GIRARDI pay the Lion Air Victims. Defendant further

As noted in Mr. Lira's opening brief, and corroborated by other GK employees, his arguments with Tom Girardi over paying the clients were at times quite heated. Ultimately, Mr. Lira chose to resign, walked away from what some might have viewed as a secure position at his father-in-law's firm, refused to participate in Girardi's misconduct, and confronted him directly on his way

---

[1] The government's memo questions Lira's narrative on this point ("if Lira's version is to be credited..."). Of course, as just noted, the government itself agreed to this language, which would certainly be unusual for it to do so if it in fact had any such doubts.

out. These actions are mitigating and the government's characterizations to the contrary are unreasonable. At the same time, this does not absolve him of his conduct, but it puts it in proper perspective.

David also knew and anticipated how nasty the response would be from Tom, his "father-in-law," upon delivering the news of his resignation. Tom indeed showed his colors, and the best evidence comes from Tom's own mouth:



June 17, 2020

Robert Finn, Esq.
5199 E. Pacific Coast Hwy., #402
Long Beach, CA 90804
(562) 901-3388

Re:    The case you Referred to GK – Hugo Torres v. De La Torre

Dear Robert:

As you may have heard, David Lira decided to go on to a greener pasture.

I want you to know that I will have full responsibility in handling all important matters on the case you referred. I will be in charge of any settlement conference, any motion for summary judgment, and the trial itself.

We are still getting a lot of recognition and accolades for our work. I was named the "Toxic Tort Attorney of the Year." In December 2019, I was named the "Top National Trial Lawyer of the Year." In June of 2020, I was named the "Top Legal Expert of the Year". I made a cover of a legal magazine describing me as a "Legal Legend." Perhaps the nicest award I received was on June 3rd of this year, being recognized in The Wall Street Journal.

I don't mean to brag but it is important that you know that we can still do a good job for your client. Speaking of that, we want you to know that, on every case you refer to me, to Girardi | Keese, we will pay a 50% associate counsel fee, even if the case goes to trial.

There is only one requirement that has to be met. As soon as the social distancing ban is lifted, we have to meet for a glass of Pinot Noir.

Your pal,

TOM
\kc
Enclosures
2019177

Via E-Mail: Michael.DeMarco@klgates.com

June 17, 2020


Michael DeMarco
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, MA 02111
(617) 951-9111

**Re:   *Girardi & Keese***

Dear Michael:

Jake has a serious vertigo problem, and the doctors told him he had to leave.  David Lira
had a vertigo problem on being nice.

With kind regards,


THOMAS V. GIRARDI
TVG:kc

Relatedly, in its § 3553(a) discussion, the government stated that Mr. Lira "left GK the following month, calling Girardi a 'thief' on the way out, but doing nothing else—except running to another firm where he could make a fresh start." Dkt. # 173 p. 38. While David absolutely should have done more, again, it is inappropriate and ultimately, unfair for the government to be so cavalier with its characterizations. The fact that David engaged in heated confrontations with Tom on numerous occasions before leaving cannot fairly be characterized as "running" or "fleeing." And in any event, it knows full well David spent many months planning his next professional move in order to make it as smooth as possible for GK, his clients, and yes, himself and his family. As an aside, but perhaps worthwhile thought experiment, consider what the government's arguments would be if David had not resigned, had not confronted Girardi, had not informed the Edelson firm of the funds being received, and remained at Girardi Keese until the bitter end.

### B. Koushan Wires

The government began its memo with a "Background" section that included the following

statement:

> Defendant had other settlements routed outside of GK shortly before he left the firm
> because he knew Girardi would steal that money too. Dkt. # 173 p. 5.

Insofar as this assertion relates to stealing funds specifically due and owing to clients, this

claim is untrue and based upon unsupportable speculation and conjecture. The government initially

"pitched" the probation officer on the argument that Mr. Lira admitted in his plea agreement to

specific knowledge that Girardi had in fact stolen client funds before formally backing off. Here is

how the PSR recounted the back-and-forth:

> Between March 4 and March 30, 2020, Boeing transferred the settlement funds for
> certain victims into GK's Client Trust Account. GK was required to distribute the
> aforesaid $7.5 million to said victims and their family members as soon as practicable.
> A fifth Lion Air victim [...] settled later, resulting in another $1 million being funded
> to GK's interest on lawyer's trust account (IOLTA) in June 2020. One week later,
> the defendant left his employ with GK. Girardi, Lira, GK Lawyer A, and Christopher
> K. Kamon, GK's head of accounting and finance, knew that the funds had been
> wired into the Client Trust Account around the time of the transfer and that,
> according to court orders, the funds needed to be distributed promptly to the clients.
> Between April 20 and June 2020, the defendant knew that Girardi was not paying
> [Client Victims A-D] as required, despite said victims' inquiries and demands. The
> defendant reportedly demanded that Girardi pay said victims, but he knew that
> Girardi had misappropriated the money. (It should be noted here that the defense
> version, discussed below, objected to the government's version's allegation that the
> defendant knew that Girardi had misappropriated the money, and, in a July 10, 2025
> email, [the] Assistant United States Attorney [. . .] agreed that the plea agreement
> does not state that the defendant knew that Thomas Girardi was stealing or
> misappropriating client money before or when the defendant left the firm in June
> 2020). Some of the funds had been used to pay clients in other cases, and the
> defendant signed some of the checks disbursed to the other clients, those who were
> not associated with the Lion Air lawsuits. Some funds were also used to pay for
> payroll and other GK expenses. The government's version alleges that in March
> 2020, the defendant signed a check for $500,000 from GK's client trust account to
> its operating account for fees associated with the Lion Air case, though the defendant
> knew that GK was not owed any fees on the Lion Air case, for the reasons noted

above. The government notes that that the defendant did not sign all the checks used to misappropriate Lion Air Victim settlement funds nor that he used the monies for himself. Rather, the government argues that the defendant "deliberately closed his eyes to the obvious: Girardi was stealing money from GK clients to fund the firm." PSR p. 7 ¶ 16.

In any event, and in marked contrast, the "other settlements" refer to the other set of Lion Air Plaintiffs who David was referred from another lawyer, Anthony Koushan, and who David achieved a tremendous outcome for—they received great settlements and received all monies they were owed promptly. Mr. Koushan told the government as much: "Lira also told Koushan that he wanted to send the settlement money for their Lion Air clients to Koushan's trust account as opposed to the Girardi Keese trust account in order to ensure that Koushan was paid his referral fee and to keep Koushan's referral money safe."

David directed the wires to run through his referring attorney's trust account *not* because he was concerned Girardi would attempt to steal the client funds; rather, he had a concern Girardi would attempt to cheat the referral source out of the referral fee. That is unscrupulous behavior, but it regrettably happens with some regularity within the legal profession, and there was a heightened risk of that happening here, given the possibility of this case settling after David's departure from GK. That is why David agreed to route the settlement proceeds directly to Mr. Koushan's trust account. Again, had he not done so, regardless of the reason, the government would be arguing this point in aggravation, and there may have been additional clients who did not receive prompt compensation.

11

### C. Notification to "Local Counsel"

The government asserted that Mr. Lira "never notified Judge Durkin, his clients, his local counsel, or anyone else that Girardi was a thief," yet that statement disregards the actions taken by Mr. Lira.

First, he absolutely did notify local counsel, if not that Tom was a thief, that the money was in the accounts. Perhaps David should have done that sooner than he did, but David did so first on June 16, 2020, three days after his resignation from G&K and approximately one-month after David learned that Girardi had only wired half of the settlement proceeds due to the clients. At least one Edelson attorney confirmed this fact for the government as reflected in FD-302 reports.

David also sent the following letter directly to Edelson attorneys on July 6, 2020:



Second, Edelson was not merely local counsel. Edelson negotiated for themselves a 50% fee split with Girardi Keese. When lead attorneys bring on "local counsel" for the limited purpose of

navigating local practices and customs, handling filings, and covering ministerial court hearings, they do not agree to a 50/50 fee split. The fact is Edelson shared equally in the primary litigation responsibilities. They boasted about the amount of work they did on the case, and even up continuing into the present, they are still demanding their full fees and aggressively seeking them in litigation. Describing them merely as local counsel tends to minimize their culpability, and in contrast, improperly elevate David's. Moreover, the Edelson firm was aware of the court order for at least five, if not eight, months, before notifying the court. All the while they employed a similar strategy as David Lira—to push Tom to do what he should have done in the first instance, although they were significantly concerned with both the clients receiving their settlement funds and their own firm receiving its significant attorney's fees.

### D. The Successor Agreement & the "Son-in-Law"

The government began its brief by stating, as if it were a fact in aggravation, that David is Girardi's "son-in-law," and went on to discuss the July 25, 2017 successor agreement, in which David agreed to assume Tom's responsibilities as the head of GK if Girardi became physically or mentally unable to do so. Dkt. # 173 pp. 5-6. The successor agreement was for the benefit of the firm lenders who had a secured interest in the firm cases and therefore demanded a "successor" to contact in the event of Girardi's death or incapacitation. In other words, the lenders would contact David for servicing of the outstanding loans.

Counsel suspects the reason the government is featuring these facts, and relying upon them so prominently, is because it wants to elevate Mr. Lira's status and position within the firm relative to others. We saw this early on in the case with the government's attempts to paint him as Tom's "partner." In reality, Tom did not have any partners. Even the Keese in Girardi Keese was not a

13

partner. Jack Girardi, Tom's youngest brother who started clerking at GK in 1972, was not only *not* a partner, he was paid as a 1099. And David Lira, despite being the "son-in-law," was not a partner either. David worked at GK for over 20 years, but he was not a signatory on the Torrey Pines account until after the passing of senior lawyer Jim O'Callahan. Mr. Lira took on his role of signatory because he was also a senior lawyer and was told that there needed to be two signatures on every check. This, coupled with the fact that the firm signed thousands of checks due to their toxic tort practice- was his reason for being added. David had been the sole signatory on the firms San Bernadino office account which has had no complaints regarding accounting.

Tom exclusively held 100% of the equity in the firm. GK did not issue units or shares to any of its attorneys. No other attorney ever received a K-1, a partner's draw, or anywhere near the money he or she brought into the firm. No one else had any sort of voting rights. No one else was required to make a capital contribution in lean times. The same is true with respect to an equity agreement. Or any other partnership agreement. None exist because David was not a partner and did not enjoy a special status with Tom because of the family connection. Thus, instead, the government makes surface-level references to David's status as the "son-in-law" and the fact that he would have to assume responsibility for the firm if something happened to Tom.

Upon moving past the label and considering the actual circumstances of their relationship, it becomes abundantly clear that the two were not close. David was not part of Tom's "lunch crew," though many others were. In fact, David despised it, and the exuberance and lack of humility it engendered. Tom would see David's children (his grandchildren) roughly once a year. Tom would not spend holidays at David and Jacqueline's house, or vice versa. It does not matter how many times or how prominently the government references the fact that David was his "son-in-law." David

and Tom were estranged well before David's resignation from GK, and he has not spoken to him since that day.

### E. David's Personal Finances Circa 2020

Right before turning to a section titled "GK's Financial Issues," the government referenced David's personal finances, stating the following:

> For his work, defendant was paid considerably: he made more than $4.3 million between 2015 and 2020 and was the highest paid employee at GK during that time period. Still, by early 2020 defendant was borrowing against his own retirement savings account. Dkt. # 173 p. 6.

Starting with the retirement borrowing, at no point does the government state the significance or relevance of this fact—it simply threw it out there for the Court to make of it what it will. Counsel suspects the purpose, especially given than the government's memo immediately turns to "GK's Financial Issues," is to invite the Court to infer that Mr. Lira's conduct was more willful and mal-intentioned in the sense that he was willing to "look the other way" for personal gain; that he was acting in the interest of self-preservation; and that he was greedy.

Retreating from speculation, and to a fact the government cannot square with its desired view of the case, "by early 2020" David was already planning his next professional chapter. David had agreed to join Johnston Hutchinson in December 2019. That meant in the near future, he would have to live without a salary or draw until he brought in a settlement. And then the pandemic happened, which, it turns out, presented a significant financial challenge for just about everyone, plaintiff's lawyers primarily working on contingency providing no exception. That is why David drew on his retirement account. It has nothing to do with whatever negative inference the government wishes the Court to draw, and it was inappropriate for it to simply throw that bare fact out there.

Finally, $4.3 million over a five-year period is certainly a great deal of money.[2] It does not go as far in Southern California for a family of six as the government seems to think. David and Jacqueline sacrificed to put their children in private schools and college, prolonging any retirement to do so. Finally, borrowing against his retirement, as opposed to raiding a clients trust account or setting up a phony invoice scheme, shows that David did things the right way.

The fact is that David could have made *millions* more by hanging his own shingle had he done so much sooner. He brought in hundreds of millions of dollars into the firm over the years, and he was in his 60's at this point. David did not hang his own shingle sooner because, yes, like everyone, he wants to make a good living, but that is far from all that is important to him, or even *primarily* what is important to David. Counsel raises this point only to demonstrate that David's work is not just about the money to him. He cared deeply about it. He loves the professionalism and collegiality of the bar. He has lived and furthered those values throughout his career, and the attempt to paint a picture of an individual motivated by greed based upon his income is an unfair one.

### F. Lira Signing Trust Checks

The government stated that the Lion Air settlement proceeds did not go to the clients "as soon as practicable" because, "[i]nstead . . . it went to pay the clients who had been complaining to defendant and Girardi for months, in addition to other GK clients. Defendant signed the checks for two of those clients on March 11, 2020—the day that the first of the Victim Clients' settlements came into GK's client trust account." Dkt. # 173 p. 9.

---

[2] Five years is an odd sample size. The purpose in any event seems to be at least in part to elevate David's relative importance within GK based upon his compensation as the government lacks other evidence to establish as much. As noted in what the government anticipated would become GE 126 at Mr. Lira's trial, Tom wrote Kamon a memo on March 6, 2014 listing updated base salaries, which had David at $600,000, same as Attorney J.O., and in line with other senior GK attorneys. Attorney J.G. likewise informed the FBI his base salary (presumably near the end) was $550,000.

To the extent the government's narrative suggests Mr. Lira was "in on" Girardi's fraud scheme, again, it is incorrect. David was a "second signatory" on one trust account for the firm and he became so only after the prior second signatory, another attorney at the firm (and not even Girardi's son-in-law), passed away. He performed this ministerial task without insight into the trust account, operating accounts, or other relevant knowledge and context. Tellingly, it was only Girardi and Kamon who had actual access to the actual account statements.

Regarding the specific claim of the approximate $500,000 check, this was in no way intended to deprive the Lion Air clients of their money, and the remaining funds that were in the account, (save the $500,000.00) was more than enough to fully pay the settlement funds to Lion Air clients. As to the rest of the checks purportedly signed by David Lira, they were forged. And while the government contends that Lira "allowed" others to sign his name to checks at times, they have no evidence he did so as it related to Lion Air and he had no visibility into the fact that his name was being signed to these other checks. Indeed, his signature continued to be forged after his resignation and departure from GK, a fact Judge Durkin noted as well.

### G. "Lies" to Victim Clients

While it is difficult to avoid repetition, it is correct that in April 2020, Victim B reached out for a loan. At this time, the settlement funds belonged to Victim B, and Girardi was effectively loaning Victim B her own money.

Relatedly, there was a string of emails that David did was copied on but did not respond to. The fact is that George Hatcher and Keith Griffin were both specifically pushing Tom to remit payment at this time. Tom is the one who unilaterally decided to and in fact sent her $40,000. The

following day, Keith Griffin sent a text message to the clients that all the money was in the trust account.

When David did eventually respond to the emails, it is true he mentioned covid. But he did not claim the firm was *not* in possession of the money. David told them Tom controlled the wires and certainly hoped they would press Tom to do right and do it quickly. It was not the best choice there is no dispute; but it is an example of David at worst trying to buy Girardi time to come to his senses, not "lying" to clients because he wanted Girardi's fraud to succeed. That is a distinction with a difference.

The claim that Lira's memos and emails to Tom were exclusively "CYA" communications is flatly wrong. The government took a singular statement out of context. David of course wanted to memorialize his conduct so there was a clear record of it, and others obligations and responsibilities. Lawyers reflexively do this—just review one of the government's stock Rule 16.1 letters, or think of how many times an Assistant United States Attorney claims to be acting in an "abundance of caution." Lawyers do this in a variety of ways almost daily. While one may refer to the CYA rationale in conversation with George Hatcher, again, instead of drawing the worst of inferences from this one comment to infer David's state of mind, look to the obvious evidence: David did not have heated screaming matches with Tom in the privacy of GK's inner sanctum in the hopes that a fellow employee would one day report it to the FBI and he in turn would later be able to reference the 302. And the reason is he was not exclusively out to protect himself; again, he desperately wanted Tom to pay the clients, as nearly everyone did.

Finally, the false letters were never "ok'd" by David Lira. Sometimes people say "ok" to acknowledge receipt or demonstrate understanding. And in other times they say "ok" to suggest

acceptance or approval. The government wants the Court to infer the latter. We know he meant "ok" in the sense of the former because when he did actually read the emails and see their contents, he told Kim Cory not to send them.

## H. Dismissed Perjury Allegations

In response, based upon the government's memorandum, it seems necessary to note that even seasoned federal agents can and do give testimony inconsistent with prior statements, and those inconsistencies are treated as impeachment, not perjury. For example, in *United States v. Cotton*, 823 F.3d 430, 439 (8th Cir. 2016), an agent was impeached at trial with conflicting testimony about when photos were taken. Similarly, in *United States v. Alvear*, 2024 WL 940414, DEA agents were at times impeached on issues, including their recollections regarding the investigation and what sort of documents they obtained and/or reviewed. These cases underscore a simple reality: memory lapses, imprecise wording, or inconsistencies under oath occur, even with law enforcement professionals. They are not automatically treated as perjury, and it would be improper to hold Mr. Lira to a harsher standard than the government's own agents.

One can even find other examples within this case itself, and from the very same show cause hearing no less. As this Court is aware, the Edelson firm took the position in front of Judge Durkin that they were unaware that any of the Lion Air clients had been funded until June 16, 2020, when David Lira notified them. Up until that point, they have averred to lacking prior knowledge that Boeing wired the settlement funds to GK, and routinely blame David, Keith, and others for intentionally keeping them in the dark. Edelson Attorney Ari Scharg testified under oath before Judge Durkin on that point. When Judge Durkin asked him directly if he was aware that any of the

cases had been funded, he said, "Absolutely not." Below are excerpts of Scharg's testimony at the

Order to Show Cause hearing:

```
BY THE COURT:
Q.  Well, at any of these times, did you understand that there
had been funding for any of the clients?
A.  Absolutely not.
```

```
Q.  -- that would happen.  And you were aware of the
settlement agreement requiring Boeing to fund it within 30
days of the signing of that, correct, or signing of the -- all
court approvals, so that would -- this was February 21st.
Boeing would have had to have funded it by March 21st,
correct?
A.  According to the settlement agreement, yes.
```

```
Q.  And you were under the impression that Boeing hadn't
funded it --
A.  Yes.
Q.  -- when you're going back and forth with Mr. Griffin,
correct?
A.  Well, that's what he told me.
Q.  I understand.
A.  Yes.
Q.  And you certainly could have called Boeing, correct?
A.  I mean, I had their phone number.  I know the attorneys at
Boeing.  But at that point in time there was no reason for me
to call Boeing.  I didn't think that Boeing had sent the
money, and there was no reason to call to see if they had sent
the money.
```

BY MR. TIEVSKY:

Q. Are you aware of Mr. Lira leaving Girardi Keese?

A. Yes.

Q. Did you speak to him about these cases around that time?

A. Yes.

Q. That was around June 16th that you spoke to him?

A. Yes.

Q. Who was on the call?

A. It was myself, David Lira, and Rafey Balabanian.

Q. And what did he tell you?

A. He told us on the call that he was leaving Girardi Keese, seemed like an incredibly acrimonious split. It sounded like he was there for a long time and it was a messy split. I

**Scharg - Direct by Tievsky**

779

mean, at the end of the call, he said, "Oh, and by the way I think that the" -- "that the Boeing funds have come in. You should check with Keith."

...

---

Q. Why did you ask him that question?

A. Because we just learned for the first time from David Lira that he thought that the Boeing money came in.

...

Q. When is the first time you realized the money had been received by Girardi & Keese for the first four settlements?

A. I believe Rafey learned of that during a phone call with Keith Griffin on June 30th-ish.

Q. My question was is when did you learn?

A. Oh. Around that time.

Q. Please turn to Exhibit 311-17. There's a text message from you that says, "David Lira just brought me up to speed on his situation. Yikes. Anyway, he said those cases have been funded."

     Do you see that?

A. Yes.

---

What follows next is part of an email thread forwarded by Keith Griffin to Ari Scharg:

21



**From:** Ari Scharg <████████████>
**To:** Keith Griffin ████████████████
**Subject:** Re: Lion Air
**Date:** Mon, 23 Mar 2020 17:29:16 -0400

Need anything else from me on this?

Ari J. Scharg | Edelson PC
████████████████████
████████████
████████ (direct) | ████████ (firm) | ████████ (fax)
████████ ████████ ████

On Mar 18, 2020, at 12:56 PM, Keith Griffin <████████████> wrote:

Ari

Can you send me the Order with the Allocation (ie the sealed affidavit) that was submitted under seal for each of the four cases that have been approved?



-----Original Message-----
From: Ridlon, Daniel P. (SEA)
Sent: Wednesday, March 11, 2020 12:57 PM
To: 'Keith Griffin' <████████████>
Cc: Silvernale, Joe (SEA) <████████████>; Shultz, Mack H. (SEA) ████████████
Subject: RE: Lion Air

Keith,

The court approved the settlement of ████████████ last week. Today we wired the funds in accordance with the release. Please confirm you received them.



-----Original Message-----
From: Ridlon, Daniel P. (SEA)
Sent: Wednesday, March 04, 2020 12:17 PM
To: 'Keith Griffin' <████████████>
Cc: Silvernale, Joe (SEA) <████████████>; Shultz, Mack H. (SEA) <████████████>
Subject: RE: Lion Air

Keith,

Payment was made today for ████ Please confirm you received it.

In this thread, which covers March 2020, a Perkins Coie attorney advises Griffin that the first Lion Air client's settlement had been funded. Scharg received this email on March 23, 2020, prior to him learning from David Lira that the money was funded, and well prior to his under oath testimony before Judge Durkin. "Absolutely not" was his choice of words. In this email chain, he is notified unequivocally that at least one of the Lion Air clients were funded. Later, in 2021 and 2022, the government asked Scharg about this, and below are excerpts of his responses.

---

**March 23, 2020 E-mail from Ari Scharg to Keith Griffin Re: Lion Air, EPC000922**

   Regarding DANIEL RIDLON's e-mail on March 4, 2020 to GRIFFIN stating "Keith, Payment was made today for Sutanto. Please confirm you received it" and RIDLON's March 11, 2020 e-mail to GRIFFIN stating "Keith, The court approved the settlement of Muhammad Nasir Bin Huzaifah last week. Today we wired the funds in accordance with the release. Please confirm you received them", SCHARG did not see these e-mails at the time. SCHARG was added to the chain later in time, and he thought he just looked at the e-mail immediately below the e-mail that added him and figured the chain was about negotiations regarding specific language, and he did not read the full e-mail chain. If SCHARG had seen those RIDLON e-mails at the time, he would have forwarded them to people including his law partners at EDELSON PC. There may have been a lot going on at this point in time so SCHARG responded with an email asking "need anything else from me on this".

---

**March 23, 2020 E-mail from Ari Scharg to Keith Griffin Re: Lion Air**

   GRIFFIN forwarded this e-mail to SCHARG but there was no indication in the subject line that it was a forwarded e-mail, it only said "Re". SCHARG saw GRIFFIN's March 18, 2020 e-mail to him that said: "Ari Can you send me the Order with the Allocation (ie the sealed affidavit) that was submitted under seal for each of the four cases that have been approved" and did not scroll down into the e-mail chain any further. GRIFFIN and PERKINS COIE were exchanging e-mails about changing language in a stipulation for a client that had not been paid a settlement yet, and then GRIFFIN e-mailed SCHARG and asked him to send information for a client that had also not been paid. At the time of the e-mail, SCHARG felt there was no reason for him to scroll down through the whole e-mail chain which he was not a part of. However, in hindsight, SCHARG wished he had scrolled through the e-mail chain and saw DANIEL RIDLON's March 4, 2020 e-mail to GRIFFIN in which he wrote: "Payment was made today for Sutanto. Please confirm you received it."

---

Whether this constitutes perjury seems to vary depending on who is asked. Undersigned counsel would be willing to give him the benefit of the doubt, but the fact remains there is objective

evidence of Scharg learning these facts, being put on notice, and nonetheless he emphatically disavowed them under oath. Mr. Scharg, like Mr. Lira, most likely made a mistake. It is an especially troubling one given Edelson's defense to its conduct was so significantly rooted in claiming GK intentionally hid receipt of the funds from them, but still ultimately a mistake.

## III. Guidelines Calculation

### A. Clarification Regarding the Base Offense Level, PSR, p. 14 ¶ 41-42: U.S.S.G. § 2J1.2 was Correctly Identified as the Most Analogous Guideline.

In its memorandum, the government continued to press its argument that § 2B1.1 is the most analogous guidelines provision, notwithstanding its agreement to dismiss the fraud charges and admissions of David taking action to fight against it.

Requiring further comment is the fact that, as recently as April 29, 2024, the Seventh Circuit reaffirmed that the "majority of circuits that have decided this issue have also adopted [the elements based approach]," and went on to expressly hold that "[w]e now join those circuits in holding that courts should apply the elements-based approach to decide whether a guideline is sufficiently analogous to the defendant's crime of conviction." *United States v. Betts*, 99 F.4th 1048, 1057 (7th Cir. 2024). Furthermore, the Seventh Circuit stated that this approach is a "purely legal approach" that does not require consideration of the underlying facts, and thus, any determination on this issue is subject to *de novo* review. *Id.*

Despite this being binding precedent, the government turned to the Eighth Circuit, which argued in a 2003 opinion that "the elements of contempt of court are of little help in determining the most analogous guideline" because "misconduct constituting contempt of court varies

significantly" and is "highly context dependent." Dkt. # 173 pp. 25-26 (citing *United States v. Ferrara*, 334 F.3d 774, 777 (8th Cir. 2003)).

The government nonetheless argued its view of contested facts and inferences that maybe kind-of somewhat relate to Girardi's separate fraudulent conduct. For example:

> The contempt conviction is intertwined with the fact that the Victim Clients did not receive their full settlement. Girardi embezzled that money. But Girardi could not do it on his own.[3] Defendant helped perpetuate this fraud by lying to the Victim Clients and covering for Girardi. Defendant knew that Girardi was not paying clients and lying to them even before the Boeing settlements funded. Defendant also knew that the firm was having trouble paying bills and making payroll. Dkt. # 175 p. 19.

In any event, returning to Mr. Lira's offense of conviction, and the mandatory elements-based approach we are not in fact free to disregard, contempt of court as proscribed by 18 U.S.C. § 401(3) has three elements:

1. That the Court entered a reasonably specific order; and

2. That the defendant violated the order; and

3. The defendant's violation of the order was willful.

The superseding indictment itself alleged that defendants "did willfully and knowingly disobey and resist a lawful order of a Court of the United States, namely, the order . . . issued by . . the District Court Judge of the United States District Court for the Northern District of Illinois, by failing to distribute settlement funds to Victim A as required by that order."

Here, to be brief, David Lira did not steal money from his clients, nor did he profit from Tom Girardi and Chris Kamon's thefts. Rather, he pled guilty to contempt, because he was aware

---

[3] Perhaps not. But he did so without Lira for over six months of the 8-9 month period, and it certainly did not help Girardi with his fraudulent endeavors when Lira refused to continue at GK, confronted him, called him a thief, and notified local counsel that the funds had been received by GK.

and subject to Judge Durkin's order requiring Girardi Keese to distribute those funds as soon as practicable while the remaining charges are being voluntarily dismissed by the government. When that did not happen and he became aware it had not happened, despite making efforts to convince Girardi to pay the clients, he did not alert the court, the bar, or otherwise engage in extensive enough efforts to ensure compliance. This does not underplay the significance of his plea or the crime itself; but rather, it distinguishes it from knowing fraud.

Meanwhile, 18 U.S.C. § 401 confines contempt prosecutions thereunder to acts directed towards the judicial branch of government and its ordinary processes. As the Department of Justice's Justice Manual defines it, "Contempt of court is an act of disobedience or disrespect towards the judicial branch of the government, or an interference with its orderly process. It is an offense against a court of justice or a person to whom the judicial functions of the sovereignty have been delegated." Department of Justice, Justice Manual, JM 9-39.000, *available at* https://www.justice.gov/archives/jm/criminal-resource-manual-752-general-definition-contempt (last accessed September 24, 2025). The majority of federal cases are civil in nature and thus disputes about money. Notwithstanding that pecuniary nexus, the general rule is that § 2J1.2 will most often be the appropriate and most analogous guideline.

The government's additional factual arguments set forth in its memorandum do not alter this conclusion. First, those facts are not agreed, and constitute another example of the government stretching this case into something it is not in an effort to justify its sentencing positions. For example, it boldly claims "[t]he firm did not have the financial ability to pay the Victim Clients because Girardi embezzled the money." Dkt. # 173 p. 21. This claim—and this entire section of the government's brief—is immaterial and ultimately a distraction. But it is also not accurate. Girardi's

conduct was absolutely the primary cause of the firm's financial problems. But all along, over the preceding years, had the firm's head of accounting, Chris Kamon, not embezzled (at least) over $10 million, there would have been $10 million-plus to cover the shortfall of a few million. Again, while not the most important fact, it should not be misstated.[4]

As a final note regarding the government's case law citations, the government's citation and recitation of *Tankersley* on this issue and in its version of the offense is misleading. Here is what it argued this time:

> The Seventh Circuit in *Tankersley*, however, never addressed whether that was the correct guideline. Instead, it ultimately reversed holding that the obstruction enhancement in § 3C1.1 should not have been imposed, while affirming other parts of the sentence (i.e., the defendant was not entitled to acceptance of responsibility credit and the enhancement for substantial interference with the administration of justice was warranted). Given that this case did not include any discussion on whether § 2B1.1 applied, it did not decide the issue here. Dkt. # 173 p. 28.

The government continues to press this argument while simultaneously refusing to acknowledge the only reason the Seventh Circuit "never addressed whether that was the correct guideline" is because the government agreed in the district court it was the appropriate guideline. When the reason the Seventh Circuit "never addressed" § 2J1.2 is because the government agreed its application in the district court, that is an important fact that should not be omitted from any discussion of applicable precedent.

With respect to *United States v. Trudeau*, 812 F.3d 578 (7th Cir. 2016), the government cites a footnote stating "The Sentencing Commission instructs courts to use § 2B1.1, the guideline for

---

[4] The paragraph alleging the "common theme" running through defense submissions to the PSR is to shift blame on to Girardi, describing it as a "cop out," and multiple other unfair characterizations are baseless. It had no place in a discussion of the appropriate base offense level—especially given its speculative argument that Lira was so concerned with his own professional reputation (rather than stealing money) undermines its own argument in support of § 2B1.1. These points have been discussed extensively, and counsel reincorporates all previous arguments related thereto.

Basic Economic Offenses, to calculate a sentencing range for contempt arising out of a violation of a court order enjoining fraudulent conduct."[5] Dkt. # 173 p. 28. It stretched this into a claim that "the Seventh Circuit has not in detail addressed the use of § 2B1.1 in a criminal contempt case based on the circumstances here—where the contemptuous conduct is premised on failure to follow court orders as the result of theft."

Of course, those are not the relevant facts of this case. David's failure to comply with the order was not "the result of theft." David never personally stood in a position to transmit the funds. The government has argued the same when it was other defendant's matters. In any event, first, the Seventh Circuit has spoken definitely. Rather, and simply, "courts should apply the elements-based approach to decide whether a guideline is sufficiently analogous." *Betts, supra.*

For these reasons, and as argued more fully in Mr. Lira's Sentencing Memorandum, § 2J1.2 is the most sufficiently analogous guideline, and pursuant thereto, the base offense level is 14.

### B. Offense Level Computation, Victim Related Adjustment, PSR p. 15 ¶ 46: Clarification Regarding U.S.S.G. § 3A1.1(b)

The sum and substance of the government's argument on the vulnerable victim enhancement was as follows:

> The PSR concluded that this enhancement did not apply because "the victim of a contemptuous act or obstruction of justice is a societal interest and not a person." PSR ¶ 45. The government respectfully disagrees. The contempt conviction cannot be divorced from the fact that real victims were impacted by it. Defendant's crime here prevented the Victim Clients from being paid and allowed Girardi to steal their money. The count of conviction led to their harm. There is also nothing about a contempt conviction that precludes a victim enhancement, especially in a case like

---

[5] Here is the rest of Note 6 from *Trudeau*, which the government also omitted from its brief: "The main component of Trudeau's guidelines calculation was the combined $37.6 million lost by consumers who purchased *The Weight Loss Cure* book by calling the toll-free number publicized in the infomercials." Suffice to say, Kevin Trudeau does not exactly present a salient point of comparison to David Lira. *See, e.g.,* CNN, Television pitchman Kevin Trudeau is Headed to Prison, March 18, 2014, *available at* https://www.cnn.com/2014/03/17/justice/illinois-pitch-man (last accessed September 24, 2025).

this where the contemptuous conduct impacted actual victims and exacerbated their harm. This enhancement applies, and should apply even if the Court applies the obstruction guideline to determine the base offense level. Dkt. # 173 p. 32

First, the government's argument is unmoored from Seventh Circuit precedent. The claim that the "contempt conviction cannot be divorced from the fact that real victims were impacted by it" stands on the authority of its say-so alone. The Guidelines, by contrast, expressly state that the term "victim" is limited to the "offense of conviction." U.S.S.G. § 3A1.1(b) cmt. n. 2. It initially cited additional authority in its version—all of which were cases including wire fraud convictions. *See* GVO pp. 41-42 (citing *United States v. Rumsavich*, 313 F.3d 407, 413 (7th Cir. 2002) (investment fraud scheme targeting elderly investors who "had a lower than average ability to protect themselves" warranted enhancement); *United States v. Johns*, 686 F.3d 438, 460 (7th Cir. 2012) (financial desperation can make a victim vulnerable for purposes of this enhancement); *United States v. Parolin*, 239 F.3d 922, 926-27 (7th Cir. 2001). It cited no authority on this point in its Sentencing Memorandum.

Second, most court cases involve disputes over money. It follows that contemptuous conduct generally involves individuals engaging in improper, illegal, or other forms of obstructive conduct in order to gain an advantage in litigation, and ultimately, obtain money or property. It thus more often than not risks harm to real people. That is not a reason to disregard or otherwise ignore binding authority in furtherance of one party's preferred resolution of this issue.

Third, to reiterate, the government's arguments would be convincing as applied to Tom Girardi. David Lira, meanwhile, did not steal a single dollar from his clients. He did not cheat them out of money. Rather, he was aware and subject to Judge Durkin's order requiring Girardi Keese to distribute those funds as soon as practicable. When that did not happen and he became aware it

29

had not happened, despite making efforts to convince Girardi to pay the clients, he did not alert the court, the bar, or otherwise engage in extensive enough efforts to ensure compliance. There was no gain to Mr. Lira. He had his own set of clients who got paid properly. Mr. Lira certainly did not devise or participate in any scheme. On the contrary, after three months of the settlement funds having been received but not distributed, David left Girardi Keese. He confronted Girardi, as he did on other occasions, and urged him to pay the clients.

Undersigned counsel is aware of and agrees with this Court's reaction to Mr. Kamon's objection to this enhancement. None of this means the Lion Air clients were not affected, but the government's arguments are better suited for its § 3553(a) discussion.

In sum, and to reiterate, contempt at its core involves interference or disruption with the authority and work of the court. Said conduct can vary widely, and in this instance, the subject of the at-issue order was the distribution of settlement proceeds. But David did not intend to steal or cheat anyone else out of money. Had the government wished to continue to prosecute its claims that Lira was a participant in Girardi's fraud scheme(s) it should not have struck the agreement it did. There is no "victim" to his offense of conviction *within the meaning of this guideline* and thus no basis to apply § 3B1.1(a).

### C. Offense Level Computation, Victim Related Adjustment, PSR p. 15 ¶ 47: Clarification Regarding U.S.S.G. § 3B1.3

In calculating the total offense level, the Probation Office correctly rejected the government's argument that § 3B1.3 applies. In its Sentencing Memorandum, the government continued to overlook the main point: that the defendant had to *use* the special skill to significantly facilitate the commission and concealment of the offense. The background commentary further clarifies "[t]his adjustment applies to persons who abuse their positions of trust or their special skills to facilitate

30

significantly the commission or concealment of a crime." Recall again that David Lira resigned from his position of trust at Girardi Keese. He confronted Girardi and insulted him by calling him a thief in the hopes it would shame him and he would transmit the funds. Four days later, on June 16, 2020, he told the attorneys of record and co-counsel to Girardi Keese that the funds had been received, which, again in his capacity as a lawyer, he confirmed for them formally in a July 6, 2020 letter. The PSR correctly declined to apply this enhancement, and the Court should as well.

## IV.     18 U.S.C. § 3553(a)(6)

In discussing 18 U.S.C. § 3553(a)(6) in its Sentencing Memorandum, the government referenced Mr. Kamon's sentence and stated the following:

> This Court sentenced Kamon to 65 months' imprisonment in connection with his wire fraud guilty plea in the present case. The government has taken these sentences into consideration, and juxtaposed with defendant's conduct here, believes that a meaningful custodial term is warranted, and that the length of that prison term should be 36 months. Dkt. # 173 pp. 43-44.

The defense agrees that Mr. Kamon presents an important point of comparison here and with respect to this factor; however, the government failed to discuss or recognize critically important facts from his sentence. He received a sentence of 65 months' imprisonment that was imposed *concurrent to his already existing 121-month sentence.* Here is the government stating its concurrent sentencing request:

| 11 | The government stands by a recommendation of a |
|----|------------------------------------------------|
| 12 | guidelines sentence here within the new guidelines range |
| 13 | calculated by your Honor.  And the government's still going to |
| 14 | ask for a top-end sentence, and that's 71 months' imprisonment. |
| 15 | The government is agreeing to recommend that that run |
| 16 | concurrent to the 121 months that Mr. Kamon is already serving |
| 17 | as a result of his California conviction. |

And here is the government arguing that the separate conduct for which Mr. Kamon received 121 months' incarceration was wholly separate and apart from his instant offense:

```
                                                                      65

 1           MR. HASTEN:  Your Honor, there are -- it's a different

 2    offense.  There are different victims that were involved in

 3    this case.  It's a different settlement.  It's a different

 4    case, the underlying case.
```

Of course, he was not only sentenced for that separate offense with different victims, a different settlement, and a different case. He also had his $10 million-plus embezzlement side fraud, and even here, he did not plead merely to contempt, but was also charged and convicted as part of the Lion Air fraud scheme.

Christopher Kamon thus effectively got *no time in custody* for defrauding the Lion Air client victims. Why the government would agree to concurrent time for separate offenses—especially in light of the presumption that terms of imprisonment imposed at different times for different offenses are to be served consecutively—is not a question that has to be answered. *Cf.* 18 U.S.C. 6 3584(a) ("Multiple terms of imprisonment imposed at different times run consecutively unless the court orders that the terms are to run concurrently"). But the practical effect of this significant break for a repeat fraudster cannot be ignored. Any day in custody David received would thus be a day more than Christopher Kamon.

## V.     Conclusion

The government and the defense stand worlds apart on the operative facts of this case. That disagreement is evident on nearly every page of the government's submission. Each side is entitled to its opinion. But this is not the time to relitigate issues that have already been resolved or to try a case to a jury that was never empaneled. The government itself elected to dismiss certain charges, yet now seeks to revive those same allegations as if the case were still being tried before a jury. Sentencing is not about re-trying dismissed counts or stretching disputed inferences into proven factual conclusions; it is about addressing the actual conduct and individual before the Court and imposing a fair and proportionate sentence in light of that record and the applicable § 3553(a) factors.

Based on the foregoing, and for all of the reasons submitted, the just and appropriate sentence in this matter is therefore a non-custodial sentence.

Respectfully submitted,

/s/ Damon M. Cheronis
**Damon M. Cheronis**

/s/Ryan J. Levitt
**Ryan J. Levitt**

Attorneys for David Lira

Damon M. Cheronis
**Cheronis & Parente LLC**
140 S. Dearborn St. Ste. 404
Chicago, IL 60606
312.663.4644
damon@cheronislaw.com

Ryan J. Levitt
**Benesch, Friedlander, Coplan, & Aronoff LLP**
71 South Wacker Drive, Suite 1600
Chicago, IL 60606
312.212.4943
rlevitt@beneschlaw.com